LOFTUS & EISENBERG, LTD.
ALEXANDER N. LOFTUS, ESQ.
(*to be admitted pro hac vice*)
ROSS M. GOOD, ESQ.
(*to be admitted pro hac vice*)
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T:  (312) 772-5396
alex@loftusandeisenberg.com
ross@loftusandeisenberg.com

ARON LAW FIRM
WILLIAM ARON, ESQ. (#234408)
15 W Carrillo St, Suite 217
Santa Barbara, CA 93101
T: (805) 618-1768
bill@aronlawfirm.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT—NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, , <br><br> Plaintiffs, <br><br> v. <br><br> SPIEGEL ACCOUNTANCY CORP., JEFFREY SPIEGEL, RYAN SPIEGEL, and SAC ADVISORY GROUP, LLC <br><br> Defendants. | Case No.: 23-CV- <br><br> **COMPLAINT FOR:** <br> 1. **Accounting Malpractice** <br> 2. **Violation of § 12(a)(2) of the Securities Act of 1933** <br> 3. **Violation of § 15 of the Securities Act of 1933** <br> 4. **Declaratory Judgment under § 29(b) Of The Act For Violation Of § 15(a) and 17 CFR § 239.500** <br> 5. **Violation of California Corporations Code § 25501.5** <br> 6. **Violation of California Corporations Code § 25401** <br> 7. **Violation of California Corporations Code § 25403** <br> 8. **Violation of California's Unfair Competition Law, Cal. Bus. & Prof Cod § 17200** <br> 9. **Negligent Misrepresentation** <br><br> **DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, by and through their undersigned attorneys, complains against Defendants, Spiegel Accountancy Corp, SAC Advisory Group, LLC, Jeffery Spiegel, and Ryan Spiegel, as follows:

## I.      INTRODUCTION

1.      SAC Advisory Group ("SAC") served as the de facto placement agent or broker for a Los Angeles Ponzi Schemer, Zachary Horwitz ("Horwitz") and his 1inMM Capital, LLC ("1inMM") venture. SAC's managers were Jeffrey Spiegel ("Jeff"), Ryan Spiegel ("Ryan")(collectively "The Spiegels"). The five Plaintiffs collectively invested over $17,000,000 in SAC based on The Spiegels' representations.

2.      Horwitz's scheme was absurd, and it wouldn't have been funded but for sophisticated placement agents such as Defendants parroting his lies, cloaking the scheme in their own credibility as financial professionals, and selling the offering to their closest friends.

3.      The manner Horwitz allegedly generated revenue for itself included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, Horwitz would retain rights to the same content for an additional period of years, thereby enabling Horwitz to continue licensing the content to other parties for Horwitz's sole financial benefit.

4.      Any of these supposed revenue streams could have been confirmed by reputable third parties directly but never were.



5.      In reality, Horwitz had no relationship with either HBO or Netflix and never licensed any movie rights to either company.

6.      Defendants acted as brokers for investment in 1inMM and owed well defined duties in that role they assumed to do some investigation into the investment before offering it. Instead, Defendants operated in willful ignorance and never sought any third party confirmation of Horwitz's stories nor registered as brokers.

7.      Defendants, as de facto brokers, and were the gatekeepers of any information from Horwitz.

8.      Had any of the Defendants called HBO or Netflix, obtained 1inMM bank records, or ordered an audit, as required by controlling regulations, before recommending this investment all of this would have been prevented and Plaintiff would not have even been presented with this "opportunity".

9.      On or about September 1, 2021, Horwitz pled guilty to running a Ponzi scheme with money raised by Defendants. In his guilty plea, Horwitz admitted that the Ponzi scheme ran from March 2014 until April 2021.

## II.      PARTIES

10.      Plaintiff, ELLUSIONIST CASH BALANCE PLAN AND TRUST, is a Trust whose Trustee is a citizen of California and domiciled in California.

11.      Plaintiff, UYEN HUHYN, is an individual and a citizen of California and domiciled in California.

12.      Plaintiff, SOUTHWEST INVESTMENTS FUNDS, LLC, is a Nevada limited liability company whose only member is a citizen of California and domiciled in California.

13.      Plaintiff, AVR GROUP, LLC, is a Nevada limited liability company whose only member is a citizen of California and domiciled in California.

---

Accounting Malpractice and Federal Securities Complaint



14.     Plaintiff, TRIDENT ASSET MANAGEMENT, INC., is a California Corporation with its principal place of business in California.

15.     Plaintiff, PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, is an Arizona limited liability company whose only member is a citizen of California and domiciled in California.

16.     Defendant, JEFFREY SPEIGEL, is an individual and citizen of California and domiciled in California.

17.     Defendant, RYAN SPEIGEL, is an individual and citizen of California and domiciled in California.

18.     Defendant, SAC ADVISORY GROUP, LLC, is a California limited liability company whose primary place of business is 2300 Contra Costa Blvd, Suite 425, Pleasant Hill, California.

19.     Defendant, SPIEGEL ACCOUNTANCY CORP., is a California Corporation whose primary place of business is 2300 Contra Costa Blvd, Suite 425, Pleasant Hill, California. At all relevant times, Jeffrey Spiegel was acting as an agent or apparent agent of Spiegel Accountancy Corp.

## III.     JURISDICTION

20.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 77.

21.     The Court has personal jurisdiction over Defendants because they are authorized to do business in this District and regularly conduct business in this District.

## IV.     VENUE

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) in that Defendants reside in the State in which this district is located.

23.     The Defendants reside in this district pursuant to 28 U.S.C. § 1391(c), so personal jurisdiction is appropriate.

24.     In addition, a substantial part of the events or omissions giving rise to these claims occurred in this district.

25.     All of The Spiegels' relevant business, including the formulation and execution of the unlawful practices alleged herein, occurred in or emanated from California, where The Spiegels have their principal place of business. Thus, California has significant contacts and/or a significant aggregation of contacts to the claims asserted by Plaintiffs.

26.     California has a materially greater interest than any other State in enforcing the rights and remedies granted to consumers under the California laws invoked in this Complaint. These rights and remedies further strong fundamental public policies of the State of California.

27.     The unregistered securities at issue in this case are not "covered securities" within the meaning of National Securities Market Improvement Act of 1996 (NMSIA), 15 U.S.C. § 77r(b), and accordingly this action is not subject to the procedural requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(a). The securities were not issued by a nationally registered investment company nor was it designated for trading in a national securities exchange.

