LOFTUS & EISENBERG, LTD.
ALEXANDER N. LOFTUS, ESQ. (*pro hac vice*)
ROSS M. GOOD, ESQ. (*pro hac vice*)
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T: (312) 772-5396
alex@loftusandeisenberg.com
ross@loftusandeisenberg.com

ARON LAW FIRM
WILLIAM ARON, ESQ. (#234408)
15 W Carrillo St, Suite 217
Santa Barbara, California 93101
T: (805) 618-1768
bill@aronlawfirm.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT—NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, | CASE NO. 3:23-cv-00287-AMO **RESPONSE TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT** |

Plaintiffs,

v.

JEFFREY SPIEGEL, RYAN SPIEGEL, SAC ADVISORY GROUP, LLC, and SPIEGEL ACCOUNTANCY CORP.

Defendants.

Date:
Time:
Courtroom:    10 – 19th Floor
Judge:    Hon. Araceli Martinez-Olguin

1

## <u>TABLE OF CONTENTS</u>

2

I. STATEMENT OF ISSUES ............................................................................................... 1

3

II. INTRODUCTION ........................................................................................................... 1

4

III. ARGUMENT ................................................................................................................. 2

5

A. Legal Standards ............................................................................................................... 2

6

B. Plaintiffs state a claim pursuant to 10(b)(5) ................................................................... 3

7

i. Falsity is adequately alleged to sustain Plaintiffs' § 10(B) claim at
this stage .............................................................................................................................. 3

8

ii. Scienter is adequately alleged to sustain Plaintiffs' § 10(B) claim ................................ 4

9

a. The FAC adequately alleges the "who, what, when, where" of the
alleged fraud ........................................................................................................................ 8

10

11

b. There is no impermissible "lumping" of Defendants in the
Complaint ............................................................................................................................ 9

12

13

iii. The FAC Pleads Reliance ............................................................................................. 10

14

iv. The FAC pleads loss causation .................................................................................... 10

15

v. The FAC pleads economic loss .................................................................................... 10

16

C. Plaintiffs State Claims for Violation of 12(A)(2) and Violation of
Section 15 ........................................................................................................................... 11

17

18

D. Plaintiffs State a Claim for Declaratory Judgment ....................................................... 14

19

E. Plaintiffs adequately allege Defendants Violated California
Corporations Code § 25401 ............................................................................................... 17

20

21

F. Plaintiffs adequately allege Negligent Misrepresentation ............................................ 17

22

G. Plaintiffs adequately allege Accounting Malpractice ................................................... 18

23

H. Defendants' proximate cause argument is a non-sequitur ............................................ 20

24

IV. CONCLUSION ............................................................................................................. 22

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Affiliated Ute Citizens v. United States,*
4   406 U.S. 128 (1972) ................................................................................................ 11

5   *In re Asyst Techs., Inc. Derivative Litig.,*
6   2008 WL 4891220 (N.D. Cal. Nov. 12, 2008) ...................................................... 15

7   *Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................ 2
8
    *S.E.C. v. Alliance Transcription Services, Inc.*
9   (D. Ariz., Dec. 18, 2009, No.CV08-1464-PHX-NVW) 2009 WL 5128565 ........ 5

10  *Bell Atlantic Corp. v. Twombly,*
11  550 U.S. 544 (2007) ................................................................................................ 2

12  *Brody v. Transitional Hosps. Corp.,*
13  280 F.3d 997 (9th Cir. 2002) .................................................................................. 3

14  *Bridges v. Geringer,*
    No. 5:13-cv-01290-EJD, 2015 U.S. Dist. LEXIS 66695 (N.D. Cal. May 21, 2015) ........... 13
15
    *Buffin v. Community,*
16  2021 U.S. Dist. LEXIS 190329 (C.D. Cal. Aug. 6, 2021) .................................... 15

17  *Burgess v. Premier Corp.,*
18  727 F.2d 826 (9th Cir. 1984) ................................................................................ 16

19  *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys.,*
    637 F.3d 1047 (9th Cir. 2011) ................................................................................ 3
20
    *Cook v. Avien, Inc.,*
21  573 F.2d 685 (1st Cir. 1978) ................................................................................ 12

22  *Doe v. United States,*
23  419 F.3d 1058 (9th Cir. 2005) ................................................................................ 2

24  *Dura Pharms., Inc. v. Broudo*
25  544 U.S. 336 (2005) ................................................................................................ 3

26  *Ernst & Ernst v. Hochfelder*
    425 U.S. 185 (1976) ................................................................................................ 4
27
    *ESG Capital Partners, LP v. Stratos,*
28  828 F.3d 1023 (9th Cir. 2016) .......................................................................... 2, 4

1

2  *Facebook, Inc. v. Pac. Nw. Software, Inc.*,
   640 F.3d 1034 (9th Cir. 2011) ............................................................................................. 15

3
4  *Hatrock v. Edward D. Jones & Co.*,
   750 F.2d 767 (9th Cir. 1984) ................................................................................................ 10

5  *Hill York Corp. v. American International Franchises, Inc.*,
6  448 F.2d 680  (5th Cir. 1971) ............................................................................................... 12

7  *Hollinger v. Titan Capital Corp.*,
   914 F.2d 1564 (9th Cir. 1990) ................................................................................................ 4

8
9  *Hellum v. Breyer*,
   194 Cal.App.4th 1300 (2011) .............................................................................................. 10

10
11 *Koepke v. Loo*,
   18 Cal.App.4th 1444 (1993) ................................................................................................ 21

12 *Liu Hongwei v. Velocity V Ltd. partnership*,
13 No. 2:15-cv-05061-ODW-E, 2018 U.S. Dist. LEXIS 115636 (C.D. Cal. July 11, 2018) .... 13, 14

14 *Lindner v. Barlow, Davis & Wood*,
   210 Cal. App. 2d 660 (1962) ............................................................................................... 19

15
16 *Massey v. Banning Unified School Dist.*,
   256 F.Supp.2d 1090 (C.D. Cal. 2003) ................................................................................... 2

17 *Melcher v. Fried*,
18 No. 16-cv-2440, 2018 U.S. Dist. LEXIS 205252 (S.D. Cal. Dec. 4, 2018) ........................ 16

19 *Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................................................ 3
20
21 *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*,
   578 U.S. 374 (2016) ............................................................................................................. 16

22
23 *Mills v. Electric Auto- Lite Co.*,
   396 U.S. 375 (1970) ............................................................................................................. 15

24 *Moore v. Anderson Zeigler Disharoon Gallagher & Gray*,
25 109 Cal. App. 4th 1287, 135 Cal. Rptr. 2d 888 (2003) ........................................................ 19