**V.     FACTS COMMON TO ALL COUNTS**

**A.     Horwitz's Obvious Ponzi Scheme**

28.     Horwitz, a Los Angeles based actor and Indiana University alum, and his company 1inMM conducted Ponzi scheme raising over $690 million from investors through several de facto placement agents including SAC and its funds using fabricated agreements and fake emails with prominent third party companies with whom Horwitz had no actual business relationship.



29.     Horwitz told Defendants that the purpose of the 1inMM offering was to finance 1inMM's acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies, mostly Netflix or Home Box Office ("HBO").

30.     Horwitz told Defendants he had experience acquiring and licensing distribution rights in movies to HBO and Netflix. Horwitz sold himself as bringing "a wealth of knowledge, reputation, and experience[.]"

31.     In reality, 1inMM and Horwitz had no distribution relationship with either HBO or Netflix and never licensed any movie rights to either company.

32.     Horwitz obtained funds from SAC's three funds and other firms asking as placement agents via promissory notes which were funded by units in the funds to individual investors.

33.     Horwitz relied on The Spiegels to act as his brokers or investment bankers to raise funds and serve as a gatekeeper of his lies delivered to retail investors.

34.     The Promissory Notes issued by 1inMM to the de facto placement agents including SAC's funds had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months. Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the life of the note.

35.     Horwitz told Defendants that he and 1inMM would profit from these transactions by selling the movie rights to HBO or Netflix at a profit in excess of the profits paid to investors, and that Horwitz and 1inMM would retain this excess.

36.     Horwitz told Defendants he had experience and relationships in the media content distribution industry, that he and 1inMM had existing business relationships with HBO and Netflix, and that he could use his experience and connections to acquire and sell distribution rights in movies to Netflix and HBO for a profit.

---



37.     Horwitz promised to use the proceeds from each promissory note placed with investors to purchase the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.

38.     The manner Horwitz claimed 1inMM supposedly generated revenue for itself included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, 1inMM would retain rights to the same content for an additional period of years, thereby enabling 1inMM to continue licensing the content to other parties for 1inMM's sole financial benefit.

39.     Any of these supposed revenue streams could have been confirmed by reputable third parties directly but never were.

40.     Horwitz justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.

41.     To support his false representations, Horwitz sent forged documents to The Spiegels that purported to evidence his business dealings with HBO and Netflix, including distribution agreements that appeared to reflect agreements by Netflix and HBO to license rights from 1inMM in the specific movie titles for which investors had purchased the Promissory Notes.

42.     Horwitz's representations were false and the documents he sent to SAC were fabricated.



43.     These falsehoods could have easily been confirmed prior to any investment by Plaintiffs with a phone call to Netflix or HBO but that call was not made until long after the scheme imploded and The Spiegels reaped millions in "commissions" from Horwitz's scheme.

44.     Horwitz and 1inMM did not have business relationships with Netflix or HBO and did not sign distribution agreements with Netflix or HBO. They did not acquire the movie rights funded by the Promissory Notes and did not sell those rights to Netflix or HBO.

45.     Horwitz used money "invested" in his "company" to pay earlier investors for lavish personal spending, including, but not limited to, extravagant trips to Las Vegas, flights on chartered jets, payments for high-end automobiles, a subscription service for luxury watches, and the purchase of a multi-million-dollar home.

46.     In late 2019, Horwitz and 1inMM stopped making payments to investors for the outstanding promissory notes.

47.     Horwitz provided Defendants false explanations for why he had stopped making payments.

48.     Horwitz initially blamed HBO and Netflix for failing to make promised payments to 1inMM.

49.     Horwitz told Defendants that while he had intended to sue HBO for non-payment, that he was instead able to obtain an alleged consolidated distribution agreement, pursuant to which HBO would immediately pay its past due payments to 1inMM

50.     Throughout 2020, Horwitz lulled The Spiegels, with false promises that negotiations with HBO and Netflix would soon lead to large payments to 1inMM and, in turn, the repayment of outstanding notes.

**B.  Defendants' Unwitting Participation in the Scheme**

51.     Horwitz raised money with five principal firms who acted as placement agents selling securities, including SAC, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in promissory notes used to fund individual projects offered by 1inMM (hereinafter "1inMM Offering").

52.     The Spiegels relied on personal relationships and word-of-mouth referrals to obtain investors.

53.     The Spiegels solicited $75,132,950 in investment via sales of units in three funds in the 1inMM Offering of which $29,733,025 remains outstanding.

54.     Ryan was introduced to 1inMM by his friend Craig Cole.

55.     Defendants falsely claimed, "Ryan has known Craig Cole, Co-Founder of 1INMM, for over 10 years and has built a working relationship with his company."

56.     Cole was not a co-founder of 1inMM, and it certainly was not "his company."

57.     Horwitz made representations regarding 1inMM to Ryan and Jeff regarding Horwitz's experience and relationships in the media content distribution industry, as well as the investment dynamics, deal structure, potential returns, and associated risks pertaining to the opportunity.

58.     Defendants negligently relied on only representations from Horwitz and Cole when recommending the investment to Plaintiff rather than confirming anything with third parties.

59.     In or about March of 2017, Defendants began soliciting investment with SAC.

60.     Despite the wide solicitation of investment from greater than 35 investors for greater than $10,000,000, Defendants did not file a Form D with the Securities and Exchange Commission regarding the SAC offering.

---

Accounting Malpractice and Federal Securities Complaint



61.     The federal securities laws require the notice to be filed by companies that have sold securities without registration under the Securities Act of 1933 in an offering made under Rule 504 or 506 of Regulation D or Section 4(a)(5) of the Securities Act. *See* 17 CFR § 230.503.

62.     The investments with each Plaintiff were structured as "Profit Sharing Agreements" whereby SAC provided 1inMM with the funds necessary to pay the purported Acquisition Fee (the "SAC Advance") in exchange for a participation interest in the funds received by 1inMM in relicensing a portion of the Distribution Rights to a third-party media company. Plaintiffs each agreed to fund the "SAC Advance" when 1inMM made the return payment the Plaintiff received 16% interest. (Profit Sharing Agreement attached hereto as Exhibit "A" and incorporated herein)

63.     SAC did not disclose its cut in the scheme.

64.     1inMM paid "interest" of between 30% and 40% throughout the scheme.

65.     SAC stood to earn a tidy 14% to 24% "commission" on the $36,676,565 investors put into SAC to fund the "Profit Sharing Agreements".

66.     Ryan is the managing member of SAC Advisory Group, LLC,

67.     SAC operates from the offices of Jeff Spiegel's accounting firm, Spiegel Accountancy Corp.

68.     SAC Advisory Group, LLC is operated by Jeff and Ryan with the assistance of staff employed by Spiegel Accountancy Corp. in the Spiegel Accountancy Corp office.