26 *S.E.C. v. Murphy*,
   626 F.2d 633 (9th Cir. 1980) ........................................................................................... 12-14

27
28 *Nat'l Union Fire Ins. Co. v. Cambridge Integrated Servs. Group, Inc.*,
   171 Cal. App. 4th 35, 89 Cal. Rptr. 3d 473 (2009) ............................................................. 17

1
2
*Neilson v. Union Bank of California,*
 290 F. Supp. 2d 1101 (C.D. Cal. 2003) ............................................... 18

3
4
*Parvin v. Davis Oil Co.,*
524 F.2d 112 (9th Cir. 1975).................................................................. 13

5
6
*Paskenta Band of Nomlaki Indians v. Crosby,*
122 F.Supp.3d 982 (E.D.Cal. 2015)...................................................... 21

7
*Petro-Ventures, Inc. v. Takessian,*
967 F.2d 1337 (9th Cir. 1992)............................................................... 16

8
9
*SEC v. Ralston Purina Co.,*
346 U.S. 119 (1953).............................................................................. 12

10
11
*Reese v. Malone,*
747 F.3d 557 (9th Cir. 2014).................................................................. 3

12
13
*South Ferry LP v. Killinger,*
 542 F.3d 776 (9th Cr. 2008).................................................................. 7

14
15
*Sparling v. Daou (In re Daou Systems),*
411 F.3d 1006 (9th Cir. 2005)............................................................... 10

16
*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,*
552 U.S. 148 (2008).............................................................................. 10

17
18
*Strategic Diversity, Inc. v. Alchemix Corp.,*
666 F.3d 1197 (9th Cir. 2012)............................................................... 11

19
20
*Swartz v. KPMG LLP,*
476 F.3d 756 (9th Cir. 2007)................................................................. 18

21
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007)....................................................................... 4, 6, 7

22
23
*Turpin v. Sortini,*
31 Cal. 3d 220, 643 P.2d 954 (1982) .................................................... 19

24
25
*In re Vantive Corp. Sec. Litig.,*
283 F.3d 1079 (9th Cir. 2002)................................................................. 3

26
*In re Wells Fargo & Co. S'holder Derivative Litig.,*
282 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................ 15

27
28

**Rules and Statutes**

§ 10(b)(5) of the Securities Act of 1934 ............................................................................... *passim*

§ 12(a)(2) of the Securities Act of 1933 ............................................................................... *passim*

§ 29(b) of the Securities Act of 1934 ................................................................................... *passim*

California Corporations Code § 25501 ................................................................................. 1, 9

California Corporations Code § 25403 ................................................................................. 1

Fed. R. Civ. P. 8(a) ............................................................................................................. 2

Fed. R. Civ. P. 9(b) ............................................................................................................. 3, 18

Fed. R. Civ. P. 12(b)(6) ....................................................................................................... *passim*



Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully submit this opposition to Defendants' Motion to Dismiss First Amended Complaint.

## I.    STATEMENT OF ISSUES

Whether the First Amended Complaint (the "FAC") adequately pleads Defendants' violation of § 10(b)(5) of the Securities Act of 1934, § 12(a)(2) of the Securities Act of 1933, violation of § 15 of the Securities Act of 1933, violation of § 29(b) of the Securities Act of 1934, violation of California Corporations Code § 25501, violation of California Corporations Code § 25401, violation of California Corporations Code § 25403, and states a claim for Negligent Misrepresentation and Accounting Malpractice.

## II.    INTRODUCTION

This case involves the sale of securities for investment in a Ponzi Scheme. Defendants are the second largest aggregator[1] for the 1inMM Capital, LLC ("1inMM") Ponzi Scheme operated by convicted fraudster Zachary Horwitz ("Horwitz"). *See* Doc. 36-1, Request for Judicial Notice ("RJN"), Ex. 1-3. Horwitz raised very little money directly from individual investors and instead relied on a handful of aggregators, such as Defendants, to add credibility to the sales pitch and act as a gatekeeper between the fraudster and the investors. *Id.* Horwitz has gone to prison and the largest aggregator settled the civil claims against it recently. The liability against this aggregator is obvious and well pled. Doc. 32, First Amended Complaint ("FAC").

The 1inMM Ponzi Scheme would not have flourished with over $1 billion dollars running through its accounts were it not for the willful ignorance of aggregators including Defendants.

Defendants' inexperience and ineptitude in selling securities is the basis for the claims and disposes of the potential defenses. Defendants profited from playing broker-dealers but failed at every level of compliance requisite for their assumed roles. Defendants did not do any of the due diligence required of any professional in the role they assumed and piled on their own

---

[1] Organization or individual that gathers up investment for a Ponzi Scheme



misrepresentations on top of those made by Horwitz in the course of raising over $75 million for the fraudulent scheme. The Defendants' hubris speaks through the rambling Motion to Dismiss and their repeated attempts to delay discovery in this action. Doc. 36, Motion to Dismiss FAC ("MTD"). The Motion should be denied, and case should move forward expeditiously against those who profited from a terrible crime.

### III.   ARGUMENT

#### A. Legal Standards

Under Federal Rules of Civil Procedure, rule 8(a), plaintiffs' complaint must make a "short and plain statement of the claim." Fed. R. Civ. P. 8(a); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). On a motion to dismiss for failure to state a claim under Federal Rules of Civil Procedure, rule 12(b)(6), the Court must accept plaintiffs' factual allegations as true, draw all reasonable inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally. *Twombly,* 550 U.S. at 555-56; *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Doe v. United States,* 419 F.3d 1058, 1062 (9th Cir. 2005). Plaintiffs need not allege "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief." *Twombly,* 550 U.S. at 570. The Court must consider only whether the allegations are "plausible," which stops well short of a "probability" standard. *Iqbal,* 556 U.S. at 678. It need not appear that the plaintiff can obtain the specific relief demanded as long as the court can ascertain from the face of the complaint that *some* relief can be granted. *Massey v. Banning Unified School Dist.,* 256 F.Supp.2d 1090, 1092 (C.D. Cal. 2003).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his'' entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.*

A plaintiff's failure to meet the heightened pleading standards of Federal Rules of Civil Procedure, rule 9(b) may provide the basis for a motion to dismiss under Rule 12(b)(6). *See ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1031-32 (9th Cir. 2016). When alleging fraud, "a

party must state with particularity the circumstances constituting fraud," although "knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "To satisfy Rule 9(b), a pleading must identify the 'who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (citation omitted).

The pleading standards are fully satisfied with the fact intensive FAC.