69.     During this time, Horwitz made representations and provided purported contracts, emails, and other information to the Jeff and Ryan, which Defendants negligently believed to be true and accurate without investigating the obvious holes in the story that was far too good to be true.

70.     Defendants proceeded to sell Plaintiffs investment in the 1inMM Offering by regurgitating the lies told by Horwitz.

Accounting Malpractice and Federal Securities Complaint



71.     Rather than relying on any substantive investigation of their own, Defendants relied on the fact that 1inMM kept paying as sufficient evidence that the obvious Ponzi Scheme was legitimate.

72.     Defendants did not bother to do their own independent due diligence on 1inMM.

73.     Defendants did not bother to do their own independent due diligence on Horwitz.

74.     Horwitz peppered Defendants with dozens of bogus documents supporting his scheme and even forged documents conveyed by reputable attorneys to help perpetuate the fraud.

75.     Defendants relied exclusively on Horwitz's own due diligence of himself and 1inMM rather than doing their own investigation.

76.     Defendants kept their head in the sand long after other funds feeding 1inMM realized the fraud.

77.     The amount repaid by 1inMM to SAC during this period for these participation agreements, inclusive of specified interest, was approximately $56,888,512, of which at least $4,000,000 was retained by Defendants.

78.     At present, the Plaintiffs are owed approximately $6,322,950 for amounts loaned between 2017 and 2020 pursuant to the 1inMM Offerings.

**C. Defendants' Duty to Plaintiffs**

79.     The 1inMM Offerings were structured as follows: funds managed by SAC lent money to 1inMM for defined projects at a rate of 25% to 40% interest, SAC funded the loan to 1INMM via the sale of the "SAC Advance" and SAC received 9% to 24% of the initial investment when 1inMM paid.

80.     For all intents and purposes SAC was acting as a placement agent for 1inMM and paid a 9% to 24% commission on the sales.

Accounting Malpractice and Federal Securities Complaint

81.     Placement agents such as SAC who sell private placements to retail customers for a commission such as SAC are required to register with the Financial Industry Regulatory Authority ("FINRA").  While SAC was not actually a professional broker/dealer, it pretended to be and just as it assumed the profits of a broker/dealer, it assumed the duties.

82.     FINRA regulates broker/dealer firms like Defendants and their registered representatives (*i.e.*, stockbrokers), and promulgates rules and regulations that brokerage firms and their registered representatives must adhere to.

83.     While SAC was not a licensed broker-dealer it acted as if it was one when selling the 1inMM Offering in exchange for what amounted to a hefty commission.

84.     A placement agent, or at least a party acting in that role such as SAC, is required to perform reasonable due diligence on a private placement prior to offering it for sale to its customers pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1).

85.     In order to ensure that it has fulfilled its responsibilities, FINRA requires that a broker-dealer in a Regulation D offering, as SAC was pretending to be, must, at a minimum, conduct a reasonable investigation concerning:

a.      the issuer and its management;

b.      the business prospects of the issuer;

c.      the assets held by or to be acquired by the issuer;

d.      the claims being made; and

e.      the intended use of proceeds of the offering.

86.     Defendants had a duty to conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.

87.     FINRA has also provided detailed guidance on how a broker-dealer such as SAC was acting with the 1inMM Offering may ensure an adequate investigation has taken place into the issuer and its management, the issuer's business prospects, and the issuer's assets.

88.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1INMM and its history by Defendants would have included:

a.     Examining historical financial statements of 1inMM, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management;

b.     Looking for any trends indicated by 1inMM's financial statements;

c.     Contacting customers and suppliers regarding their dealings with 1inMM;

d.     Reviewing 1inMM's contracts, leases, and financing arrangements;

e.     Inquiring about 1inMM's past securities offerings and the degree of their success;

f.     Inquiring about the length of time that 1inMM had been in business and whether the focus of its business was expected to change.

89.     This was not done here. The full extent of the investigation was reliance on information supplied by the Ponzi Schemer. There was zero independent investigation done by Defendants.

90.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1INMM's business prospects by SAC should include:

a.     Inquiring about the viability and value of any movies funded by 1INMM;

b.     Inquiring about the industry in which 1INMM operates, and the competitive position of 1INMM; and

c.     Requesting any business plan, business model or other description of the business intentions of 1INMM and its management and their expectations for the business,

---

Accounting Malpractice and Federal Securities Complaint



and analyzing management's assumptions upon which any business forecast is based. A broker/dealer should test models with information from representative assets to validate projected returns, break-even points, and similar information provided to investors.

91.     This was not done here. The contracts were fictitious. Defendants did not engage HBO or Netflix independent of Horwitz in any way to confirm Horwitz's wild story.

92.     Jeff is a Certified Public Accountant with Spiegel Accountancy Corp, and Plaintiffs relied on his financial expertise with Spiegel Accountancy Corp[1]. when deciding to invest with SAC.

93.     The American Institute of Certified Public Accountants' ("AICPA") Code of Professional Conduct Section 1.000.020 addresses how CPAs such as Jeff should respond to certain ethical conflicts.

94.     The AICPA Code of Professional Conduct Section 1.400.001 "Acts Discreditable" provides: "A member shall not commit an act discreditable to the profession."

95.     Section 0.300.060 of the Code provides:

> Due care principle. A member should observe the profession's technical and ethical standards, strive continually to improve competence and the quality of services, and discharge professional responsibility to the best of the member's ability. ... **Due care requires a member to discharge professional responsibilities with competence and diligence**. It imposes the obligation to perform professional services to the best of a member's ability, with concern for the best interest of those for whom the services are performed, and **consistent with the profession's responsibility to the public**. ... **Each member is responsible for assessing his or her own competence of evaluating whether education, experience, and judgment are adequate for the responsibility to be assumed**...**Members should be diligent in discharging responsibilities to clients, employers, <u>and the public.</u>**

---

[1] All Plaintiffs with exception of Uyen Huhyn were presently customers of Spiegel Accountancy Corp or had previously engaged Jeffrey Spiegel to perform professional accounting services.

Accounting Malpractice and Federal Securities Complaint



96.     The International Ethics Standards Board for Accountants ("IESBA") Code of Ethics for Professional Accountants is another standard that defines the duties owed by Jeff.

97.     Section 100.1 provides:

**A distinguishing mark of the accountancy profession is its acceptance of the responsibility to act in the public interest**. Therefore, a professional accountant's responsibility is not exclusively to satisfy the needs of an individual client or employer. In acting in the public interest, a professional accountant shall observe and comply with this Code.