**B.  Plaintiffs state a claim pursuant to 10(b)(5) (MTD at 9, 22)**

To prevail under Rule 10b-5, a plaintiff must prove: (1) falsity (meaning a material misrepresentation or omission by the defendant); (2) scienter (i.e., a wrongful state of mind); (3) a connection with the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341-42 (2005); *Metzler Inv. GMBH v. Corinthian Colls., Inc.,* 540 F.3d 1049, 1061 (9th Cir. 2008). To meet the more exacting standards of the PSLRA, a plaintiff must specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading. *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1085 (9th Cir. 2002). Plaintiffs satisfied every element with specific detail and the Motion should be denied.

**i.      Falsity is adequately alleged to sustain Plaintiffs' § 10(B) claim at this stage**

Falsity is established by showing that a statement or omission "affirmatively create[s] an impression of a state of affairs that differs in a material way from one that actually exists." *Brody v. Transitional Hosps. Corp.,* 280 F.3d 997, 1006 (9th Cir. 2002); *see also Reese v. Malone,* 747 F.3d 557, 569-70 (9th Cir. 2014). The premise of the claim is that Defendants affirmatively created the impression that Horwitz's scheme was real, money was moving to and from HBO and Netflix, and Defendants had investigated this fully and even were co-signors on the accounts to guarantee the money was moving as promised. (FAC ¶ 64). The reality is that the whole thing was imaginary and Defendants did nothing to confirm Horwitz's story. (FAC ¶ 65).

1    **ii.       Scienter is adequately alleged to sustain Plaintiffs' § 10(B) claim**

2          In this case, Plaintiffs are proceeding under a deliberate recklessness theory of scienter.

3    (FAC ¶¶ 6, 66, 135) A misrepresentation or omission is deliberately reckless if it is highly

4    unreasonable and involves not merely simple negligence, "but an extreme departure from the

5    standards of ordinary care, and [] presents a danger of misleading buyers or sellers that is either

6    known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v.*

7    *Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (internal quotation omitted). Plaintiffs

8    alleging deliberate recklessness need not prove that a defendant "actually knew" their statements

9    were false or misleading, just that they "recklessly turn[ed] a blind eye" to the falsity. *In re*

10   *VeriFone Holdings, Inc. Secs. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). In this case, not only was

11   the conduct extremely reckless but Defendants had a huge financial incentive to be reckless and

12   secure millions in profits off the sham investment.

13         The Supreme Court explained that "[t]he inquiry . . . is whether all of the facts alleged, taken

14   collectively, give rise to a strong inference of scienter, not whether any individual allegation,

15   scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S.

16   308, 323, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) (citations omitted). An inference that is "merely

17   plausible or reasonable" is not enough, "it must be cogent and at least as compelling as any

18   opposing inference of nonfraudulent intent." *Id.* at 324. Applying this standard, the Ninth Circuit

19   has held that a plaintiff can establish scienter "by showing deliberate recklessness or 'some degree

20   of intentional or conscious misconduct.'" *ESG Capital,* 828 F.3d at 1035.

21         The Ninth Circuit has established that "recklessness" will satisfy the scienter requirement

22   of Rule 10b5 under the standards of *Ernst & Ernst v. Hochfelder* 425 U.S. 185, 193 n. 12 (1976):

23         In *Hochfelder*, the Court reserved the question whether "reckless behavior is
24         sufficient for civil liability under §10(b) and Rule 10b-5." 425 U.S. at 193-94 n.
             12,…. This court answered the question affirmatively in *Nelson v. Serwold*, 576
25         F.2d 1332 (9th Cir.), Cert. denied, 439 U.S. 970, 99 S.Ct. 464,….Nelson contains
             a thorough discussion of the scienter requirement and the effect of Hochfelder. We
26         concluded that "recklessness, or some degree of intent not sufficiently aggravated
             to be characterized as 'deliberate and cold-blooded'" would support liability under
27         §10(b) and Rule 10b-5. *Nelson v. Serwold*, 576 F.2d at 1338. Our holding is in
             accord with those of other circuits. *See, e. g., Edward J. Mawod & Co. v. Securities*

& *Exch. Com'n*, 591 F.2d 588, 596 (10th Cir. 1979); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir. 1978); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir.), Cert. denied, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).

Recklessness sufficient to meet the scienter requirement has been described as follows:

> Reckless conduct is best described as "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (*quoting Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)).

*S.E.C. v. Alliance Transcription Services, Inc.* (D. Ariz., Dec. 18, 2009, No.CV08-1464-PHX-NVW) 2009 WL 5128565, at *5.

It goes without saying that in measuring the quality of the "recklessness" of alleged misconduct, context is critical: one must factor in the factual circumstances and the nature of the duty of the one who is alleged to have acted recklessly. Plainly, imbibing an alcoholic beverage while sitting in one's backyard at the end of the work week with relative certainty that the car is in the garage for the weekend is far less likely to be determined a reckless act, than if one was to imbibe the same beverage immediately before driving carpool to the local elementary school on a Monday.

In this case, the recklessness is plead clearly some highlights of the reckless conduct plead include:

First, Defendants never contacted, HBO, Netflix, Sony, City National Bank, never investigated whether there were any internal controls in place at 1inMM, never talked to any third parties in the movie funding business who had experienced dealing with Horwitz, never evaluated Horwitz's personal finances or credit rating, never confirmed what if any assets 1inMM had, never checked to see if 1inMM had an UCC filings for its purported interest in films, never reviewed any financial statements or tax returns created by a third party for 1inMM or Horwitz, and limited their due diligence to asking Horwitz and Cole questions and reviewing documents provided by Horwitz and Cole. (FAC ¶ 67a). Limiting due diligence on a seventy million dollar investment to simply

1    what one young man with no relevant experience reports is akin to driving the carpool with a

2    blindfold on.

3        Second, it is true that Horwitz provided forgeries to ply Defendants, however the forged

4    agreements didn't even name the right counterparty.  the contracts Horwitz gave Defendants were

5    with "**HBO Holdings, Inc**." (emphasis added). Defendants did not know what if any relationship

6    "HBO Holdings, Inc." had with the streaming platform HBO and did not bother to confirm that

7    HBO Holdings, Inc. was even an existing corporation. There was no HBO Holdings, Inc.

8    incorporated anywhere in 2017 or 2018. This is readily apparent with a Google Search of "HBO

9    Holdings, Inc" which leads to the Edgar Archive of all of Time Warner's Subsidiaries which does

10   not include "HBO Holdings, Inc." Further, the California Secretary of State website that shows

11   there is no company registered to do business in California called "HBO Holdings, Inc" despite

12   numerous other HBO entities. Investing over $75,000,000 based on contracts without checking to

13   confirm the party on the other side where the profits were being paid from exists is reckless. (FAC

14   ¶ 67, d.). Applying the analogy above, with the amount of money at stake this act is comparable to

15   performing brain surgery after imbibing an alcoholic beverage.