98.     Section 110 of the Code provides:

A professional accountant shall not **knowingly be associated with** reports, returns, **communications** or other information where the professional accountant believes that the information: (a) Contains a materially false or misleading statement; (b) Contains statements or information furnished recklessly; or (c) Omits or obscures information required to be included where such omission or obscurity would be misleading.

99.     When a professional accountant becomes aware that the accountant has been associated with such information, the accountant shall take steps to be disassociated from that information

100.    Defendants did not engage directly with 1inMM bankers, accountants, or attorneys in order to vet the wild lies they were told.

101.    Jeff violated his most basic duties as a professional by failing to at all investigate this absurd investment.

102.    Jeff violated Cal. Code Regs. tit. 16, § 57 by wearing multiple hats of fund manager, accountant, account for investors, and accountant for the funds.

103.    Minimal investigation would have confirmed the purported counsel at Netflix was not even working at Netflix at the time of the supposed emails or that HBO had no record of 1inMM.

104.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1INMM's assets and facilities should include:

a.     Carefully examining any reports by third-party experts that may raise red flags;

b.     Obtaining an expert opinion from auditors and financial experts and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors.

c.     Inquiring about previous or potential regulatory or disciplinary problems of the issuer.

d.     Obtaining a credit check of 1INMM.

e.     Making reasonable inquiries concerning the issuer's management. SAC should have inquired about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change.

f.     Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A party acting as a broker-dealer might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issue; and

g.     Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

105.    Defendants failed to do this third-party confirmation of this supposedly $600,000,000 operation.

106.    A broker-dealer that offers securities, including those offered under Regulation D, must meet the suitability requirements of FINRA Rule 2111. This means that the broker-dealer must have a reasonable basis to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.

107.    FINRA Rule 2111.05(a) is the source of a broker-dealer's obligation to perform a reasonable investigation of the issuer and offered securities before offering securities in a Regulation D for sale to its clients.

108.    Reasonable-basis suitability requires that a broker-dealer (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test.

109.    Defendants could not rely blindly upon the issuer for information concerning a company, nor may it rely on the information provided by the issuer in lieu of conducting its own reasonable investigation.

110.    While broker-dealers like SAC are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a high degree of care in investigating and independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate this duty to investigate.

111.    Of course, under these circumstances, Defendants were in a position to know more about 1inMM, understand its business, its finances, and its outlook better than just a mere broker-dealer since it was acting as it's placement agent or investment banker raising capital exclusively for 1inMM.

112.    As the *de facto* placement agent and investment banker for 1inMM, SAC was in a unique position compared to another broker-dealer that was merely part of the investment banking syndicate.

113.    In the course of a reasonable investigation, a broker-dealer, such as The Spiegels were acting, must note any information that it encounters that could be considered a "red flag" that



would alert a prudent person to conduct further inquiry. A broker-dealer's reasonable investigation responsibilities obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer. When presented with red flags, the broker-dealer must do more than "blindly rely" upon representations by the issuer's management or the disclosure in an offering document.

114.    As described below, unfortunately for the Plaintiffs, SAC failed to conduct proper due diligence, which caused Defendant's conduct to fall below the standard of care thereby breaching the duties that it owed the Plaintiffs.

### D.   1INMM DEFAULTS

115.    On January 22, 2020, Ryan advised Plaintiffs that the fund was not able to take on new investment purportedly because "Our partners ended up securing another funding source, so we are going to continue with what we currently have for the time being"

116.    On January 31, 2020, Ryan advised Plaintiffs that there would be some changes in the fund based on Horwitz's imagined deal with HBO:

> Participation Amendments- You may or may not know that TimeWarner (who owned HBO) was recently acquired by AT&T, so there has been some changes in the process between our distribution partner and HBO. These changes are now taking place and we are amending our agreements with our distribution partner to cater to these process changes. HBO has expanded their diligence period on the front end of the purchase cycle, meaning that there is anywhere from 1-3 weeks of diligence before the LOI is inked and the 6 month process starts for the minimum guarantee payment (where we are liquidated from the deal). In addition, there is a 1-2 week processing time from when the minimum guarantee is due to our distribution partner and they actually receive the funds.
>
> As a result of these processing changes, we are amending our agreement with our distribution partner [1inMM]. The new agreement will be a maturity date of 7.5 months and a yield of 26%, which is amended from the original agreement of a maturity date of 6 months and a yield of 22%. The effective yield is very similar to our original agreement. While our new maturity date is slated to be at 7.5 months, there is the possibility that we are paid before that on some films, which would only increase the effective yield. We still expect for investor returns to be over 20% and on par with the returns from 2019.

117.    Throughout 2020 Ryan relayed Horwitz's elaborate lies about delays in payment to lull investors into not pursuing action.

---

Accounting Malpractice and Federal Securities Complaint



118.    On April 17, 2020, Ryan and Jeff advised Plaintiffs that 1inMM had defaulted on its loans and advised investors "With this news, **we have decided to wind down the equity fund as participations are paid over the coming months**. **We will return capital and earnings to investors as the participations in our portfolio are paid off.**" (emphasis added) Despite it appearing to be a sufficiently dire situation to warrant shutting down the fund, Ryan and Jeff promised "We want to reassure you again, that although we are having some delays, we know that no funds have been lost. We expect that we will be receiving all of the funds due and will be returning your capital and earnings."

119.    By the fall of 2020 Ryan and Jeff engaged counsel to assist them in spreading Horwitz's falsehoods and providing another layer of credibility to the absurd story told to lull the victims.

120.    On October 4, 2020, Ryan emailed an investor, "We will be getting clarity on payments and documentation this week from 1inMM. Our lawyer is in direct contact with their legal counsel, who also confirmed the execution of the agreement."

121.    On October 15, 2020, Ryan directly asked Horwitz for a letter from his lawyer to use to placate his investors.

122.    Rather than just telling investors that he was speaking to Horwitz, Ryan concocted a letter from a reputable attorney to make the absurdity seem more plausible to investors.

123.    On November 4, 2020, SAC's counsel, Richard Bowels, sent a letter to Plaintiffs that provided in pertinent part:

> As you know, 1inMM Capital (our distribution partner) and HBO (the licensor of our films), have been in negotiations over the past many months to restructure their agreement. That amended agreement was finally executed on October 13, 2020. I was provided a severely redacted copy of this agreement in order to verify that it had been signed and what the terms were regarding the catch up payment owed on film investments. I received the redacted version on October 20, 2020. **While the agreement is highly confidential, I am able to tell you that I was able to verify its execution and was further able to verify the terms of payment of past due amounts to 1inMM**. SAC has also been in communication with 1inMM Capital regarding how 1inMM will satisfy its obligations to SAC and its entities. The following information has been provided:
> • 1inMM has confirmed that it agrees with the total amount due and owing as asserted by
> SAC and its entities.