16       Third, Defendants proceeded with no due diligence of Horwitz apparently because his

17   supposed business partner, Craig Cole ("Cole"), was friends with Ryan Spiegel. However,

18   Defendants ordered a background check on Cole that confirmed he had no interest in 1inMM and

19   was not employed by 1inMM. (FAC ¶67 (e)). Nonetheless, Defendants continued to tout Ryan's

20   long time relationship with Cole and claimed Cole was a 1inMM co-founder as a reason to trust the

21   investment. (FAC ¶¶ 66 f., 67 f.). Relying on Cole despite confirmation of his lack of any formal

22   relationship with 1inMM and holding him out as a co-owner of 1inMM despite confirming

23   otherwise was reckless at the time.

24       Furthermore, Defendants intent to defraud at the time of offering the investment can be

25   inferred from their intentional false statements of fact made to investors later. In determining

26   whether there is a "strong inference" of scienter, the court must weigh competing inferences.

27   *Tellabs*, 551 U.S. at 323-24 ( ("[A] court must consider plausible, nonculpable explanations for the

28   defendant's conduct, as well as inferences favoring the plaintiff."). The inference of scienter must

be more than "merely reasonable . . . it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. The court must view the complaint "holistically." *Id.*; *see also South Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cr. 2008)("Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter."). Thus, a complaint for securities fraud survives a motion to dismiss when, after considering the totality of the circumstances, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellab*s, 551 U.S. at 324; *South Ferry*, 542 F.3d at 784.

Ryan still told investors their money was safe even after 1inMM defaulted on its obligations and remarkably was not being paid by ANY of the three platforms, and all for different purported reasons. This lie was told with the intent of keeping the fraud under wraps and delaying the consequences of facilitating a Ponzi Scheme. (FAC ¶ 67l). On February 17, 2021, 1inMM's attorney, who had been passing along many of the misrepresentations to Ryan and Jeff, explicitly disavowed any statements he had made on behalf of Horwitz and 1inMM. (FAC ¶ 67m). This noisy withdrawal and disavowal was a significant red flag that Ryan knowingly concealed from investors. *Id.* Again, this whole $75,000,000 investment is based on what one man says and that man's lawyer disavowed everything he said. The wheels completely fell off the scheme at this point and we can draw the logical inference Defendants would have told investors and the authorities at this point if this was a surprise to Defendants that Horwitz was lying or if they didn't also have something to hide.

Remarkably, just four days after Horwitz's own lawyer said that nothing previously said on Horwitz's behalf should be believed, on approximately February 21, 2021, Ryan told investors that Horwitz had a new deal with HBO for repayment and money was coming. (FAC ¶ 67m). Ryan had reason to know this was obviously false and he kept up the lie regardless. *Id.*

On or about March 15, 2021, Ryan knowingly lied to his investors stating: "We wanted to provide a quick update as to where everything currently stands. After discussions with their investment groups, 1inMM has agreed to accept the payment proposal from Warner Media and were told they will be receiving the agreement this week. Once all the details are finalized and the

1   agreement is executed we will be sharing all the information with investors. **We are optimistic**

2   **that this will get finalized and payments will be remitted**." (Emphasis added). At this point the

3   SEC was engaged in its investigation of Horwitz. Two weeks prior, another 1inMM aggregator

4   presented evidence of the fraud to the SEC and had notified its hundreds of investors of the fraud.

5   (FAC ¶¶ 67, n, 90).  On March 31, 2021, the SEC prepared a filing including records provided by

6   Defendants. *Id.* The logical inference of this timing is that Defendants had already been contacted

7   by the SEC at the time of the false statements conveyed on March 15, 2021. The March 15 email

8   was a flat out lie.

9        Finally, to round out the misrepresentations, Ryan told investors on April 7 "we received

10   some shocking and disheartening news yesterday regarding 1inMM Capital" that the SEC initiated

11   action against 1inMM. (FAC ¶ 88). This was certainly not "shocking" news. Ryan was working

12   with the SEC for nearly a month without telling investors the truth though investors were then and

13   are now paying Ryan's legal fees.  This is yet another direct lie to investors told to conceal the fact

14   that he knew 1inMM was a fraud long ago.

15        The conduct alleged is deplorable and more than satisfies the reckless standard of scienter

16   necessary for this case to proceed.

17         a. **The FAC adequately alleges the "who, what, when, where" of the alleged**
             **fraud**

18

19   Defendants contend that the FAC is "Plaintiffs' allegations leave the Defendants to wonder:

20   Exactly who allegedly said what, to whom, and when?" (MTD. at 2, 11, 15) Defendants are reading

     a different complaint or borrowed the argument from another brief. The Who, what, and when is
21
     spelled out in great detail in the Complaint.
22
        **Who?** The corporate entity SAC Advisory Group and its two owners Jeff and Ryan.
23
        **What?** The materially false and, or, deliberately reckless representations discussed above. This
24
     includes the basics of the investment spelled out in the Profit Sharing Agreement, emails to
25
     investors (they were sent on a group list), and the reckless conduct inducing investments and lulling
26
     investors once they invested.
27

28

**When?** When Defendants first decided to offer the investment they failed to investigate anything, then made misrepresentations in the Profit Sharing Agreements themselves at the time of the investments. Defendants, as the issuers of those communications, know when, how, why, and where they were issued.

**Where?** Plaintiff has particularized the "where" of each misrepresentation by identifying the documents and or the medium (i.e., advertising and/or Internet) where the representations were made.

Defendants seem to confuse the discussion of the road show sales pitch (FAC ¶¶ 54-63) with the allegations supporting the fraud claims. The road show sales pitch is discussed to support the public offering element of the 12(a) claim which is pled by Rule 8(a) standards. The fraud and reckless allegations are pled with the detail required by Rule 9(b). *See* (FAC ¶64- 73)

### b.  There is no impermissible "lumping" of Defendants in the FAC

Defendants argue that Plaintiffs "routinely make prohibited 'group' allegations, inappropriately lumping the Defendants and Plaintiffs together." (MTD at 16.) Defendants fail, however, to point out any specific portion of the FAC that causes any confusion. Yes, as the motion states, in paragraph "Jeff, Ryan, and SAC told investors at conferences and symposiums and Plaintiffs by phone and email that 1inMM had a letter of intent to sell each movie with a distributor before the movie rights were purchased." FAC ¶64 c." (MTD. 16).  It is true that the representations were made by both father and son and included offering materials of SAC. There's no confusion. It's father, son, and the business they own all communicating the same offering.