• 1inMM has agreed to notify SAC of payments made by HBO over the coming months. What I can tell you is that the redacted agreement provides that **HBO will be making full payment by the end of the year, unless it exercises options to extend, which would require making substantial interim payments**.

• 1inMM has committed that it will make pro rata or proportionate payments to SAC for its share of the total advances. These payments will be made within 14 days of 1inMM receiving any payment from HBO.

• 1inMM has told SAC that March 1, 2021 is the latest date by which full payment will be made.

• SAC will remit payments to its investors in a timely manner as soon as received from 1inMM. These payments will be remitted on a first in first out basis based on the original maturity date of each film.

124.    On February 28, 2021 investors in JJMT Capital, LLC who also invested funds in 1inMM, were advised that 1inMM was a fraud after JJMT's new counsel at King & Spalding discovered Horwitz's fraud and Ponzi Scheme **after just one day of investigating.**

125.    On March 15, 2021, while the fraud was obvious to hundreds of other investors, Ryan continued to pass along lies to his investors stating: "We wanted to provide a quick update as to where everything currently stands. After discussions with their investment groups, 1inMM has agreed to accept the payment proposal from Warner Media and were told they will be receiving the agreement this week. Once all the details are finalized and the agreement is executed we will be sharing all the information with investors. We are optimistic that this will get finalized and payments will be remitted."

126.    On April 5, 2021, the Securities and Exchange Commission filed a securities fraud Complaint against Horwitz detailing the obvious fraud that was easily unraveled with minimal investigation.

127.    Two days later, on April 7, 2021, Ryan communicates to investors "we received some shocking and disheartening news yesterday regarding 1inMM Capital" that the SEC initiated action against 1inMM.

128.    This was not shocking to Ryan, he had supplied documents to the SEC at least a month earlier in support of its investigation, and it was readily apparent that Horwitz was running a Ponzi Scheme as was confirmed by counsel at King & Spalding after one day of investigation months earlier.

129.     Plaintiffs justifiably relied on Defendants' representations about the suitability of investment in 1inMM because the SAC principals were accounting professionals and had personal relationships with a 1inMM founder.

130.     Plaintiffs relied on Defendants to investigate the investment it was offering and confirm facts presented in the offering materials.

131.     Plaintiff justifiably relied on Defendants' statements about the investment and that Defendants had a reasonable basis for recommending the investment.

**E.  Plaintiff's Investment in SAC**

132.     Plaintiff, Uyen, first invested in SAC on or about September 2019 and entered her final investment agreement (investment agreements collectively referred to as "Securities Contracts") on or about January 2020 and paid $359,450 to participate in a profit sharing agreements.

133.     Plaintiff, Ellusionist, first invested in SAC on or about September 2019 and entered its final investment agreement on or about January 2020 and paid $1,701,500 to participate in profit sharing agreements.

134.     Ellusionist was a longtime customer of Spiegel Accountancy Corp and was solicited for investment in SAC at Spiegel Accountancy Corp's Office.

135.     Plaintiff, Southwest Investment Funds, first invested in SAC on or about June 2019 and entered its final investment agreement on or about January 2020 and paid $10,001,650 to participate in profit sharing agreements.

136.     Plaintiff, AVR Group, LLC, first invested in SAC on or about June 2019 and entered its final investment agreement on or about January 2020 and paid $2,359,515 to participate in profit sharing agreements.

137.     Plaintiff, Trident Asset Management, Inc., first invested in SAC on or about June 2019 and entered its final investment agreement on or about January 2020 and paid $663,125 to participate in profit sharing agreements.



138.    Plaintiff, Phoenix Affordable Housing Authority, LLC, first invested in SAC on or about June 2019 and entered its final investment agreement on or about January 2020 and paid $2,227,950 to participate in profit sharing agreements.

139.    The principal of Southwest Investment Funds, AVR Group, LLC, Trident Asset Management, Inc, and Phoenix Affordable Housing Authority, LLC was a customer of Spiegel Accountancy Corp and was solicited by Jeff Spiegel at Spiegel Accountancy Corp's office.

**F.  Class Action Tolling**

140.    Plaintiffs were all members of a proposed class and delayed filing this action until class certification Motions were denied in *Carter v. Spiegel et al* 21-CV-03990 and a subsequent AAA Proceeding *Nanya v. Spiegel et al* 01-22-0002-9473.

141.    These individual claims were tolled until a motion for class certification was denied.

**V. CLAIMS**

<u>**FIRST CLAIM FOR RELIEF**</u>
**Accounting Malpractice**
**[Against Spiegel Accountancy Corp. and Jeffrey Spiegel]**

142.    Plaintiffs restate and reallege paragraphs 1 through 141 as though fully set forth herein as paragraph 142.

143.    At all times relevant hereto, Jeffrey Spiegel was acting as an agent or apparent agent of Spiegel Accountancy Corp.

144.    At all relevant times, Plaintiffs were customers of Spiegel Accountancy Corp.

145.    Spiegel Accountancy Corp. performed numerous services on behalf of Plaintiffs including but not limited to preparing its tax returns and keeping its books and records.

146.    Jeffrey Spiegel sold Plaintiffs on the 1inMM in investments when meeting to discuss the tax services provided by Spiegel Accountancy Corp. at its office.

147.    Jeffrey Spiegel used his knowledge of Plaintiffs' financial situations and the long trusting relationship after years of providing accounting services to sell Plaintiffs into a Ponzi Scheme.



148.    Jeffrey Spiegel and Spiegel Accountancy Corp. owed Plaintiffs a duty of reasonable care at all times relevant hereto.

149.    Jeffrey Spiegel and Spiegel Accountancy Corp. and the California Board of Accountancy established regulations prohibiting conflicts of interests which provide:

(a)    Incompatible Occupations/Conflict of Interest. A licensee shall not concurrently engage in the practice of public accountancy and in any other business or occupation which impairs the licensee's independence, objectivity, or creates a conflict of interest in rendering professional services.

(b)    Licensees engaged in the practice of public accountancy shall comply with all applicable professional standards, including but not limited to generally accepted accounting principles and generally accepted auditing standards.

150.    The AICPA Code of Professional Conduct Section 1.400.001 "Acts Discreditable" provides: "A member shall not commit an act discreditable to the profession."