Defendant's "lumping" argument ignores the fact that specific allegations, discussed above, are set forth with respect to both defendants Jeff, Ryan, and the company the two of them own. *See e.g.*(FAC ¶¶ 78, 80, 88)

Defendants' argument also fails to account for the fact that with respect to Plaintiffs' California Corporations Code § 25501 claim made against all Defendants, "the plain language of section 25504 means that principal executive officers and directors are presumptively liable for their corporation's" securities fraud violations of California Corporations Code § 25501 and § 25401 "unless they can prove that they lacked knowledge of the facts that established the violation."

1  *Hellum v. Breyer* (2011)194 Cal.App.4th 1300, 1310-1314 (holding that "[t]he plain language of

2  section 25504 expressly subjects outside directors to collateral liability based solely on their status

3  as directors, without requiring any proof of control"). Plaintiffs allege that at all relevant times, Jeff

4  and Ryan were the two owners of SAC with both having knowledge of and participation in the facts

5  underlying the alleged securities fraud. By operation of law what SAC says, Jeff and Ryan say, and

6  Jeff and Ryan are liable for SAC's statements.

7      **iii.     The FAC Pleads Reliance**

8          Plaintiff Investors must show reasonable and actual reliance on misrepresentations—namely,

9  that but for the fraud, Plaintiff Investors would not have participated in the 1inMM Offering. *See*

10  *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc*., 552 U.S. 148, 159 (2008). Plaintiffs

11  had no other possible sources of information on this investment and were completely dependent on

12  Defendants' representations. Plaintiffs reasonably relied on Jeff who was their accountant and audit

13  professional. (FAC ¶¶ 90, 107). Moreover, Defendants warned Plaintiffs not to contact Horwitz or

14  HBO supposedly to prevent them from somehow messing up the deal or upsetting Horwitz so they

15  could not possibly rely on anything else when making the investment. (FAC ¶ 161).

16      **iv.     The FAC pleads loss causation**

17          To prove loss causation, the plaintiff must demonstrate a causal connection between the

18  deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the

19  plaintiff. *Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767, 773 (9th Cir. 1984). "A plaintiff is not

20  required to show that a misrepresentation was the sole reason for the investment's decline in value

21  in order to establish loss causation," other contributing forces will not bar recovery under the loss

22  causation requirement. *See Sparling v. Daou (In re Daou Systems)*, 411 F.3d 1006, 1025 (9th Cir.

23  2005) (citation and internal quotation marks omitted). In this case it's simple, but for Defendants'

24  misrepresentations there would have been no investments from Plaintiffs.

25      **v.      The FAC pleads economic loss**

26          Plaintiffs can demonstrate economic loss in two general ways. The first is the "out-of-pocket,"

27  or "market" measure of damages, which is the difference between the fair value of what was

28  received and the fair value of what one would have received had there been no fraudulent conduct.

Response to Motion to Dismiss First Amended Complaint
Case No. 3:23-cv-00287                              10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155 (1972). Alternatively, "rescissionary damages are to be measured so as to result in the substantial equivalent of rescission," taking into account the value of the property, and any income produced by it, after the date of rescission. *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1208 (9th Cir. 2012) (internal quotation marks and citations omitted). Here, Plaintiff Investors alleged the specific amounts of their investments and then separately states the exact amount of the defaulted January 2020 investments. (FAC ¶¶ 121-128). Plaintiff Investors have alleged all that they need to show economic loss and entitlement to rescissionary damages.

**C. Plaintiffs State Claims for Violation of 12(A)(2) and Violation of Section 15. (MTD. at 12, 19).**

The language of § 12(a)(2) sets out for four elements for liability: (1) there must be an offer or sale of a security; (2) the offer or sale must be made by the use of any means of interstate commerce or the mails; (3) the offer must be made by means of a prospectus; and (4) the prospectus or oral communication relating to the prospectus must include an untrue statement or omission of a material fact. The basic elements of the claim are not disputed in the Motion to Dismiss, and the only point of contention now is whether the investment is public or private. Plaintiff pled ample facts that the offering was public including: (1) Defendants solicited $75,132,950 in investment via sales of three forms of investment in the 1inMM Offering of which $29,733,025 remains owed to investors (FAC ¶ 46); (2) Over 100 individuals from all walks of life and experience invested in Defendants' various offerings of investment in 1inMM thanks to Defendants' aggressive public sales efforts.(FAC ¶ 63); (3) Defendants employed a video presentation to sell investment in the 1inMM Offering (FAC ¶ 66, https://grabify.link/RCI5S5); (4) Defendants engaged at least one salesman with experience selling insurance and unregistered investments and paid him a finder's fee of 5% of the amount invested in consideration of each investor he successfully solicited on Defendants' behalf. (FAC ¶ 55); (5) Defendants had no prior relationship with the investors solicited by salesmen including recent immigrants and elderly individuals. (FAC ¶ 56); Ryan and

1    Jeff presented to large groups of potential investors at a conference in Oregon. (FAC ¶ 57); On or

2    about April 5, 2017, Ryan presented the investment opportunity to individuals at the Mile Marker

3    Club Symposium in Oregon. (FAC ¶ 57); Defendants had no prior relationship with the investors

4    solicited at conferences. (FAC ¶ 58). These facts are sufficient to state a claim that the investment

5    was offered to the public who required the protections of securities laws. Courts have developed

6    flexible tests to determine whether a transaction involves a public offering. These tests focus on

7    four factors: "(1) the number of offerees; (2) the sophistication of the offerees; (3) the size and

8    manner of the offering; and (4) the relationship of the offerees to the issuer." *S.E.C. v. Murphy*, 626

9    F.2d 633, 644-45 (9th Cir. 1980) (citations omitted). For an offering to be private, the test must be

10   met with respect to each purchaser and offeree. *Id*. at 645. There is no language in *Gustafson*, the

11   case Defendants repeatedly rely upon, indicating that a "public offering" should be strictly defined

12   as an offering made to the public at large.  Plaintiff pled facts of a public offering by detailing the

13   road show sales pitch employed by defendants. *See* (FAC ¶¶ 54-63). This fact intensive issue cannot

14   be resolved on a 12(b)(6) Motion. Defendants may later present affirmative facts to contradict what

15   is pled but the issue cannot be resolved now against Plaintiffs.

16       The Supreme Court held that the offer of stock to employees by an employer may constitute a

17   public offering requiring registration. *SEC v. Ralston Purina Co.,* 346 U.S. 119 (1953)(Even if

18   limited to only employees (or customers of an accounting firm and their associates) an offering

19   may be public).  In determining whether a public offering exists, courts are to look to the

20   characteristics of each offeree. *Id.* With regard to the number of offerees, courts have routinely held

21   that this factor is not dispositive; there may be instances where there are few offerees but the

22   offering is nonetheless public. *Murphy*, 626 F.2d at 645. Here Plaintiffs alleged "Over 100

23   individuals from all walks of life and experience invested in Defendants' various offerings of

24   investment in 1inMM thanks to Defendants' aggressive public sales efforts" (FAC ¶ 63).