151.    Section 0.300.060 of the Code provides:

Due care principle. A member should observe the profession's technical and ethical standards, strive continually to improve competence and the quality of services, and discharge professional responsibility to the best of the member's ability. ... Due care requires a member to discharge professional responsibilities with competence and diligence. It imposes the obligation to perform professional services to the best of a member's ability, with concern for the best interest of those for whom the services are performed, and consistent with the profession's responsibility to the public. ... Each member is responsible for assessing his or her own competence of evaluating whether education, experience, and judgment are adequate for the responsibility to be assumed...Members should be diligent in discharging responsibilities to clients, employers, and the public.

152.    The International Ethics Standards Board for Accountants ("IESBA") Code of Ethics for Professional Accountants is another standard that defines the duties owed by Jeff.

153.    Section 100.1 provides:

A distinguishing mark of the accountancy profession is its acceptance of the responsibility to act in the public interest. Therefore, a professional accountant's responsibility is not exclusively to satisfy the needs of an individual client or employer. In acting in the public interest, a professional accountant shall observe and comply with this Code.

154.    Section 110 of the Code provides:

A professional accountant shall not knowingly be associated with reports, returns, communications or other information where the professional accountant believes that the information: (a) Contains a materially false or misleading statement; (b) Contains statements or information furnished recklessly; or (c)  Omits or obscures information required to be included where such omission or obscurity would be misleading.

155.    When a professional accountant becomes aware that the accountant has been associated with such information, the accountant shall take steps to be disassociated from that information

156.    Spiegel Accountancy Corp. and Jeffrey Spiegel violated the controlling standards set forth herein and capitalized on a conflict of interest, woefully failed to discover the fraud despite the countless red flags and, once the fraud became obvious, it failed to act in the public interest.

157.    Jeff violated controlling regulations while concurrently selling his customers investment in a Ponzi scheme for his own personal gain while also providing them with tax services.

158.    But for the negligent acts and breaches of the standard of care, SAC Advisory Group and Jeffrey Spiegel would not have parroted Horwitz's lies, would have uncovered the fraud, and would have saved Plaintiffs millions of dollars.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, SPIEGEL ACCOUNTANCY CORP. and JEFFREY SPIEGEL; award compensatory damages in an amount in excess of $6,000,000 and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

## SECOND CLAIM FOR RELIEF
### Violation of Section 12(a)(2) of the Securities Act of 1933
### [Against SAC]

159.     Plaintiffs, restate and reallege paragraphs 1 through 141 as though fully set forth herein as paragraph 159.

160.     For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

161.     Defendants were sellers, offerors, and/or solicitors of sale of the Defendants' Profit Sharing Agreements under Section 12(a)(2) of the Securities Act and pertinent common law.

162.     Defendants offered, sold and/or solicited a security, namely the Defendants' Profit Sharing Agreements by and through untrue and/or misleading statements of material fact that Defendants exercise of reasonable care should have known were false.

163.     Defendants solicited Plaintiffs in person at Spiegel Accountancy Corp's Office, over the telephone, through the mail and through email.

164.     Defendants actively solicited the sale of the Defendants' Profit Sharing Agreements to serve Defendants' own financial interests.

165.     Neither Plaintiffs nor Defendants had access to the type of information normally provided in prospectus of a SEC registration statement such as Form S-1.

166.     At the time of purchase of Defendants' Profit Sharing Agreements, Plaintiffs did not know that the representations made to them by Defendants were untrue and did not know the above described omitted material facts, were not disclosed.

167.     Plaintiffs did not know, or in the exercise of due diligence could not have known of the untruths and omissions made by Defendants.



WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, SAC ADVISORY GROUP, LLC, award compensatory damages in an amount in excess of $10,000,000, and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

### THIRD CLAIM FOR RELIEF
**Violation of Section 15 of the Securities Act of 1933**
**[Against Spiegel Accountancy Corp., Jeff, and Ryan]**

168.    Plaintiffs restate and reallege paragraphs 1 through 1341 as though fully set forth herein as paragraph 151.

169.    For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

170.    Defendants, Jeff, Ryan, and Spiegel Accountancy Corp. were sellers, offerors, and/or solicitors of sale of the Defendants' Profit Sharing Agreement under Section 12(a)(2) of the Securities Act and pertinent common law.

171.    Jeff, Ryan, and Spiegel Accountancy Corp had control over SAC.

172.    Defendants solicited Plaintiffs in person, over the telephone, through the mail and through email.

173.    Defendants Jeff, Ryan, and Spiegel Accountancy Corp actively solicited the sale of the Defendants' Promissory Notes to serve Defendants' own financial interests.

174.    At the time of purchase of Defendants' Profit Sharing Agreements, Plaintiffs did not know that the representations made to them by Defendants were untrue, and did not know the above described omitted material facts, were not disclosed.

175.    Plaintiffs did not know, or in the exercise of due diligence could not have known of the untruths and omissions made by Defendants.

Accounting Malpractice and Federal Securities Complaint



WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, SPIEGEL ACCOUNTANCY CORP., JEFFREY SPIEGEL, and RYAN SPIEGEL,  award  compensatory damages in an amount in excess of $10,000,000, and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

**THIRD CLAIM FOR RELIEF**
**Declaration that Contracts are Void**
**Under Section 29(b) Of The Act For Violation Of Section 15(a) and 17 CFR § 239.500**
**[Against all Defendants]**

176.    Plaintiffs restate and reallege paragraphs 1 through 141 as though fully set forth herein as paragraph 176.

177.    Defendants were never registered as broker dealers in violation of 15 U.S.C. § 78o(a)(1)

178.    Defendants never filed a Form D as required by 17 CFR § 239.500.

179.    Section 29(b) of the Act provides in relevant part that:
> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, ... [or] the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void.

15 U.S.C. § 78cc(b) (emphasis added).

180.     SAC was acting as a dealer within the meaning set forth in Act. See 15 U.S.C. § 78c(a)(5)(A). SAC violated Section 15(a)(1) of the Act by purchasing and selling securities as a regular part of its business without being a registered dealer. See 15 U.S.C. § 78o(a)(1).

181.    SAC and its sales agents, Jeff and Ryan Spiegel were not capable of lawfully effectuating the securities transactions with Plaintiffs detailed in this Complaint. The transactions were, simply put, prohibited by the Act.



182.    Defendants utilized the means of interstate commerce to effectuate the securities transactions with Plaintiffs, which are unlawful given that Defendants are not registered dealers and they did not file a Form D.

183.    The registration and filing requirements are designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers as occurred here. Accordingly, Plaintiffs are in the class of persons that the Act was designed to protect.

184.    Plaintiffs have a private right of action for rescission of the Securities Contracts in this case under Section 29(b) of the Act. *See Mills v. Electric Auto- Lite Co*., 396 U.S. 375 (1970).