25       A court assessing the availability of a private offering exemption focuses upon the issuer and

26   the offerees, paying particular attention to the relationship between the two. *See, e.g., Cook v. Avien,*

27   *Inc*., 573 F.2d 685, 691 (1st Cir. 1978); *Hill York Corp. v. American International Franchises, Inc*.,

28   448 F.2d 680, 690 (5th Cir. 1971). This assessment often requires a careful inquiry into the facts

surrounding the offering, *see, e.g., Parvin v. Davis Oil Co.*, 524 F.2d 112, 118 (9th Cir. 1975), and, of course, it requires knowledge of who was the issuer of the securities. Plaintiffs allege Defendants engaged a salesman and solicited investment at conventions thus securing investment from individuals Defendants had no relationship at all. (FAC ¶ 56).

In a Court within this district a group of twenty-one investors who lost money in a Ponzi scheme sufficiently alleged a "public offering" to support a Section 12(a)(2) claim. *Bridges v. Geringer*, No. 5:13-cv-01290-EJD, 2015 U.S. Dist. LEXIS 66695, at *12-15 (N.D. Cal. May 21, 2015). That Court provided the following rationale:

> {R}eliance on Gustafson is inappropriate in this context. In Gustafson, the Court had no reason to decide the issue the Bank raises - whether a particular securities transaction constitutes a public offering - since the case indisputably involved a private stock purchase. Id. at 581 ("It will be recalled that as to private transactions, such as the Alloyd purchase, there will never have been a registration statement."). Instead, the issue of "whether an offering is public or private turns on whether the particular class of persons affected needs the protection" of the securities laws, and is subject to a four factor test focused on the number of offerees, the sophistication of the offerees, the size and manner of the offering, and the relationship of the offerees to the issuer. *West v. Innotrac Corp.*, 463 F. Supp. 2d 1169, 1176 (D. Nev. 2006) (citing *SEC v. Murphy*, 626 F.2d 633, 644-45 (9th Cir. 1980)). Here, though the Bank would limit review to one paragraph, the court construes the Complaint as a whole and finds that it adequately describes with sufficient particularity what could be deemed a public offering under the applicable test, at least at the pleading stage. The fact that Geringer, Luck and Rode may have communicated artificial restrictions on the number of investors and required a minimum investment are relevant considerations as to whether or not the Fund was a public or private offering, but are not dispositive

*Id.*

In this case, Plaintiffs plead a detailed recitation of the sales pitch and the wide variety of investors induced to invest based on the presentations, videos, and paid salesman. Like it did in *Bridges* the Court needs to review the whole story and conclude at a minimum that there are too many factual questions remaining to dispose of this issue now.

There is scant precedent resolving the public versus private question via a 12(b)(6) Motion. The best discussion of the elements from a Ninth Circuit Court is found in *Liu Hongwei v. Velocity V Ltd. partnership*, No. 2:15-cv-05061-ODW-E, 2018 U.S. Dist. LEXIS 115636, at *10-12 (C.D.

Cal. July 11, 2018). In that case the Central District of California evaluated a similar complaint and held the offering was public where 30 investors each invested over $500,000. The Court reasoned:

> First, the offering documents specified that the "VLP units would be sold to 30 investors," which indicates that the opportunity to invest must have been marketed to more than 30 foreign investors. [] While the number of investors is relatively small, the Court interprets the stated number of offerees to be determinative as the total amount of investors is unknown without Defendant's response. *See People v. Humphreys*, 4 Cal. App. 3d 693, 698, 84 Cal. Rptr. 496 (1970) ("The significant factor is not the number of ultimate purchasers but rather the number of offerees."). Additionally, the Court does not find the second element of the private offering exception to be strongly demonstrated because the level of sophistication of the "Chinese and Taiwanese individuals, who made the investment[s]" is unknown. ([] Even so, a lack of finding of the second factor is not dispositive. Third, the offerings were neither small nor offered in a private manner as each investor financed at least $500,000.00 and was contacted about the investment through EB-5 migration agents. (Compl. ¶¶ 9, 13.) Lastly, the investment relationship was such that Plaintiffs were dependent on Defendants to produce evidence that all the information was truthful and available. *Murphy*, 626 F.2d at 647 ("A court may only conclude that the investors *do not* need the protection of the Act if all the offerees have relationships with the issuer affording them access to or disclosure of the sort of information about the issuer.") (emphasis added). Altogether, the four factor test indicates that the investment offer constitutes a public offering, and therefore falls under the protection of § 77l.

*Liu Hongwei v. Velocity V Ltd. partnership*, No. 2:15-cv-05061-ODW-E, 2018 U.S. Dist. LEXIS 115636, at *10-12 (C.D. Cal. July 11, 2018). *Liu* makes clear that there is no bright line and instead this is a fact intensive multifactor test that cannot be resolved against Plaintiffs at this early stage of the litigation. Defendants did not register the offering as a private offering so there is no clear guidance on what this was. The leading cases on this complicated issue are summary judgment cases for a reason. *See Murphy*, 626 F.2d at 644;). Accordingly, the Motion to Dismiss should be denied as to the 12(a) claim and the related control person claim.

**D. Plaintiffs State a Claim for Declaratory Judgment. (MTD. at 5, 21)**

The Declaratory Judgement Claim is the heart of the claim. Defendants rely on voidable agreements with terms that are not enforceable. This claim seeks a declaration to the enforceability of two terms of the Profit Sharing Agreements that are the foundation of the defense to all of the

claims. "Section 29(b) renders voidable '[e]very contract made in violation of any provision of [the securities laws] or of any rule or regulation thereunder, and every contract ... the performance of which involves [such a] violation.' *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1039 (9th Cir. 2011). At the motion to dismiss stage, all a plaintiff must allege is that "(1) the contract involved a prohibited transaction; (2) he is in contractual privity with [the entity]; and (3) [the individual] is in the class of persons that the securities acts were designed to protect." *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017) (*quoting In re Asyst Techs., Inc. Derivative Litig.*, 2008 WL 4891220, at *9 (N.D. Cal. Nov. 12, 2008). In the *Wells Fargo* derivative action, the Court determined that allegations that defendants committed violations of the Exchange Act while performing their duties under various employment contracts was sufficient to state a claim under Section 29(b). *Wells Fargo*, 282 F. Supp 3d 1074 at 1106. The court justified this by reference to *Asyst Technologies*, where the contract in question were stock option contracts granted to director-defendants in that derivative action. *Asyst Technologies*, 2008 WL 4891220, at *9.