185.    As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the Parties as to whether Defendants violated Section 15(a)(1) of the Act and 17 CFR § 239.500 whether, pursuant to Section 29(b), the violative agreement or performance by Defendants of the same renders the agreements void.

186.    Section 29(b) of the Act voids the rights of the violator (i.e., Defendants, who are conducting themselves as unregistered dealers) when the conduct of the violator contravenes the Act.

187.    Section 29(b) of the Act is clear, its statutory language voids the transaction as to Plaintiffs and any security o is void, improper, and unlawful.

188.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Social, requests the Court declare: (i) SAC, by its actions, violated Section 15(a)(1) of the Act and 17 CFR § 239.500; and (ii) pursuant to Section 29(b) of the Act, the Securities Contracts are void and/or rescinded.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, requests the Court enter an Order in Plaintiff's favor against Defendants finding the Securities Contracts are void and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

### FOURTH CLAIM FOR RELIEF
**Violation of California Corporations Code Section 25501.5**

189.    Plaintiffs restate and reallege paragraphs 1 through 141 as though fully set forth herein as paragraph 189.

190.    When Plaintiffs purchased the Profit Sharing Agreements neither Defendants nor the entities they controlled were required to be licensed as a securities broker-dealer, or to have applied for and secured a certificate under California Corporations Code section 25200.

191.    Neither SAC Advisory Group, LLC nor the Spiegels are licensed as a securities broker-dealers, nor, upon information and belief have they applied for and secured a certificate under California Corporations Code section 25200, Part 3.

192.    As a proximate result of SAC's failure to obtain the proper broker-dealer licensing or certificate, Plaintiffs are entitled to rescission of the investments in SAC and reasonable attorneys' fees and costs.

Accounting Malpractice and Federal Securities Complaint



1      WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST,

2  UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT

3  ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC,

4

5  respectfully requests that the Court enter judgment against Defendants, SPIEGEL

6  ACCOUNTANCY CORP., JEFFREY SPIEGEL, and RYAN SPIEGEL,  award compensatory

7  damages in an amount in excess of $10,000,000, and grant any and all further relief that the Court

8  deems to be necessary or appropriate under the circumstances.

9                     **FIFTH CLAIM FOR RELIEF**

**Violation of California Corporations Code Section 25401 -**

10  **Untrue Statements or Omissions in Connection with Sale of Security**

**[Against SAC, Jeff, and Ryan]**

11

12     193.   Plaintiffs restate and reallege paragraphs 1 through 141 as though fully set forth

herein as paragraph 193.

13

14     194.   California Corporations Code Section 25401 reads as follows:

15       "It is unlawful for any person to offer to sell a security in this state or buy or

16       offer to buy a security in this state by means of any written or oral
         communication which includes an untrue statement of a material fact or omits

17       to state a material fact necessary in order to make the statements made, in light
         of the circumstances under which they were made, not misleading."

18

19     195.   By its terms, Corporations Code Section 25401 does not require any fraudulent

20  misrepresentation or and intent to deceive, rather simply the making of untrue statements of

material fact or the non-disclosure of a material fact.

21

22     196.   As more fully set forth in General Allegations, plaintiffs are informed and believe

23  and based thereon allege that the above-described representations, promises, assurances,

expressions of opinion and non-disclosures of material fact by Defendants were made negligently,

24

25  recklessly and carelessly.

26

27

28

---



1

2    197.    California Corporations Code Section 25501 is the remedial statute for Code

3    Section 25401, and reads as follows:

4        Any person who violates Section 25401 shall be liable to the person who
         purchases a security from him or sells security to him, who may sue either for
5        rescission or damages.

6    198.    Jeff and Ryan are jointly and severally liable pursuant to California Corporations

     Code Section 25504 which provides in pertinent part:
7
         Every person who directly or indirectly controls a person liable under Section
8        25501 or 25503, every partner in a firm so liable, every principal executive
         officer or director of a corporation so liable, every person occupying a similar
9        status or performing similar functions, every employee of a person so liable who
         materially aids in the act or transaction constituting the violation, and every
10       broker–dealer or agent who materially aids in the act or transaction constituting
         the violation, are also liable jointly and severally with and to the same extent as
11       such person, unless the other person who is so liable had no knowledge of or
         reasonable grounds to believe in the existence of the facts by reason of which
12       the liability is alleged to exist.

13   199.    Defendants offered to sell Plaintiff securities, consisting of Profit Sharing

14   Agreements, to Plaintiffs within the State of California, by means of both oral and written

15   communications by Defendants to Plaintiffs, and said offer included untrue statements concerning

16   the true value of the units being offered, and numerous statements lulling Plaintiff to allow the

17   fraud to continue, whereas the true facts were that 1inMM was a pure Ponzi Scheme with no actual

18   value.

19   200.    Plaintiff is therefore informed and believe and based thereon allege that Defendants

20   made untrue and misleading statements of material facts and also omitted material facts in offering

21   and selling the 1inMM Offering to Plaintiffs.

22   201.    Plaintiff is informed and believes and based thereon allege that defendants Ryan and

23   Jeff should reasonably have known these statements were untrue and misleading at the time they

24   made them, and that plaintiffs were in complete reliance upon his claimed superior and exc1usive

25   knowledge, information and expertise, and that the facts stated and omitted were material to

26   plaintiff's decision to participate in the Offering.

27

28

202.     As a result of Defendants' representations and non-disclosures, plaintiff participated in the 1inMM Offering and caused investment funds to be transferred to funds operated by defendants to purchase the subject securities.

203.     For all the reasons set forth above the Plaintiffs lost the value of their investment and hereby seek recovery of the full amount of their monetary detriment, damage and loss in the sum in excess of $10,000,000 or in an amount or amounts to be established according to proof at time of trial.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, JEFFREY SPIEGEL, RYAN SPIEGEL, and SAC ADVISORY GROUP, LLC,  award compensatory damages in an amount in excess of $10,000,000, and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

### SIXTH CLAIM FOR RELIEF
**Violation of California Corporations Code Section 25403**
**Liability of person inducing or assisting violation**
**[Against Spiegel Accountancy Corp]**

204.     Plaintiffs restate and reallege paragraphs 1 through 141 and 194 through 203, as though fully set forth herein as paragraph 204.

205.     Spiegel Accountancy Corp knowingly provided substantial assistance in SAC's violation of 25401.

206.     As a proximate result of Spiegel Accountancy Corp substantial assistance of SAC Plaintiffs are entitled to rescission of the investments and reasonable attorneys' fees and costs.