Plaintiffs have a private right of action for rescission of the Securities Contracts in this case under Section 29(b) of the Act. *See Mills v. Electric Auto- Lite Co*., 396 U.S. 375 (1970). The FAC pled facts that an actual controversy of sufficient immediacy exists between the Parties as to whether the blanket releases contain in the Profit Sharing agreements are enforceable, pursuant to Section 29(b), the violative agreement or performance by Defendants of the same renders the agreements void. Section 29(b) of the Act voids the rights of the violator (i.e., Defendants, who are conducting themselves as unregistered dealers) when the conduct of the violator contravenes the Act.

Section 29(a) of the Securities Exchange Act, however, provides that "any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter

or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void." 15 U.S.C. § 78cc(a); *Buffin v. Community*, 2021 U.S. Dist. LEXIS 190329, at *6 (C.D. Cal. Aug. 6, 2021). In addition, "[i]n dealing with federal securities, the general rule is that unknown or subsequently maturing causes of action may not be waived." *Petro-Ventures, Inc. v. Takessian*, 967 F.2d 1337, 1340-41 (9th Cir. 1992). That is exactly how Defendants are employing this contract term. This provision "generally invalidates blanket releases of liability that accompany the purchase of a sale of securities." *Melcher v. Fried*, No. 16-cv-2440, 2018 U.S. Dist. LEXIS 205252, 2018 WL 6326334 at *6 (S.D. Cal. Dec. 4, 2018). However, Section 29(a) does not bar waivers of securities fraud claims to settle existing litigation, *Petro-Ventures*, 967 F.3d at 1342-43, or if the waiving party has actual knowledge of claims for securities fraud at the time of signing the release, *Burgess v. Premier Corp.*, 727 F.2d 826, 831-32 (9th Cir. 1984). Neither occurred here: Plaintiffs signed the agreement before making the investment, learning of the present claims, or filing this action.

Accordingly, since the waiver is for an unknown and subsequently maturing cause of action it is void as a matter of law.

The FAC makes clear that Defendants were in the business of selling securities and the Profit Sharing Agreements contain anticipatory waivers of compliance with securities law. (FAC ¶ 167). There is an actual controversy between the parties as to the enforceability of these terms under Federal Securities Laws. There is no legitimate question that this action is properly broad "to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 378-79 (2016) thus granting this Court jurisdiction.



The scope of the relief granted, whether simply declaring the two sentences listed are unenforceable or voiding the entire contract goes beyond whether this simple claim states a claim upon which some relief can be granted.

**E. Plaintiffs adequately allege Defendants Violated California Corporations Code § 25401 (MTD. at 18)**

This claim is pled based on negligence. The statute provides:

> It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication **that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made**, in the light of the circumstances under which the statements were made, not misleading.

The Complaint details how Defendants parroted Horwitz's lies even after other similarly situated middlemen had disclosed the fraud to their investors. (FAC ¶ 67). Defendants didn't do an iota of due diligence into any one besides Horwitz's own representations about himself. *Id.* Defendants came nowhere close to the due diligence required of professional brokers engaged in the same work of offering securities. (Cmplt. ¶¶ 91-120). Instead, they were content to profit from of passing along the con man's lies.  The same issues are discussed above in the more exacting 10(b)(5) context. *See supra* pp. 3-9. As discussed above, Plaintiff pled the falsity of the statements and how Defendants either knew the statements were false (being co-signors or Craig Cole's role) or were reckless in not determining the truth (no third party contact at all and not simply Googling the HBO entity on the contracts)

**F. Plaintiffs adequately allege Negligent Misrepresentation (MTD. at 16, 28)**

The facts pled in support of this claim are largely the same as the statutory claims discussed above.  *See Supra* pp. 3-9. The elements of a negligent misrepresentation claim are "(1) a misrepresentation of a past or existing material facts, (FAC ¶ 64); (2) without reasonable ground for believing it to be true, (FAC ¶ 67, in particular a.) (3) with the intent to induce another's reliance on the fact misrepresented (FAC ¶¶ 45, 46, 203, 204), (4) justifiable reliance on the misrepresentation, (FAC ¶¶ 72, 73) and (5) resulting damage" *Nat'l Union Fire Ins. Co. v. Cambridge Integrated Servs. Group, Inc.*, 171 Cal. App. 4th 35, 50, 89 Cal. Rptr. 3d 473 (2009). This should be obvious by now. Defendants were introduced to Ponzi scheme. Did not investigation

at all. Repeated what the Ponzi scheme told them. Then reaped a huge profit for serving as the middleman for Horwitz and keeping him a step removed from curious investors.

"It is well established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirement." *Neilson v. Union Bank of California*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003); *see also Lorenz v. Sauer*, 807 F.2d 1509, 1511-12 (9th Cir. 1987) ("Under California law, negligent misrepresentation is a species of actual fraud . . . ."). Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). At a minimum, the plaintiffs must "identify the role of each defendant in the alleged fraudulent scheme." *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007). The relationship between Jeff and Ryan and SAC is discussed above. *Supra* pp. 3-9. The relationship with Spiegel Accountancy Corp is plead in two ways. In paragraph 49 the Complaint alleges, "Ryan and Jeff are both employees of Spiegel Accountancy Corp. and relied on its office infrastructure for all of SAC's activities as detailed herein" and more importantly the Complaint alleges the agency between Jeff and his firm. (FAC ¶ 15, "At all relevant times, Jeff was acting as an agent or apparent agent of Spiegel Accountancy Corp."). For the same reasons the Complaint states a 10(b)(5) claim it states a negligent misrepresentation claim.

### G.  Plaintiffs adequately allege Accounting Malpractice (MTD at 16, 28)

Spiegel Accountancy Corp. was the accountant for a feeder fund for a criminal enterprise whose principal, Jeff, profited from the investment in the criminal scheme, whose investors were customers of Spiegel Accountancy Corp. that were solicited for investment at Spiegel Accountancy Corp. Jeff was able to locate and solicit all but one of the Plaintiffs because he was there accountant with intimate knowledge of their finances and a long trusting relationship. (FAC ¶ 211).

The basic elements of a claim for professional malpractice are as follows: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from

the professional's negligence. *Turpin v. Sortini*, 31 Cal. 3d 220, 229-30, 643 P.2d 954 (1982). Regarding the first element, the duty to use skill, prudence, and diligence is triggered only where the professional owes a duty to the claimant in the first place. *See Moore v. Anderson Zeigler Disharoon Gallagher & Gray*, 109 Cal. App. 4th 1287, 1294, 135 Cal. Rptr. 2d 888 (2003) (noting that "[a] key element of any action for professional malpractice is the establishment of a duty by the professional to the claimant" and that, "[a]bsent duty there can be no breach and no negligence") (internal quotation marks omitted). As an accountant, Jeff Spiegel and Spiegel Accountancy Corp. are subject to professional liability. *Lindner v. Barlow, Davis & Wood*, 210 Cal. App. 2d 660, 665 (1962).