1    WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST,

2   UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT

3   ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC,

4   respectfully requests that the Court enter judgment against Defendants, SPIEGEL

5   ACCOUNTANCY CORP. award compensatory damages in an amount in excess of $6,000,000

6   and grant any and all further relief that the Court deems to be necessary or appropriate under the

7   circumstances.

8

### SEVENTH CLAIM FOR RELIEF
#### Violation of California's Unfair Competition Law, Cal. Bus. & Prof Cod § 17200
#### [Against all Defendants]

207.   Plaintiffs restates and realleges paragraphs 1 through 141 as though fully set forth herein as paragraph 204.

208.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Defendants engaged in conduct that violated each of this statute's three prongs.

209.   Defendants committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, et seq., when it violated the CLRA as alleged above.

210.   Defendants committed unfair and fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., when they affirmatively misrepresented, actively concealed, and/or failed to disclose the following:

   a.   Defendants misrepresented the nature the 1inMM Offering to Plaintiffs, including providing absolutely no risk disclosures whatsoever;

   b.   Defendants failed to inform Claimants that they failed to perform the most basic investigation of the investment;

   c.   Defendants failed to inform Plaintiffs that 1inMM lawyer disavowed any representations he made on behalf of 1inMM;

---



d.     Defendants failed to disclose to Plaintiffs that 1inMM had no accountant and was never audited;

e.     Defendants failed to disclose that they never initiated any direct communication with anyone at Netflix or HBO;

f.     Defendants also failed to disclose to Claimants that 1inMM was a speculative business that lacked any internal controls necessary to prevent the misuse and misappropriation of their money.

211.   These were all material facts that were required to be fully disclosed to Plaintiffs that Defendants knew despite their ostrich defense employed here.

212.   Defendants' unfair or deceptive acts or practices occurred repeatedly in the course of Defendants' trade or business and were capable of deceiving a substantial portion of its membership.

213.   As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

214.   As a result of its unfair and deceptive conduct, Defendants have been unjustly enriched and should be required to make restitution pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, SPIEGEL ACCOUNTANCY CORP., JEFFREY SPIEGEL, RYAN SPIEGEL, and SAC ADVISORY GROUP, LLC; award compensatory damages in an amount in excess of $6,000,000, and grant



any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

## EIGHTH CLAIM FOR RELIEF
### Negligent Misrepresentation
### [Against all Defendants]

215.     Plaintiffs restate and reallege paragraphs 1 through 141 as though fully set forth herein as paragraph 215.

216.     To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for Respondents include the rules promulgated by FINRA (which each broker offering securities such as the 1inMM notes should be a member of, the California Rules of Professional Conduct, the AICPA, and California Board of Accountancy Regulations.

217.     At all times relevant Jeff was acting as an actual and apparent agent of Spiegel Accountancy Corp.

218.     Those who undertake any work or calling for which a special skill is required such as a broker-dealer have a duty not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability.

219.     Defendants owed Plaintiffs a duty to act as a reasonably prudent professional would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA. These duties and obligations flow to Plaintiffs as a result of the relationship between Defendants, the Plaintiffs.

220.     Spiegel Accountancy Corp. owed Plaintiffs a duty to act as a reasonably prudent professional would do under the same or similar circumstances. These duties and obligations flow to Plaintiffs because of the direct representations made to Plaintiffs at Spiegel Accountancy Corp's office, via its email, and by its President.

221.     The Ellusionist engaged Spiegel Accountancy Corp.'s for tax preparation, audit, and business consulting for nearly twenty years prior to the investment.



222.     The members of Southwest investment Funds, AVR Group, Trident Asset management and Phoenix Affordable Housing had previously engaged Spiegel Accountancy Corp. for audit services and relied on that prior relationship when deciding to invest.

223.     Spiegel Accountancy Corp did SAC's bookkeeping and tax preparation.

224.     As set forth above, Defendants breached its legal duty to provide accurate information to Plaintiffs as prospective purchasers of investments in SAC funds by omitting material facts, and such material facts were necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

225.     By reason of the aforesaid, Defendants are guilty of negligent misrepresentation and omission in connection with the offer and sale of investments in 1inMM Offerings.

226.     At all times relevant to this action, Defendants had knowledge of, or reasonable grounds to believe the existence of facts by reason of which their liability under this Count is alleged to exist, and with this knowledge, Defendants made material omissions of fact with respect to the offer and sale of securities.

227.     As described above, Defendants negligently breached their duties to Plaintiffs.

228.     Had a reasonably prudent broker-dealer under the same or similar circumstances conducted adequate due diligence on 1inMM to understand the risks and rewards of the 1inMM Offerings, it would have concluded that the risks in investing in 1inMM far outweighed any potential reward, and it would not have approved of the 1inMM Offerings for sale to any of its clients.

229.     By approving of the sale of the 1inMM Offerings to its clients, notwithstanding the numerous red flags identified herein, 1inMM demonstrated that it failed to understand the risks and rewards of the 1inMM offerings, or consciously ignored the risks presented by these red flags in order to ensure Defendants maximized its fees and commissions.

230.     Defendants knew or should have known that Plaintiffs would place their trust and confidence in Defendants that it had a reasonable basis to conclude that 1inMM was suitable for at



least some investors, and that it had conducted adequate due diligence to understand the risks and

rewards of the 1inMM offering.

231.    Defendants knew or should have known that it was reasonably foreseeable that

Plaintiffs would act in reliance on Defendants approval to sell the 1inMM Offerings.

232.    But for Defendants' approval to sell the 1inMM Offerings, Plaintiff would not have

even been presented the opportunity to participate in the 1inMM Offerings.

233.    As a direct and proximate result of Defendants' negligence, Defendants are liable to

Plaintiffs  all of the investment losses that they suffered in the 1inMM Offerings.



WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, SPIEGEL ACCOUNTANCY CORP., JEFFREY SPIEGEL, RYAN SPIEGEL, and SAC ADVISORY GROUP, LLC, award compensatory damages in an amount in excess of $10,000,000, and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

Dated:  January 20, 2023

Respectfully submitted,

**LOFTUS & EISENBERG, LTD.**

By:  /s/*Alexander N. Loftus*
Alexander N. Loftus
Attorneys for Plaintiffs

Alexander Loftus, Esq.
Ross M. Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T:  (312) 772-5396
alex@loftusandeisenberg.com
ross@loftusandeisenberg.com
*Pro Hac Vice Applied For*

William Aron, Esq.
ARON LAW FIRM
15 W Carrillo St, Suite 217
Santa Barbara, CA 93101
T: (805) 618-1768
bill@aronlawfirm.com

Accounting Malpractice and Federal Securities Complaint