Plaintiffs plead the following facts necessary to state a claim for accounting malpractice: First, Jeff was acting as an actual or apparent agent of Spiegel Accountancy Corp. (FAC ¶ 207). Second, Plaintiffs were customers of Spiegel Accountancy Corp. (*Id.* at 208) Jeff sold Plaintiffs on the 1inMM in investments when meeting to discuss the tax services provided by Spiegel Accountancy Corp. at its office and utilized his knowledge of their financial situation and trusting relationship as their accountant to effectuate the sale of the bogus securities (*Id.* ¶¶ 210, 211). The California Board of Accountancy, ICPA Code of Professional Conduct, and The International Ethics Standards Board for Accountants ("IESBA") Code of Ethics for Professional Accountants define the standard of care which prohibit just this sort of conduct. (*Id.* ¶¶ 216-222). Spiegel Accountancy Corp. and Jeffrey Spiegel violated the controlling standards set forth herein and capitalized on a conflict of interest, woefully failed to discover the fraud despite the countless red flags, and, once the fraud became obvious, it failed to act in the public interest. (*Id.* at 220). Jeff Spiegel violated controlling regulations while concurrently selling his customers investment in a Ponzi scheme for his own personal gain while also providing them with tax services. (*Id*. at 221). Finally, but for the negligent acts and breaches of the standard of care, Jeffrey Spiegel would not have parroted Horwitz's lies, would have uncovered the fraud, and would have saved Plaintiffs millions of dollars.  (*Id*. at 222).  Plaintiffs allege Jeff was wearing his CPA hat at all times relevant. (FAC ¶ 16). To the extent he claims that he took off his CPA had and put on his broker or underwriter hat at some point and time is an issue of fact to resolve later. The bottom line is that

Plaintiffs invested because he was their accountant, trusted him because he was their accountant, and Jeff relied on the professional relationship to make the sale. If all this happens within the context of the professional relationship, then his professional duties of competence and diligence apply here as well.

Accordingly, there is no question that Plaintiffs state a claim for accounting malpractice against their accountant who profited by selling them into a Ponzi Scheme fund that his firm did the accounting work for.

Assuming, *arguendo,* the waiver was somehow valid, the waiver is limited to claims "against SAC" there is no limitation on claims against the other Defendants.

The Agreement provides:

> "Investor acknowledges that SAC has not guaranteed that Investor will actually receive the Preferred Return and Investor irrevocably waives any and all claims **against SAC** in the event Investor receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder."

(FAC Ex. A, ¶ 3.1)

There is no language in the investment contract extending this waiver to other parties or broadly defining SAC to include all Defendants.

**H. Defendants' proximate cause argument is a non-sequitur (MTD. at 30)**

Defendants miss the mark on this argument. While they very much want to claim they were victims of Horwitz, it doesn't work that way legally or factually considering they made a multimillion dollar profit.

The criminal act by Horwitz is the first act in the causal chain. First, Horwitz lied to Defendants. Second, Defendants failed to investigate whether Horwitz was misrepresenting facts. Third, Defendants parroted Horwitz's lies to Plaintiffs. Fourth, Defendants profited handsomely on selling securities based on these lies. Fifth, Horwitz's obvious lies were discovered. Sixth, investors lost their investment.  There is no "intervening act". The criminal conduct occurred, then Defendants through their willful ignorance profited on the crime and kept it going. The negligence alleged is the failure of Defendants to be aware of what had already occurred.

Defendants oddly rely on *Paskenta Band of Nomlaki Indians v. Crosby*, 122 F.Supp.3d 982 (E.D.Cal. 2015) which supports Plaintiffs' argument perfectly. The issue in that case was whether a criminal act broke the causal chain.  The law as explained in *Paskenta* is clear, "Criminal conduct which causes injury will ordinarily be deemed the proximate cause of an injury, **superseding any prior negligence** which might otherwise be deemed a contributing cause." *Id.* at 996 (emphasis added). In this instance, the crime of creating an imaginary investment preceded Defendants' negligence in approving it, marketing it, and selling it for a profit. The District Court held the criminal conduct was not a superseding cause and the Motion to Dismiss was denied. The same logic applies here.

Defendants rely on *Koepke v. Loo*, 18 Cal.App.4th 1444, 1449 (1993). Where, unlike here, the alleged negligence preceded the criminal act. In *Koepke* the alleged negligence was the failure to prevent an unforeseeable act. Conversely, in this case the criminal act was complete, and the negligence was in furtherance of the crime. The situations are completely distinct.

Obviously, there is no case that can be cited where a broker or salesman successfully placed the entire blame for his own failure to investigate on the person he failed to investigate and achieved dismissal.

1

2       **IV. CONCLUSION**

3            Defendants' motion to dismiss should be denied in its entirety.[2]

4       Dated:  May 21, 2023                              Respectfully submitted,

5
                                                          **LOFTUS & EISENBERG, LTD.**
6
7                                                         By:  ___/s/*Alexander N. Loftus*_____
                                                              Alexander N. Loftus
8                                                             Attorneys for Plaintiffs

9       Alexander N. Loftus, Esq. (*pro hac vice*)
        Ross M. Good, Esq. (*pro hac vice*)
10      LOFTUS & EISENBERG, LTD.
        161 N. Clark, Suite 1600
11      Chicago, Illinois 60601
        T: (312) 899-6625
12      alex@loftusandeisenberg.com
13      ross@loftusandeisenberg.com

14      William Aron, Esq.
15      ARON LAW FIRM
        15 W Carrillo St, Suite 217
16      Santa Barbara, CA 93101
        T: (805) 618-1768
17      bill@aronlawfirm.com

18

19

20

21

22

23

24

25

26      ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
        [2] In the event the Court grants Defendants' motion, or any part of it, Plaintiffs respectfully request
27      leave to amend under Rule 15(a)(2) of the Federal Rules of Civil Procedure. This Response only
        addresses the arguments in Defendants' Motion. If any new arguments are made in Defendants'
28      Reply, Plaintiff will seek leave to file a sur-reply.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2023 I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 22, 2023.

By:   /s/*Alexander N. Loftus*
Alexander N. Loftus
Attorneys for Plaintiffs

Alexander Loftus, Esq.
Ross M. Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T: (312) 772-5396
alex@loftusandeisenberg.com
ross@loftusandeisenberg.com

