PATRICK BALDWIN, ESQ. (SBN 93337)
CHRISTOPHER MADER, ESQ. (SBN 199605)
BALDWIN MADER LAW GROUP
516 North Sepulveda Boulevard
Manhattan Beach, CA 90266
Phone: (310) 363-2031
*Attorneys for Defendants Spiegel Accountancy Corporation, Jeffrey Spiegel, Ryan Spiegel and SAC Advisory Group, LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC. and PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC,<br><br>    Plaintiffs,<br><br>        v.<br><br>SPIEGEL ACCOUNTANCY CORP., JEFFREY SPIEGEL, RYAN SPIEGEL and SAC ADVISORY GROUP, LLC,<br><br>    Defendants. | **CASE NO. 23-cv-00287-VC**<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date:          December 28, 2023<br>Time:          2:00 p.m.<br>Courtroom:   10<br>Judge:         Hon. Araceli Martínez-Olguín<br><br>Action Filed:   January 19, 2023<br>Trial Date:      Not Set |

    Defendants Spiegel Accountancy Corporation, Jeffrey Spiegel, Ryan Spiegel and SAC Advisory Group, LLC ("Defendants") hereby request that the Court take judicial notice of the documents attached hereto as Exhibits 3 – 6 pursuant to Federal Rule of Evidence 201. This request is made in support of the Defendants' Motion to Dismiss the Second Amended Complaint of Plaintiffs Ellusionist Cash Balance Plan And Trust, *et al.*

**Exhibit 3**:  Attached as Exhibit "3" is a true and correct copy of the Complaint in U.S. District Court, Central District of California Case No.: 21-cv-02927, *Securities and Exchange Commission v. Zachary Horwitz and 1inMM, LLC*.  Federal Rule of Evidence 201 permits Judicial Notice of this Complaint.

**Exhibit 4**:  Attached as Exhibit "4" is a true and correct copy of the Complaint (without exhibits) in U.S. District Court, Central District of California Case No.: 21-mj-01631, *United States  v. Zachary Horwitz*.  Federal Rule of Evidence 201 permits Judicial Notice of this Complaint.

**Exhibit 5**:  Attached as Exhibit "5" is a true and correct copy of the Sentencing Order in U.S. District Court, Central District of California Case No.: 21-mj-01631, *United States v. Zachary Horwitz*.  Federal Rule of Evidence 201 permits Judicial Notice of this Order.

**Exhibit 6**:  Attached as Exhibit "6" is a true and correct copy of the Complaint (without exhibits) in U.S. District Court, Northern District of California Case No.: 21-cv-03990, *Jocelyn Carter v. Jeffrey Spiegel and Ryan Spiegel*.  Federal Rule of Evidence 201 permits Judicial Notice of this Complaint.

Dated:  September 12, 2023

BALDWIN MADER LAW GROUP

By: _____
Patrick Baldwin, Esq.
Christopher Mader, Esq.
*Attorneys for Defendants*

# Exhibit 3

CLERK, U.S. DISTRICT COURT

APR - 5 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

1  KATHRYN C. WANNER (Cal. Bar No. 269310)
   Email: wannerk@sec.gov
2  M. LANCE JASPER (Cal. Bar No. 244516)
   Email: jasperml@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Alka N. Patel, Associate Regional Director
   Amy J. Longo, Regional Trial Counsel
6  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
7  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904

8

9                    **UNITED STATES DISTRICT COURT**

10                   **CENTRAL DISTRICT OF CALIFORNIA**

11

12   SECURITIES AND EXCHANGE            Case No. **2:21-CV-02927-CAS-GJSx**
13   COMMISSION,
                                        **COMPLAINT**
14            Plaintiff,
                                        **JURY DEMAND**
15        vs.
                                        **(FILED UNDER SEAL)**
16   ZACHARY J. HORWITZ; AND
17   1INMM CAPITAL, LLC,

18            Defendants,

19

20

21

22

23

24

25

26

27

28

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The SEC brings this emergency action pursuant to authority conferred on it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Sections 21(d) and 21(e) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u(e), to restrain and enjoin the Defendants Zachary J. Horwitz ("Horwitz") and 1inMM Capital, LLC ("1inMM") (collectively "Defendants") from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a) and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Horwitz resides in this district and Defendant 1inMM has its principal place of business in this district.

## SUMMARY

4.     Horwitz, a Los Angeles based actor, and his company 1inMM conducted an offering fraud and Ponzi scheme in violation of the federal securities laws. Since March 2014, until at least December 2019, Defendants raised over $690 million from investors by selling promissory notes issued by 1inMM, using fabricated agreements

1

and fake emails with prominent third party companies with whom Defendants had no actual business relationship. Horwitz then misappropriated and misused the offering proceeds, including for the purchase of a luxury home he has recently listed for sale.

5.      Defendants represented that the purpose of the offering was to finance 1inMM's acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies, mostly Netflix or Home Box Office ("HBO"). To persuade investors to purchase the promissory notes, Horwitz made materially false and misleading statements, including that he had experience acquiring and licensing distribution rights in movies to HBO and Netflix, and that he had, in the past, used the profits from those transactions to repay investors in 1inMM's promissory notes. Horwitz described himself to investors in company documents as bringing "a wealth of knowledge, reputation, and experience[.]" Defendants also claimed that HBO, Netflix, and other media corporations were 1inMM's "Strategic Partners[]".

6.      Horwitz showed investors numerous fictitious documents to substantiate his claimed deals with HBO and Netflix, including numerous fake movie distribution agreements.

7.      Defendants promised returns in excess of 35% on 1inMM's Promissory Notes.

8.      In reality, 1inMM and Horwitz had no relationship with either HBO or Netflix and never licensed any movie rights to either company.

9.      Instead, Horwitz misappropriated investor funds to pay putative returns on earlier investments.

10.      In addition, in 2018 Horwitz misappropriated investor funds to purchase his $5.7 million personal home.

11.      Horwitz also transferred some investor funds into his personal bank account. Moreover, since March 2014, until at least December 2019, Horwitz also spent lavishly from his personal bank account.

12.      For example, in 2016 and 2017 alone, Horwitz spent over $100,000 on

2

trips to Las Vegas. Then in 2018, after purchasing his Beverlywood home, Horwitz made payments to American Express of at least $1,842,840 and paid almost $700,000 to a celebrity interior designer.

13.    In late 2019, Horwitz began defaulting on outstanding notes issued by 1inMM, leaving investors with more than $234 million in unreturned principal. Horwitz falsely blamed his default on refusals by HBO and Netflix to pay for distribution rights they had licensed from 1inMM and claimed he was engaged in promising negotiations with them to obtain past-due payments.

14.    From early 2020 to at least March 2021, Horwitz has been lulling investors with false promises that he and 1inMM are on the verge of reaching agreements with HBO and/or Netflix, and would soon be able to repay investors from the proceeds of those settlements. To make his lies more convincing, Horwitz shows investors fabricated email communications with representatives of HBO as well as false collections accounts allegedly showing funds available from HBO and Netflix for distribution.

15.    On or about January 21, 2021, Horwitz listed his personal home for sale, threatening to dissipate all that may remain of the more than $690 million he raised from 1inMM's investors.

16.    As a result of the conduct alleged in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 17j(b), ("Exchange Act"), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5. Unless restrained and enjoined, Defendants will engage in future violations of the federal securities laws. The SEC seeks an emergency asset freeze, accounting and document preservation order, as well as permanent injunctions, disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint plus prejudgment interest thereon, and civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3).

**DEFENDANTS**

17.     **Zachary J. Horwitz** ("Horwitz"), age 34, is a resident of Los Angeles, California, and the managing member of 1inMM.  He controlled 1inMM and its bank accounts at all relevant times as its sole principal.  Horwitz purports to be an actor based in Los Angeles.

18.     **1inMM Capital, LLC** ("1inMM") is a California limited liability company formed in September 2013.  Its principal place of business is Horwitz's home in Los Angeles, California.  Neither 1inMM nor its securities offerings are registered with the Commission.

**FACTS**

**A.     The Promissory Notes**

19.     Beginning in or about March 2014, Horwitz raised investor funds pursuant to promissory notes issued by 1inMM (the "Promissory Notes").

20.     The Promissory Notes had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months.

21.     Principal amounts for the Promissory Notes ranged from approximately $35,000 to $1.5 million.

22.     Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the life of the note.

23.     Defendants represented that 1inMM would use the proceeds from each Promissory Note to finance transactions in which Defendants would: (1) acquire distribution rights in a specific movie; (2) license those rights to a specific media company; and (3) use the profits from these transactions to satisfy the note.

24.     In many instances, Horwitz provided investors documentation purporting to grant the investor a security interest in the movie rights acquired through the proceeds of that note.

25.     The following table illustrates the terms of a representative sample of

Promissory Notes:

| Date | Putative Movie | Putative Licensee | Principal | Payment at Maturity | Maturity Date | Return at Maturity |
|------|----------------|-------------------|-----------|---------------------|---------------|--------------------|
| Dec. 17, 2018 | *Active Measures* | Netflix | $1,398,000 | $1,994,700 | Dec. 17, 2019 (12 months) | 43% |
| Feb. 27, 2019 | *Lucia's Grace* | Netflix | $1,397,500 | $1,994,625 | Feb. 27, 2020 (12 months) | 43% |
| May 29, 2019 | *Run With The Hunted* | HBO | $744,500 | $1,004,084 | Nov. 29, 2019 (6 months) | 35% |
| June 12, 2019 | Desolation | HBO | $740,250 | $1,004,304 | Dec. 12, 2019 (6 months) | 35% |
| July 12, 2019 | *Blood Quantum* | HBO | $735,000 | $998,865 | Jan. 1, 2020 (6 months) | 36% |
| Oct. 18, 2019 | *La Melodie* | HBO | $739,850 | $997,840 | April 18, 2020 (6 months) | 35% |

26.     Horwitz represented to investors that he and 1inMM would profit from these transactions by selling the movie rights to HBO or Netflix at a profit in excess of the profits paid to investors, and that Horwitz and 1inMM would retain this excess.

27.     Horwitz told some investors that 1inMM would profit from the transactions in additional ways, including by retaining certain distribution rights acquired in the transactions and licensing those rights for 1inMM's benefit.

**B.     Identification and Solicitation of Investors**

28.     Horwitz relied on personal relationships and word-of-mouth referrals to obtain investors.

29.     Horwitz typically solicited investors in person, over the telephone, and via email.

30.     Horwitz raised money from five principal investors, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in the Promissory Notes.

31.     Horwitz's five principal investors raised funds from more than 200 downstream investors, some of whom raised funds from further downstream

investors to finance purchases of Promissory Notes.

32. Often, investors combined capital for the purchase of an individual Promissory Note.

33. In many instances, Horwitz was aware that investors were combining funds for the purchase of an individual Promissory Note.

**C.    The Fraud**

34. Horwitz told investors he had experience and relationships in the media content distribution industry, that he and 1inMM had existing business relationships with HBO and Netflix, and that he could use his experience and connections to acquire and sell distribution rights in movies to Netflix and HBO for a profit.

35. Horwitz represented that investments in the Promissory Notes were safe because Netflix and HBO were established media companies that had an urgent need for new content, were willing to pay Horwitz a premium to license the rights he acquired, and had the financial ability to pay for those rights.

36. Horwitz promised to use the proceeds from each note to purchase the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.

37. Horwitz justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.

38. Horwitz made these representations directly to investors over the telephone, in person, and via email.

39. For example:

(a)    During a June 2017 telephone call, Horwitz falsely represented to a potential investor that 1inMM had licensed movies for distribution in Latin America to HBO and Netflix; that he had longstanding relationships with both HBO and Netflix; and that he and 1inMM had a successful track record of using investor funds to purchase distribution rights that he licensed to HBO and Netflix at a significant

markup.  That potential investor subsequently invested approximately in 34 specific movies, each associated with a separate promissory note issued by 1inMM. Defendants defaulted on paying on 12 of those promissory notes, and owe at least $8,000,955 to this investor.

   (b) On or about June 29, 2017, Horwitz met personally with another potential investor and represented that he would use that investor's funds to acquire the rights to specific movie titles and license those rights to HBO.  That potential investor subsequently invested in 108 movies with corresponding promissory notes. At this time, Defendants owe this investor at least $8,746,227.81

  40. To support his false representations, Horwitz sent documents to investors that purported to evidence his business dealings with HBO and Netflix, including distribution agreements that appeared to reflect agreements by Netflix and HBO to license rights from 1inMM in the specific movie titles for which investors had purchased the Promissory Notes.

  41. For example, among numerous other fake distribution agreements, Horwitz provided investors with the following forged distribution agreements:

   (a) Distribution agreement with HBO, dated June 1, 2019, for the movie titled "Behind the Walls."

   (b) Distribution agreement with HBO, dated May 17, 2019, for the movie titled "Run With the Hunted."

   (c) Distribution agreement with HBO, dated July 11, 2019, for the movie titled "Coyote Lake."

   (d) Distribution agreement with Netflix, dated March 4, 2019, for the movie titled "Lucia's Grace."

  42. At times, Horwitz provided putative investors with 1inMM annual reports, describing 1inMM's purported acquisitions and sales of rights in dozens of movies to Netflix and HBO.

  43. Horwitz sent documents to investors via email, including through a

secure email account, and through at least one Dropbox account to which Horwitz and certain of his investors had access over the Internet.

44. Horwitz's representations and the documents he provided were important to investors who purchased the Promissory Notes.

45. It was particularly important to investors that Horwitz had business relationships with HBO and Netflix, and that HBO and Netflix were the ultimate purported counterparties to the business deals underlying their investments. Defendants advertised the security of these business relationships, stating in 1inMM's Annual Report, "[w]e believe that the safety of our investor's funds should always be our first priority . . . Through our solid relationships, we receive confirmation from each of our outputs indicating their desire to acquire the rights to any title we purchase prior to us releasing funds for the film[.]"

46. Investors found it credible that HBO and Netflix had an urgent need for new content, were willing to pay a premium for that content, had the financial ability to do so, and would pay 1inMM in a timely fashion for the rights they licensed. One investor stated that "I believed that if HBO was involved, my investment was safe."

47. Over time, 1inMM's investors were also deceived by Horwitz's consistent track record of paying large profits supposedly generated by his deals with Netflix and HBO.

48. Horwitz's representations were false and misleading, and the documents he sent investors were fabricated.

49. Horwitz and 1inMM did not have business relationships with Netflix or HBO and did not sign distribution agreements with Netflix or HBO. They did not acquire the movie rights funded by the Promissory Notes and did not sell those rights to Netflix or HBO.

50. Horwitz used investor funds to pay purported returns on previously issued notes, which induced investors to purchase additional notes and to raise funds from downstream investors.

8

51. For example, during at least the following periods, Defendants received investor funds into accounts that only contained investor funds, and immediately used those funds to pay returns to other investors:

(a) March 2017, Horwitz made at least three payments to investors using funds raised from other investors, including, but not limited to, payments of $883,667, $713,758 and $721,128;

(b) November 2018, Horwitz made at least four payments to investors using funds raised from other investors, including, but not limited to, payments of $861,288, $945,412, $929,560 and $929,680; and

(c) June 2019, Horwitz made at least four payments to investors using funds raised from other investors, including, but not limited to, payments of $500,000, $931,387, $1,168,900 and $1,173,940.

52. In at least one instance, on or about the month of September 2017, Horwitz falsely represented to an investor group that he was personally co-investing in several of the Promissory Notes with them.

53. In fact, the funds Horwitz supplied were misappropriated from other investors.

54. In March of 2018, when it came time to pay off those Promissory Notes, 1inMM paid the investor group approximately $9 million purporting to be the return of principal and the agreed upon profit. In turn, the investor group paid Horwitz $2.33 million of that amount based on his co-investment.

55. In fact, this money was largely misappropriated from other investors.

56. Horwitz used his $2.33 million of the alleged co-investment, in combination with other money misappropriated directly from investors, to purchase his personal residence for approximately $5.7 million (in cash).

57. Horwitz completed the purchase of his residence by transferring over $5.6 million to the escrow company on March 28, 2018, the day after he received the $2.33 million, and shortly after transferring other investor funds to his personal

account.

58.     Horwitz also deposited or transferred at least some investor funds to his personal bank accounts.

59.     Horwitz used money from his personal City National Bank account ending in 5270, for lavish personal spending, including, but not limited to, extravagant trips to Las Vegas, flights on chartered jets, payments for high-end automobiles, a subscription service for luxury watches, and the previously described purchase of his multi-million-dollar home.

60.     For example, in 2016 through 2017, Horwitz spent from his personal City National Bank account ending in 5270, $124,582 on trips to Las Vegas.

61.     In 2018 alone, among other expenses, Horwitz spent the following:

      (a)     payments to American Express of $1,842,840;

      (b)     payments to a celebrity interior decorator of $691,800;

      (c)     payments for high-end automobiles of $165,408;

      (d)     payments for chartered jet flights of $137,072, and

      (e)     payments for a luxury watch subscription service of $54,600.

**D.     Lulling Conduct and Attempts to Raise Additional Funds**

62.     In late 2019, Horwitz and 1inMM stopped making payments to investors for the outstanding Promissory Notes.

63.     By text message and email, Horwitz provided investors false explanations for why he had stopped making payments.

64.     Horwitz initially blamed HBO and Netflix for failing to make promised payments to 1inMM.

65.     For example, Horwitz told one investor that while he had intended to sue HBO for non-payment, that he was instead able to obtain an alleged consolidated distribution agreement, pursuant to which HBO would immediately pay its past due payments to 1inMM.

66.     Horwitz then sent that same investor documents that Horwitz claimed

1   were (1) a term sheet with HBO Latin America Holdings and (2) a draft form of the

2   consolidated distribution agreement with HBO Latin America Holdings.

3       67.    Horwitz then sent a text message to the investor with a picture of what

4   Horwitz claimed was the signature page for that consolidated distribution agreement,

5   allegedly signed by a Senior VP of Global Licensing to HBO Latin America

6   Holdings.

7       68.    The alleged term sheet, consolidated distribution agreement, and

8   signature page to the consolidated distribution agreement between HBO Latin

9   America Holdings and 1inMM were all fake.

10      69.    There is no company named HBO Latin America Holdings.  While HBO

11  Latin America Holdings, LLC is a real company, it is merely a holding company and

12  does not license any content.

13      70.    Instead, HBO-Latin America Group is the entity that licenses third-party

14  rights for content distributed by HBO in Latin America.  HBO-Latin America Group

15  never licensed content from 1inMM.

16      71.    Throughout 2020, Horwitz lulled investors with false promises that

17  negotiations with HBO and Netflix would soon lead to large payments to 1inMM

18  and, in turn, the repayment of outstanding notes.

19      72.    For example, Horwitz falsely claimed to one investor that HBO had

20  agreed to pay 1inMM by October 15, 2020, but that HBO asked for a one-week grace

21  period to remit payment, suggesting payment would be complete by the end of

22  October 2020.

23      73.    Horwitz then represented to at least some investors that on or about

24  December 1, 2020, a collections account was established at Freeway Entertainment, a

25  collections account management company, and that HBO had deposited money due

26  to 1inMM in that account on multiple occasions.

27      74.    In addition to falsely representing the existence of ongoing negotiations

28  with HBO and Netflix, Horwitz sent investors fabricated documents purportedly

evidencing those negotiations, including falsified emails purportedly sent by representatives of HBO.

75. For example, Horwitz claimed to copy and paste fake emails from HBO into text messages that he then sent to investors, including an email suggesting that HBO had future business deals for 1inMM that would be very lucrative.

76. Horwitz promised investors that payment is forthcoming, and on or about March 12, 2021, by email, represented to some investors that "[g]ood news is that we heard back that we will have an 'execute-able' amendment by mid-next week that reflects a release of funds by April 9th (at the latest)."

77. Also on or about March 12, 2021, by email, Horwitz suggested to the representative of a different investor group that investors could provide funds to 1inMM to pay legal counsel in connection with 1inMM's alleged efforts to obtain payment from HBO, stating that "1inMM is not in a position to cover the full cost of litigation so options on the table are sharing the financial burden with investors (highly doubtful)[.]" Notably, approximately a month before Horwitz sent this email, on or about February 15, 2021, 1inMM's attorney had informed Netflix by email that he was withdrawing from representing 1inMM.

78. Horwitz's lulling statements are false and misleading because Defendants have never had any contractual or other business relationship with HBO or Netflix.

**E.    Defendants Acted with a High Level of Scienter, or in the Alternative, Were Negligent**

79. Horwitz acted with a high level of scienter.

80. Horwitz knew, or acted recklessly in not knowing, that the representations he made to investors in 1inMM about his and 1inMM's alleged business relationships with HBO and Netflix and his use of investor funds were materially false and misleading.

81. In addition, Horwitz's conduct was negligent. Horwitz's conduct in

offering and selling securities issued by 1inMM, while lying about his business relationships with HBO and Netflix and his intended use of investor funds was a departure from the ordinary standard of care of a person offering and selling securities.

82. Horwitz's state of mind is imputed to 1inMM because he controls it.

### FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against all Defendants)**

83. The SEC realleges and incorporates by reference paragraphs 1 through 82 above.

84. As set forth above, Defendants Horwitz and 1inMM made several material misrepresentations, and omitted material information, to 1inMM investors, including statements that they had business relationships with HBO and Netflix; that they had successfully sold movie rights to HBO and Netflix; and that they would use the proceeds of the Promissory Notes to buy and sell movie rights to HBO and Netflix.

85. In addition, Defendants Horwitz and 1inMM engaged in a scheme to defraud whereby they induced investors to invest in 1inMM, including: (1) by fabricating distribution agreements between 1inMM and HBO/Netflix, which they provided to investors; (2) by using investor funds to make Ponzi payments to previous investors, thereby giving the false impression that they had successfully purchased and licensed movie rights for a profit; and (3) by misappropriating millions of dollars in investor funds for the purchase of Horwitz's luxury home.

86. By engaging in the conduct described above, Defendants Horwitz and 1inMM, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or

1   artifices to defraud; (b) made untrue statements of a material fact or omitted to state a

2   material fact necessary in order to make the statements made, in the light of the

3   circumstances under which they were made, not misleading; or (c) engaged in acts,

4   practices, or courses of business which operated or would operate as a fraud or deceit

5   upon other persons.

6       87.    By engaging in the conduct described above, Defendants Horwitz and

7   1inMM violated, and unless restrained and enjoined will continue to violate, Section

8   10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17

9   C.F.R. § 240.10b-5(b).

10                          **SECOND CLAIM FOR RELIEF**

11                    **Fraud in the Offer or Sale of Securities**

12            **Violations of Sections 17(a) of the Securities Act**

13                          **(against All Defendants)**

14      88.    The SEC realleges and incorporates by reference paragraphs 1 through

15  82 above.

16      89.    By engaging in the conduct described above, Defendants Horwitz and

17  1inMM obtained money or property by means of false statements to investors in

18  connection with the offer or sale of investments in 1inMM, and omitted to disclose

19  material information about 1inMM and Horwitz.

20      90.    In addition, Defendants Horwitz and 1inMM engaged in a scheme to

21  defraud whereby they induced investors to invest in 1inMM, including by (1)

22  fabricating distribution agreements between 1inMM and HBO/Netflix, which they

23  provided to investors; (2) by using investor funds to make Ponzi payments to

24  previous investors, thereby giving the false impression that they had successfully

25  purchased and licensed movie rights for a profit; and (3) by misappropriating millions

26  of dollars in investor funds for the purchase of Horwitz's luxury home.

27      91.    By engaging in the conduct described above, Defendants Horwitz and

28  1inMM, directly or indirectly, in the offer or sale of securities by the use of means or

                                          14

1  instruments of transportation or communication in interstate commerce or by use of

2  the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money

3  or property by means of untrue statements of a material fact or by omitting to state a

4  material fact necessary in order to make the statements made, in light of the

5  circumstances under which they were made, not misleading; or (c) engaged in

6  transactions, practices, or courses of business which operated or would operate as a

7  fraud or deceit upon the purchaser.

8        92.    Defendants Horwitz and 1inMM, with scienter, obtained money or

9  property by means of untrue statements of material fact or by omitting to state a

10  material fact necessary in order to make the statements made, in light of the

11  circumstances under which they were made, not misleading.  In the alternative,

12  Defendants Horwitz and 1inMM were negligent.

13        93.    By engaging in the conduct described above, Defendants Horwitz and

14  1inMM violated, and unless restrained and enjoined will continue to violate, Section

15  17(a) of the Securities Act, 15 U.S.C. § 77q(a).

16  **PRAYER FOR RELIEF**

17        WHEREFORE, the SEC respectfully requests that the Court:

18  **I.**

19        Issue findings of fact and conclusions of law that Defendants committed the

20  alleged violations.

21  **II.**

22        Enter a temporary restraining order and preliminary injunction, in a form

23  consistent with Rule 65 of the Federal Rules of Civil Procedure, freezing assets,

24  requiring an accounting, prohibiting destruction of documents, and an order to show

25  cause why the asset freeze should not continue until this matter is determined on the

26  merits.

27  ///

28  ///

**III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining the Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**IV.**

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

**VI.**

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VIII.**

Grant such other and further relief as this Court may determine to be just and necessary.

///

///

///

///

///

16

## **Jury Demand**

The SEC demands a trial by jury on all claims so triable.


Dated: April 5, 2021

/s/ *Kathryn C. Wanner*
Kathryn C. Wanner
M. Lance Jasper
Attorneys for Plaintiff
Securities and Exchange Commission

# Exhibit 4

AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**4/5/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____JB_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

04/05/21

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____jm_____ DEPUTY

United States of America

v.

Zachary Joseph Horwitz,

Defendant

Case No.    2:21-mj-01631-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 14, 2018, in the county of Los Angeles, in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

John Verrastro, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    _____04/05/21_____

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexander Schwab x1259/David Chao x0166

**AFFIDAVIT**

I, John Verrastro, being duly sworn, declare and state as follows:

**I. INTRODUCTION**

1.    I am a Special Agent of the Federal Bureau of Investigation ("FBI") in the Los Angeles Field Office and have been so employed since 2004.  For approximately fifteen years, my primary responsibility has been investigating securities fraud, mail fraud, wire fraud, money laundering, and other fraud violations.  My experience includes interviewing witnesses, gathering documents, analyzing financial documents, conducting surveillance, and serving grand jury subpoenas.  I have also received training in investigating financial crimes, including securities fraud, bank fraud, wire fraud, and money laundering. Prior to becoming an FBI agent, I worked for ten years in financial services at a bank and an investment firm.  In the course of my FBI employment, I have participated in executing many search warrants of businesses and residences in connection with financial fraud offenses.  In investigating fraudulent schemes, I have become familiar with the types of records and documents that individuals and entities use to perpetrate their schemes, and have executed and participated in the execution of search warrants at homes and businesses of individuals involved in fraudulent schemes.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.    This affidavit is made in support of a complaint and arrest warrant for ZACHARY JOSEPH HORWITZ for a violation of wire fraud, in violation of 18 U.S.C. § 1343.  It is also made in support of an application for a warrant to search the premises located at 9615 Bolton Road, Los Angeles, California 90034 (the "SUBJECT PREMISES") for the evidence, contraband, fruits, and instrumentalities of securities fraud, mail fraud, wire fraud, aggravated identity theft, and money laundering, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10-b; and 18 U.S.C. §§ 1341, 1343, 1028A, 1956, and 1957 (the "Subject Offenses").

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, information obtained from various law enforcement personnel, other government agencies, and witnesses, and my review of records.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. <u>PREMISES TO BE SEARCHED</u>

4.    The SUBJECT PREMISES is located at 9615 Bolton Road, Los Angeles, California 90034.  The SUBJECT PREMISES is a white and tan colored two-story home with an attached two-car garage.

There is a support pillar on the front porch with the numbers 9615 shown vertically.

## IV. STATEMENT OF PROBABLE CAUSE

5.      Since 2013, ZACHARY JOSEPH HORWITZ, who goes by the screen name "Zach Avery," has operated a film distribution company called 1inMM Capital LLC ("1inMM Capital"). Based in Los Angeles, California, 1inMM Capital is purportedly engaged in the business of buying and selling film distribution rights. To raise money to acquire film rights, HORWITZ solicited investments through the issuance of promissory notes to investors, particularly private investors. To attract investors, HORWITZ falsely represented that 1inMM Capital used investor funds to acquire film distribution rights, which he would then license to major online platforms such as Netflix or HBO, thus enabling 1inMM Capital to provide investors lucrative rates of return on the promissory notes, often in excess of 25 percent. In reality, as HORWITZ knew, 1inMM Capital did not use the investor funds for the stated purpose and did not have licensing deals with these online platforms, but instead diverted the funds for his personal benefit and to make payments on earlier promissory notes in the style of a classic Ponzi scheme. To date, HORWITZ, through 1inMM Capital, is in default to investors on a total outstanding principal of approximately $227 million.

**A. Background on Zachary HORWITZ, 1inMM Capital, and JJMT Capital**

6.      Based on my review of law enforcement databases and public source documents, I know that HORWITZ is an actor and self-described Hollywood entrepreneur who lives in Los Angeles. In 2013, he founded 1inMM Capital, a Los Angeles-based film distribution company that claimed to acquire and distribute English language feature films to the Latin American market through partnerships with online platforms like Netflix and HBO.

7.      California Secretary of State records show that HORWITZ is the sole manager of 1inMM Capital. Records from City National Bank ("CNB") show that HORWITZ is also the sole signatory for a CNB checking account in the name of 1inMM Capital ending in -0290 (the "1inMM Capital account").

a.      I have reviewed a corporate "Statement of Information" for 1inMM Capital filed with the California Secretary of State on October 18, 2019. The Statement of Information lists the SUBJECT PREMISES as the "Business Address" for 1inMM Capital. That is the most recent record for 1inMM Capital available through the California Secretary of State's online "Business Search" database.

b.      I have reviewed CNB bank records showing that, no later than May 31, 2018, the address of record for the 1inMM Capital account was the SUBJECT PREMISES. The SUBJECT PREMISES has remained the address of record through the most recent account records I have reviewed, which cover the period through February 26, 2021.

8. Based on witness interviews, my review of declarations provided by investors with 1inMM Capital, as well as information obtained from other government agencies, I am aware of five main groups of private investors with HORWITZ through 1inMM Capital: JJMT Capital, LLC ("JJMT"); Movie Fund, LLC ("Movie Fund"); Fortune Film Fund One, LLC, Fortune Film Fund Two, LLC, and SAC Advisory Group, LLC (collectively, "SAC"); Vausse Films ("Vausse"); and Pure Health Enterprises, Inc. ("Pure Health").

9. By far the largest source of investor funds was a private firm, JJMT. I have interviewed J.A., a principal of JJMT. Communications between HORWITZ and JJMT occurred via telephone, email, and text, as well as through meetings in person.

a. HORWITZ began pitching to investors, including JJMT, an opportunity to provide funds to 1inMM Capital to purchase regional distribution rights to films, typically in the post-production stage of development, which 1inMM Capital would then license to online platforms such as HBO and Netflix for distribution in particular regions outside the United States, including Latin America. HORWITZ explained to investors that, based on his business relationships, 1inMM Capital could reliably license the film distribution rights to the online platforms for sums greater than what he paid for the distribution rights, thereby providing a predictable profit opportunity each time 1inMM Capital acquired a film's distribution rights.

        i.   HORWITZ's representations were also reduced to writing.  For example, attached as Exhibit 1 is a copy of a document titled "1inMM Capital Annual Report" provided by HORWITZ through 1inMM Capital to investors.  According to information relayed by counsel for JJMT, HORWITZ sent hard copies of this Annual Report to the principals of JJMT -- along with a bottle of Johnny Walker Blue Label scotch -- via U.S. mail in July 2015, and sent electronic versions to them by email in August 2015.  In the Annual Report, HORWITZ represented that in the past year, he had "acquired and successfully distributed 49 films through the 1inMM Capital banner without incurring a single loss in the process."  He reported that 1inMM Capital "continue[d] to source quality feature film projects, solidify our reputation and relationships with our current output deals and continuously search for additional profitable partnerships."  HORWITZ also claimed that "we have expanded our business model with HBO Entertainment and NETFLIX to not only service the thriving Latin American marketplace but now are distributing feature films to Australia and New Zealand as well."  "With this growth," he wrote, "we have the ability to safely and profitably distribute more than 25 additional films per year, creating ample opportunity for investment and substantial growth of our thriving feature film library."

        ii.  To bolster the claims of 1inMM Capital's "film library," the Annual Report contains a one-page spread under the heading "Library Snapshot" featuring thumbnail size posters for 52 films.

iii.  To bolster the claims of 1inMM Capital's ability to secure output deals for distribution in Latin America, the Annual Report contained a one-page spread under the heading "Our Strategic Partnerships" featuring the logos of HBO, Netflix, and Sony above the label "Distribution Partner," as well as the logos and names of several purported "Foreign Sales Partner[s]."

iv.  The Annual Report also contains several detailed representations concerning how the investments were secured.  Under the heading "Investment Focus," HORWITZ wrote, "our strategy has been and will always be a collateralized investment approach to ensure that solid returns and safe investments are the pillars that solidify our foundation."  He explained, "[t]he acquisition of each film that we acquire uses the asset acquired (Distribution Rights of the film) as collateral against any unexpected negative event that may occur. If, at any point, one of our current output deals (HBO / SONY / NETFLIX) would default on a payment owed to the company; the rights to distribute the film would immediately revert back to the distributor (1inMM Capital) and the distributor would place the film through a different output deal."  More specifically, HORWITZ elaborated that "in the event of one output platform defaulting on payment, 1inMM Capital has confirmation that this title will be acquired by a secondary deal and therefore making the investment whole."  In other words, "in the event that Netflix, HBO or Sony defaults on a payment, declares bankruptcy or displays contractual delinquency in any form, we simply sell

the film to one of the two remaining output platforms that already have agreed to license the rights of the film." Finally, HORWITZ claimed that "through our solid relationships, we receive confirmation from each of our outputs indicating their desire to acquire the rights to any title we purchase PRIOR to us releasing funds for the film so that in the event of any unexpected occurrence, we are able to recover our investment through an alternative company."

   b. Based on these representations, defendant HORWITZ solicited investments through the issuance of a series of promissory notes, which guaranteed a specified payment on a particular maturity date, typically 6 months or 12 months in the future. Each promissory note corresponded to the purported purchase of the distribution rights to a specific film and was secured by an assignment of the distribution rights to that film. Following this structure, 1inMM Capital and JJMT entered into approximately 500 such promissory notes through 2019 based on J.A.'s estimation.[1]

      i. For example, 1inMM Capital and JJMT entered into a promissory note dated September 27, 2019, signed by HORWITZ, pursuant to which 1inMM Capital borrowed $742,250 from JJMT and promised to repay $999,845 within six months, representing a calculated return of approximately 35 percent. The promissory note is purportedly secured by an assignment to JJMT of the distribution rights to the film "Bitter Harvest."

---

   [1] J.A. recalled that one of the earliest promissory notes the JJMT principals entered with 1inMM Capital was dated October 6, 2014.

Account records for the 1inMM Capital account reflect an
incoming wire payment of $742,250 on September 27, 2019.

        ii.  Similarly, 1inMM Capital and JJMT entered
into a promissory note dated December 17, 2018, signed by
HORWITZ, pursuant to which 1inMM Capital borrowed $1,425,500
from JJMT and promised to repay $1,998,825 within twelve months,
representing a calculated return of approximately 40 percent.
The promissory note is purportedly secured by an assignment to
JJMT of the distribution rights to the film "Active Measures."
Records for the 1inMM Capital account reflect an incoming wire
payment of $1,425,500 on December 14, 2018, with "ACTIVE
MEASURES FUNDING" listed on the wire item.[2]  The wire transfer
was originated by JJMT, which is based in Chicago, Illinois.

        c.  To reassure the investors of 1inMM Capital's
legitimacy and the likelihood of returns on their investments,
HORWITZ would inform the investors both that 1inMM Capital had
entered into agreements with film producers to license the
distribution rights to specific films, and that online platforms
had entered into agreements with 1inMM Capital to distribute the
specific films.  To support these claims, HORWITZ provided
copies of these purported licensing agreements and distribution
agreements to investors.

        i.  For example, HORWITZ provided JJMT with a
12-page license agreement dated October 2, 2019, between
Sierra/Affinity, as agent for Meyer Media Group, and 1inMM

---

     [2] For purposes of the requested complaint, this interstate
wiring is the selected execution of the scheme.

Capital, pursuant to which Meyer Media Group purportedly licensed to 1inMM Capital the exclusive rights to distribute the film "Bitter Harvest" in certain Latin American and African territories for a term of 15 years, in exchange for a license fee of $739,500.  The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by the "EVP International Sales" for Sierra/Affinity.

       ii.  Additionally, HORWITZ provided JJMT with a 13-page distribution agreement dated September 11, 2019, between 1inMM Capital and HBO, pursuant to which 1inMM purportedly licensed to HBO the rights to distribute the film "Bitter Harvest" in Africa and Latin America for a term of three years, in exchange for an advance of $999,845, payable and due in six months.  The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by the "President of Operations" for HBO Latin America Holdings.

       iii. Similarly, HORWITZ provided JJMT with a 12-page license agreement dated December 17, 2018, between Sierra/Affinity, as agent for Shooting Films, and 1inMM Capital, pursuant to which Shooting Films purportedly licensed to 1inMM Capital the exclusive rights to distribute the film "Active Measures" in certain Latin American and African territories for a term of 15 years, in exchange for a license fee of $1,425,500. The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by the "EVP International Sales" for Sierra/Affinity.

        iv.   Additionally, HORWITZ provided JJMT with a 20-page distribution agreement dated December 21, 2018, between 1inMM Capital and Netflix, pursuant to which 1inMM purportedly licensed to Netflix the rights to distribute the films "Active Measures" and "Divide and Conquer" in certain Latin American and Caribbean territories for a term of three years, in exchange for a fee of $4.2 million for both titles, payable and due in twelve months.  The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by Funa Maduka, the "VP, Content Acquisition" for Netflix.

        d.   Prior to the end of 2019, 1inMM Capital generally honored its promissory notes with investors, including JJMT. But since December 2019, 1inMM Capital has continually defaulted on its outstanding promissory notes with investors.  With respect to JJMT alone, 1inMM Capital appears to have defaulted on over 160 promissory notes relating to films that were supposed to be distributed by the online platforms.  As a result, 1inMM Capital has defaulted in more than $160 million in principal to JJMT alone and owes approximately $59 million more in returns per the terms of the defaulted promissory notes.

        e.   Based on my review of declarations provided by investors and information provided by other government agencies, I am aware that HORWITZ, through 1inMM Capital, made substantially the same misrepresentations described above to the four other major investor groups, namely, by falsely representing that he would use borrowed funds to acquire film rights that would be licensed to online platforms such as

Netflix and HBO. And just like with JJMT, at certain points in time in 2019, 1inMM Capital began serially defaulting on its promissory notes with these other investors. Specifically, 1inMM Capital has defaulted on approximately $29.7 million in principal with SAC, approximately $20 million in principal with Movie Fund, approximately $10 million in principal with Pure Health, and approximately $8 million with Vausse. In sum, HORWITZ, through 1inMM Capital, is in default to investors on a total outstanding principal of approximately $227 million.

### B.  1inMM Capital Defaults and HORWITZ Dissembles

10.  Beginning in December 2019, 1inMM Capital and HORWITZ began defaulting on every promissory note with JJMT with a maturity date on or after December 11, 2019.

11.  To prolong the scheme and maintain the illusion that 1inMM Capital was a legitimate business in the wake of these mounting defaults, HORWITZ falsely represented to JJMT that the online platforms had refused to pay on time for the distribution rights as obligated, and provided excuses that were purportedly given by Netflix and HBO. To support these claims, HORWITZ repeatedly sent JJMT emails in which he forwarded purported email correspondence with employees of Netflix and HBO, respectively, discussing the underlying licensing agreements.

12.  With respect to Netflix, HORWITZ fabricated the excuse that Netflix was performing an audit on all the licensed films to ensure clear title and would pay the license fees upon completion of the audit.

   a.   On February 13, 2020, HORWITZ, using the email
account "zach@1inmm.com," sent an email to the principals of
JJMT, all of whom live in the greater Chicago area, in which he
forwarded purported email correspondence from the same day with
J.G., Senior Counsel at Netflix.  In the email, J.G., using a
"@netflix.com" domain email address, purportedly wrote that
Netflix was performing an audit to confirm "that all materials
are in place, rights are cleared, paperwork is in order, etc."
for all content that associated with 1inMM Capital.

   b.   In the months that followed, HORWITZ sent
numerous emails to JJMT forwarding purported email
correspondence from J.G. informing HORWITZ of the progress of
the audit.

   13.  With respect to HBO, HORWITZ fabricated the excuse
that HBO Latin America was entering a restructuring that would
entail modifications to its existing business practices.

   a.   On February 21, 2020, HORWITZ, using the email
account "zach@1inMM.com," sent an email to the principals of
JJMT, in which he forwarded purported email correspondence from
the same day from L.V., using a "@hbo.com" domain email address
and writing on behalf of the "HBO Latin America Team."  In the
email, L.V. purportedly wrote that HBO Latin America was in the
process of bringing in HBO Brasil Partners, which would be
accompanied by "modifications to our previous business
practices," including "payment cycles, exploitation windows,
profit participation cycles, audit reviews, providing
participation statements, renegotiating currently licensed

13

titles to increase licensing period, adding licensing territories and more."

b. On March 5, 2020, HORWITZ, using the email account "zach@1inmm.com," sent an email to the principals of JJMT, which forwarded purported email correspondence on the same day from L.V., again on behalf of the "HBO Latin America Team." In the email, L.V. purportedly expressed his appreciation to HORWITZ and another individual for meeting in person to discuss their relationship. L.V. also purportedly included minutes of their meeting on March 2 and 3, 2020, at the "HBOLA Office in Coral Gables and W Miami Hotel," which covered the names of attendees, including HORWITZ, and discussion topics, including "[d]iscussion of Zach's concern regarding 3rd party investor pressure."

c. In the months that followed, HORWITZ sent numerous emails to JJMT in which he forwarded purported email correspondence from L.V. that supposedly reflected the status of discussions regarding the business relationship between HBO and 1inMM Capital.

14. As of today's date, however, 1inMM Capital has not satisfied any of its promissory notes with JJMT which have become due after December 11, 2019. Each of these notes was tied to a film to which 1inMM Capital purportedly held distribution rights that it had licensed to HBO or Netflix.

**C. HORWITZ's Misuse of Investor Funds**

15. Based on my review of bank records, I believe much of the investor money sent to the 1inMM Capital account for the

purchase of film licensing rights in Latin America was diverted to other purposes, such as payment of personal expenses or payment of returns on earlier investments in a manner consistent with a Ponzi scheme.

### 1. Purchase of the SUBJECT PREMISES

16. One personal expense to which it appears investor funds were improperly diverted was the purchase of the SUBJECT PREMISES itself. I have reviewed records for a CNB account for an account in HORWITZ's name ending -5270 (the "HORWITZ personal account"). The most recent records, which continue through February 2021, list the SUBJECT PREMISES as the address on record for the HORWITZ personal account. According to the records, the HORWITZ personal account had a balance of $311,130.70 as of February 28, 2018, but by March 28, 2018, HORWITZ made a wire payment of $5,556,401.13 to complete the purchase of the SUBJECT PREMISES.[3] The credits to the HORWITZ personal account between February 28 and March 28 all come from three sources: JJMT, the 1inMM Capital Account, and a second CNB account HORWITZ maintained for 1inMM Capital ending in -2944 for which he was the sole signer ("1inMM Capital account 2").

a. On March 27, 2018, the HORWITZ personal account received a wire transfer directly from JJMT for $2,225,564.

b. On March 28, 2018, the 1inMM Capital account made two transfers to the HORWITZ personal account: one for $800,000 and one for $900,000. These payments also appear mostly to

---

[3] HORWITZ wired a payment of $171,375 from the HORWITZ personal account to the same escrow company on January 29, 2018, in what appears to have been an earnest money payment.

comprise funds from investors in 1inMMC Capital, particularly JJMT. As of March 15, 2018, for example, the 1inMM Capital account had a balance of $1,910,149.30. From that date through March 28, 2018, the 1inMM Capital account received the following wire payments: March 16: $720,375.00 from JJMT; March 20: $694,850.00 from "Global Hospitality Concepts"; March 22: $612,620.00 from JJMT; March 22: $650,175.00 from JJMT; March 22: $675,550.00 from JJMT; March 22: $690,800.00 from JJMT; March 22: $1,406,250.00 from JJMT; March 22: $1,428,700.00 from JJMT; March 23: $180,000.00 from Creative Artists Agency; March 27: $1,380,900.00 from JJMT; March 27: $1,405,000.00 from JJMT; March 28: $622,100.00 from JJMT; March 28: $685,250.00 from JJMT; and March 28: $725,400.00 from JJMT.

c. Between March 14 and March 28, 2018, 1inMM Capital account 2 transferred a total of $2,675,000 to the HORWITZ personal account across four transfers. As of February 12, 2018, 1inMM Capital account 2 had an ending balance of $735,583. That same day and the next, 1inMM Capital account 2 received three wire transfers from investors: $685,350 from Fortune Film Fund Two LLC, $705,700 from Fortune Film Fund Two LLC, and $620,000 from SAC Advisory Group LLC. On March 20, 2018, 1inMM Capital account 2 received another wire payment for $620,185 from investor Fortune Film Fund Two LLC. These four wire transfers were the only credits to 1inMM Capital account 2 between February 12, 2018, and March 28, 2018.

17. Because HORWITZ transferred funds from his bank accounts to pay off substantial credit card balances, it is

difficult to glean a full picture of HORWITZ's lifestyle from these financial records alone. Just a week before paying over $5.5 million to complete the purchase of the SUBJECT PREMISES, for example, he paid $70,328.05 from the HORWITZ personal account to American Express. The next month, he made another payment to American Express of $57,351.25 on April 20, and on May 3, he made a payment of $164,241.06.

18. I have reviewed photographs of the SUBJECT PREMISES from its Zillow listing, and these photographs are consistent with an expensive personal lifestyle. The house includes an extensive home theater, home gym, and wine "cellar." Shots of the interior show artwork and what appears to be a grand piano. In March 2018, the same month HORWITZ purchased the SUBJECT PREMISES, the HORWITZ personal account wired two payments of $70,000 to Lonni Paul Design for "RETAINER/COUCH/SIDETABLE." Some of the photographs that I reviewed from the Zillow listing are attached as Exhibit 2 to this affidavit.

2. _Ponzi Scheme Payments_

19. In addition to the misuse of investor funds on personal expenses, I have also identified movements of funds consistent with a Ponzi scheme. Based on my review of bank records for the 1inMM Capital account, it appears that incoming investor money was used to repay investors for previous investments. In some instances, the investors were repaid with their own money. In addition, funds were sent to the HORWITZ personal account.

20.   Focusing on December 2018 and January 2019, the ending balance in account the 1inMM Capital account as of November 30, 2018, was $4,332,730.51.  On December 4, 2018, there were two wire transfers to JJMT.  One transfer was for $1,795,585 with "NETFLIX WISH UPON" noted in the wire records under the caption "ORIG TO BNF INFO," and a second wire transfer was for $1,792,525 with "NETFLIX JUST LIKE OUR PARENTS" noted under the caption "ORIG TO BNF INFO."

a.   Based on my interview of J.A., as well as my training and experience reviewing wire transfer payments, I believe the ORIG to BNF INFO on these wires indicates that they were repayments of notes with JJMT for the movies "Wish Upon" and "Just Like Our Parents."  Though the wires indicate the wire transfers related to Netflix, consistent with HORWITZ's representation that he sold film rights to Netflix, I have seen no indication in the bank records that I have reviewed from this time period that 1inMM Capital or HORWITZ received any payments from Netflix consistent with the licensing of film rights, which is consistent with the declaration of Melinda LeMoine, which stated that Netflix had no business with 1inMM Capital.

b.   Between December 4, 2018, and December 7, 2018, there were two wire transfers from the 1inMM Capital account totaling $161,000, one check paid in the amount $9,500, and a transfer to the HORWITZ personal account for $150,000 -- a total

of $320,500 in outgoing payments, which collectively brought the ending balance on December 7, 2018, to $424,120.51.[4]

      c.   Between December 14, 2018, and December 31, 2018, the 1inMM Capital account received nineteen wire transfers totaling $16,380,450. Thirteen wire transfers were from JJMT for a total of $12,763,900, though this latter amount includes a $55,000 figure that may have been transferred as a Christmas present on December 24.

      d.   During the same time period, one check for $11,000 made payable to "Great Buy Tickets" posted to the 1inMM Capital account, and two transfers were made from 1inMM Capital account to the HORWITZ personal account totaling $500,000 (along with one additional $30,000 wire transfer to a CNB account for 1inMM Productions ending -1130 that listed the SUBJECT PREMISES as the address on file). In addition, thirteen wire transfers were paid to investors, including JJMT, totaling $14,830,820.00. The ending balance for the 1inMM Capital account on December 31, 2018, was $1,432,750.51. To summarize the 1inMM Capital account for December 2018:

| | |
|---|---|
| Ending Balance 11/30/2018 | $4,332,730.51 |
| Total Wires In | $16,380,450.00 |
| Total Wires Out Investors | $18,418,930.00 |
| Other Wires Out | $161,000.00 |
| Transfers to HORWITZ accounts | $680,000.00 |

---

[4] There was also a December 7, 2018, wire transfer of $150,000 to Jellyfish Pictures Ltd listing "SHOOKUM – INVOICE" on the wire records. At this point, I have not yet verified the basis for this payment.

Checks Paid                          $20,500.00

Ending Balance 12/31/2018            $1,432,750.51

21.   Based on my training and experience, the figures above
are consistent with a Ponzi scheme rather than a legitimate
business along the lines of what HORWITZ described to his
investors.  The bank records do not show outgoing payments to
sales agents or film production companies consistent with the
acquisition of distribution rights, nor do they show incoming
payments from the online platforms to which HORWITZ claimed to
be licensing the film rights.  Rather, it shows incoming funds
to investors, outgoing funds to investors, with transfers to
other accounts HORWITZ controls along the way.

**D.   HORWITZ's Fraud Exposed**

22.   In reality, neither HORWITZ nor 1inMM Capital ever
engaged in email correspondence with Netflix or HBO, nor did
HORWITZ or 1inMM Capital ever have any business relationship
with Netflix or HBO at all.  The email exchanges and licensing
agreements were fake.

23.   I have reviewed signed declarations from Melinda
LeMoine, the Director of Content Litigation at Netflix, and
Patrick Younan, Senior Litigation Administrator at Warner Media,
which owns HBO.

a.   According to Ms. LeMoine, Netflix has no business
relationship with HORWITZ or 1inMM Capital.  In fact, on
February 12, 2021, Ms. LeMoine sent a cease-and-desist letter to
HORWITZ both via his LinkedIn account and through his attorney.
The letter stated that Netflix learned HORWITZ and his company

1inMM Capital had used forged documents to represent to third parties that 1inMM Capital had licensing agreements with Netflix, but that, in fact, Netflix had no such agreements with 1inMM Capital or HORWITZ. The letter further stated that HORWITZ has used fabricated emails purportedly exchanged with a Netflix employee to represent to others that he anticipates receiving funds from Netflix, and that those emails are also fraudulent. The letter demands that HORWITZ stop making misrepresentations regarding his agreements with Netflix.

b. According to Mr. Younan, Warner Media and its subsidiary HBO also have no business relationship with either HORWITZ or 1inMM Capital. Mr. Younan verified that HBO had never licensed various film projects that HORWITZ had claimed to have licensed to HBO in his communications with investors. In the case of some films, Mr. Younan confirmed that HBO had licensed the distribution rights, but that it had done so from companies like Lionsgate or Sony that had no affiliation with HORWITZ or 1inMM Capital.

24. Notwithstanding these facts, HORWITZ continues to communicate with victims, providing excuses as to why they have yet to be repaid.

a. For example, on March 12, 2021, HORWITZ, using the email account "zach@1inmm.com," sent an email to the principals of JJMT, positing that there has been much discussion with his lawyer regarding a settlement with HBO that would enable 1inMM Capital, and thus JJMT, to be paid without the need for litigation. In the same email, HORWITZ also wrote that

"Netflix is a real problem at the moment," that he had been "complying with every single thing that is being asked of me and doing absolutely everything I can to assist, facilitate and explain whatever is needed," and that he "will let [JJMT] know further information and progress as soon as I have that information and am able to share."

25. Not only are the distribution agreements with HBO and Netflix fabrications, it appears from my investigation that the license agreements through which 1inMM Capital purportedly acquired distribution rights were also fraudulent. On April 2, 2021, I spoke on the phone with Kendra Dousette, an attorney for Sierra/Affinity, a sales agent listed on numerous license agreements HORWITZ purportedly entered on behalf of 1inMM Capital. Ms. Dousette explained that she has worked for Sierra/Affinity since 2015 and is generally familiar with the businesses that license Sierra/Affinity's library of films given her involvement in reviewing license agreements. She had never heard of HORWITZ or 1inMM Capital. When asked about 1inMM Capital's purported license agreement with Sierra/Affinity for the distribution rights to the film "Active Measures," she noted that Sierra/Affinity has no record of that film and that real license agreements Sierra/Affinity entered would be signed by the chief operating officer or president -- not an "EVP" (executive vice president), as stated on the purported agreement.

### E.   HORWITZ and the SUBJECT PREMISES

26.   There is considerable evidence to show HORWITZ resides at the SUBJECT PREMISES and that it contains evidence, fruits, and instrumentalities of the Subject Offenses.  The SUBJECT PREMISES is listed as the "Business Address" for 1inMM Capital and is the address on file for the 1inMM Capital account.

27.   The SUBJECT PREMISES is currently listed for sale on the website Zillow, and according to Zillow's website, has been listed since January 21, 2021.  On April 1, 2021, however, I was told by another FBI Agent who had been told by a real estate agent for the property that the SUBJECT PREMISES is currently owner occupied, in escrow, and undergoing inspection.  Because I know, from my training and experience, that it is common for individuals who have recently moved to set up mail forwarding with the U.S. Postal Service, I also communicated with a United States Postal Inspector.  The Postal Inspector determined there was no record of a forwarding address for the SUBJECT PREMISES as of March 31, 2021.

28.   This property is currently titled to Leslie S. Klinger in his capacity as trustee of the MJLZ Trust.  I have reviewed CNB account documents for an account ending -0501 for the MJLZ Trust.  HORWITZ is listed as the grantor.  Beginning in February 28, 2020, and continuing through the most recent available statement for this account dated February 26, 2021, the bank statements are addressed to MJLZ Trust, by Zachary Horwitz, Grantor and lists the SUBJECT PREMISES as the address.

29.  On April 1, 2021, I obtained a search warrant for
location information for a Verizon telephone number for which
HORWITZ is the subscriber at the SUBJECT PREMISES.  Location
information show that HORWITZ was in the area of the SUBJECT
PREMISES as recently as April 5, 2021.

30.  Based on my training and experience, and information
from other experienced investigators of fraud offenses, I also
know the following:

a.  Individuals involved in fraud schemes often use
the proceeds of the fraud to purchase expensive items, or store
the proceeds in the form of cash to make it more difficult to
trace.  In fact, in reviewing the photographs from the online
Zillow listing for the SUBJECT PREMISES, I saw numerous examples
of what appear to be expensive items, including artwork, racks
of wine bottles in what appears to be a wine cellar, and a fully
equipped home gym.

b.  Typically, individuals involved in fraud schemes
maintain evidence where it is close at hand and safe, such as in
their residences, vehicles, and digital devices, which are also
commonly stored in their residences and vehicles.  Indeed, in
this case, HORWITZ appears to have made substantial use of
digital devices to communicate in furtherance of the scheme by
email and text message with his victims.  I know that
individuals who commit crimes with the aid of electronic devices
do not readily discard them, as computers, tablets, and cell
phones are expensive items that are typically used for years
before being upgraded or discarded.  Digital devices can be used

to communicate between co-conspirators and may contain information relating to the crime under investigation. And, even when those who use digital devices to commit fraud do upgrade them, they often transfer data across devices, such as contact lists, email and text communications, and documentary records.

      c.   Individuals involved in fraud frequently keep the most damaging evidence and/or proceeds of the scheme at their residences and in their vehicles to help conceal the fraud from third parties, such as associates who may have access to such documents at a workplace. Proceeds such as cash and gifts are easier to conceal at the fraudster's residence rather than in plain view of coworkers.

      d.   More sophisticated or cagey criminals may rent public storage units, safe deposit boxes, or other third-party space to further distance themselves from incriminating evidence or to hide their illicit profits from law enforcement or civil litigants. Such individuals typically maintain items relating to those third-party locations at their homes, such as keys, addresses, and leasing documents.

   31.   The requested search warrant seeks not only to seize evidence of crimes but also the "fruits of crime" and "property designed for use, intended for use, or used in committing a crime." Fed. R. Crim. P. 41(c). Even long after a crime has been completed, the illicit proceeds of a crime often still exist, frequently secreted in forms or locations difficult to detect by law enforcement. For that reason, there is probable

cause to seize evidence pertaining to HORWITZ's current assets, such as his ownership of the SUBJECT PREMISES, and whether it was purchased using funds derived from his investment fraud scheme.

## V. __REQUEST FOR SEALING__

32.  I also request that the Court order that the requested complaint and search warrant be sealed.  The fact that HORWITZ has taken steps to sell the SUBJECT PREMISES and not all the proceeds of his fraud scheme have been traced mean that he is a flight risk, since he has both the resources to flee and likely has already taken some steps to find an alternate residence once the sale of the SUBJECT PREMISES is complete.  Additionally, the criminal investigation is not yet public, and premature disclosure of the warrants could cause HORWITZ to destroy or conceal evidence or assets constituting the fruits of his crimes.

## VI. __TRAINING AND EXPERIENCE ON DIGITAL DEVICES__[5]

33.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

27

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    34.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

        a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

        b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

35. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HORWITZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of HORWITZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature. In depressing HORWITZ's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them

36. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

37. For all the reasons described above, there is probable cause to believe that HORWITZ has committed wire fraud and that evidence of violations of the Subject Offenses, as described above and in Attachment B of this affidavit, will be found in a

//

//

search of the SUBJECT PREMISES, as further described above and

in Attachment A of this affidavit.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _5th_ day of
April, 2021.

_____  MAA
UNITED STATES MAGISTRATE JUDGE

# Exhibit 5

**United States District Court**
**Central District of California**

**JS-3**

| UNITED STATES OF AMERICA vs. | | Docket No. | 2:21-cr-00214-MCS-1 |

**Defendant**    Zachary Joseph Horwitz

akas:   AVERY, Zach

**Social Security No.**   0   5   7   1

(Last 4 digits)

## JUDGMENT AND PROBATION/COMMITMENT ORDER

| | MONTH | DAY | YEAR |
|---|---|---|---|
| In the presence of the attorney for the government, the defendant appeared in person on this date. | Feb | 14 | 2022 |

| **COUNSEL** | Ryan S. Hedges, Rtnd. and Anthony Pacheco, Rtnd. |
|---|---|
| | (Name of Counsel) |

| **PLEA** | [X] **GUILTY,** and the court being satisfied that there is a factual basis for the plea. | [ ] **NOLO CONTENDERE** | [ ] **NOT GUILTY** |

| **FINDING** | There being a finding/verdict of GUILTY, defendant has been convicted as charged of the offense(s) of: |
|---|---|

Securities Fraud in violation of 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5 as charged in Count 1 of the Indictment.

| **JUDGMENT AND PROB/ COMM ORDER** | The Court asked whether there was any reason why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 240 months. |
|---|---|

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of 3 years under the following terms and conditions:

1. The defendant shall comply with the rules and regulations of the United States Probation & Pretrial Services Office and Second Amended General Order 20-04.

2. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from custody and at least two periodic drug tests thereafter, not to exceed eight tests per month, as directed by the Probation Officer.

3. The defendant shall participate in an outpatient substance abuse treatment and counseling program that includes urinalysis, breath or sweat patch testing, as directed by the Probation Officer. The defendant shall abstain from using alcohol and illicit drugs, and from abusing prescription medications during the period of supervision.

4. The defendant shall participate in mental health treatment, which may include evaluation and counseling, until discharged from the program by the treatment provider, with the approval of the Probation Officer

5. As directed by the Probation Officer, the defendant shall pay all or part of the costs of the Court-ordered treatment to the aftercare contractors during the period of community

USA vs.   Zachary Joseph Horwitz                    Docket No.:   2:21-cr-00214-MCS-1

supervision.  The defendant shall provide payment and proof of payment as directed by the Probation Officer.  If the defendant has no ability to pay, no payment shall be required.

6.  During the period of community supervision, the defendant shall pay the special assessment and restitution in accordance with this judgment's orders pertaining to such payment.

7.  The defendant shall not obtain or possess any driver's license, Social Security number, birth certificate, passport or any other form of identification in any name, other than the defendant's true legal name, nor shall the defendant use, any name other than the defendant's true legal name without the prior written approval of the Probation Officer.

8.  The defendant shall not engage, as whole or partial owner, employee or otherwise, in any business involving loan programs, telemarketing activities, investment programs or any other business involving the solicitation of funds or cold-calls to customers without the express approval of the Probation Officer prior to engaging in such employment.  Further, the defendant shall provide the Probation Officer with access to any and all business records, client lists, and other records pertaining to the operation of any business owned, in whole or in part, by the defendant, as directed by the Probation Officer.

9.  The defendant shall cooperate in the collection of a DNA sample from the defendant.

10. The defendant shall apply all monies received from income tax refunds, lottery winnings, inheritance, judgments and any other financial gains to the Court-ordered financial obligation.

11. The defendant shall submit the defendant's person, property, house, residence, vehicle, papers, computers, cell phones, other electronic communications or data storage devices or media, email accounts, social media accounts, cloud storage accounts, or other areas under the defendant's control, to a search conducted by a United States Probation Officer or law enforcement officer.  Failure to submit to a search may be grounds for revocation.  The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

The Court authorizes the Probation & Pretrial Services Office to disclose the Presentence Report to the substance abuse treatment provider to facilitate the defendant's treatment for narcotic addiction or drug dependency.  Further redisclosure of the Presentence Report by the treatment provider is prohibited without the consent of the sentencing judge.

USA vs.    Zachary Joseph Horwitz                    Docket No.:    2:21-cr-00214-MCS-1

The Court authorizes the Probation Officer to disclose the Presentence Report, and any previous mental health evaluations or reports, to the treatment provider. The treatment provider may provide information (excluding the Presentence report), to State or local social service agencies (such as the State of California, Department of Social Service), for the purpose of the client's rehabilitation.

It is ordered that the defendant shall pay to the United States a special assessment of $100, which is due immediately. Any unpaid balance shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.

It is ordered that the defendant shall pay restitution in the total amount of $230,361,884 pursuant to 18 U.S.C. § 3663A.

The amount of restitution ordered shall be paid as follows:

| Victim | Amount |
|--------|--------|
| JJMT | $162,789,709 |
| SAC Entities | $29,733,025 |
| Movie Fund | $19,296,450 |
| Vausse Films/Pure Health | $18,542,700 |

Restitution shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program. If any amount of the restitution remains unpaid after release from custody, nominal monthly payments of at least 10 percent of defendant's gross monthly income but not less than $400, whichever is greater, shall be made during the period of supervised release and shall begin 90 days after the commencement of supervision. Nominal restitution payments are ordered as the Court finds that the defendant's economic circumstances currently do not allow for either immediate or future payment of the amount ordered.

If the defendant makes a partial payment, each payee shall receive approximately proportional payment unless another priority order or percentage of payment is specified in the judgment.

Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the restitution ordered is waived because the defendant does not have the ability to pay interest.

The defendant shall comply with Second Amended General Order No. 20-04.

Pursuant to Guideline § 5E1.2(a), all fines are waived as the Court finds that the defendant has established that he is unable to pay and is not likely to become able to pay any fine.

USA vs. Zachary Joseph Horwitz      Docket No.:   2:21-cr-00214-MCS-1

The Court has entered a money judgment of forfeiture against the defendant, which is hereby incorporated by reference into this judgment and is final.

On Government's motion, all remaining counts ORDERED dismissed.

Defendant advised of his right to appeal.

It is further ordered that the defendant surrender himself to the institution designated by the Bureau of Prisons. In the absence of such designation, the defendant shall report on or before March 14, 2022 at noon, to the United States Marshal located at the First Street U.S. Courthouse 350 W. First Street, Suite 3001, Los Angeles, California 90012.

Bond exonerated upon surrender.

Court recommends to the Bureau of Prisons that the defendant be incarcerated at the Terminal Island facility located in Southern California.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

_February 16, 2022_
Date

_Mark C. Scarsi_
U. S. District Judge Mark C. Scarsi

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Clerk, U.S. District Court

_February 16, 2022_
Filed Date

By   Stephen Montes Kerr
Deputy Clerk

The defendant must comply with the standard conditions that have been adopted by this court (set forth below).

**STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE**

While the defendant is on probation or supervised release pursuant to this judgment:

USA vs.   Zachary Joseph Horwitz                    Docket No.:    2:21-cr-00214-MCS-1

1.  The defendant must not commit another federal, state, or local crime;
2.  The defendant must report to the probation office in the federal judicial district of residence within 72 hours of imposition of a sentence of probation or release from imprisonment, unless otherwise directed by the probation officer;
3.  The defendant must report to the probation office as instructed by the court or probation officer;
4.  The defendant must not knowingly leave the judicial district without first receiving the permission of the court or probation officer;
5.  The defendant must answer truthfully the inquiries of the probation officer, unless legitimately asserting his or her Fifth Amendment right against self-incrimination as to new criminal conduct;
6.  The defendant must reside at a location approved by the probation officer and must notify the probation officer at least 10 days before any anticipated change or within 72 hours of an unanticipated change in residence or persons living in defendant's residence;
7.  The defendant must permit the probation officer to contact him or her at any time at home or elsewhere and must permit confiscation of any contraband prohibited by law or the terms of supervision and observed in plain view by the probation officer;
8.  The defendant must work at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons and must notify the probation officer at least ten days before any change in employment or within 72 hours of an unanticipated change;

9.  The defendant must not knowingly associate with any persons engaged in criminal activity and must not knowingly associate with any person convicted of a felony unless granted permission to do so by the probation officer. This condition will not apply to intimate family members, unless the court has completed an individualized review and has determined that the restriction is necessary for protection of the community or rehabilitation;
10. The defendant must refrain from excessive use of alcohol and must not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
11. The defendant must notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
12. For felony cases, the defendant must not possess a firearm, ammunition, destructive device, or any other dangerous weapon;
13. The defendant must not act or enter into any agreement with a law enforcement agency to act as an informant or source without the permission of the court;
14. The defendant must follow the instructions of the probation officer to implement the orders of the court, afford adequate deterrence from criminal conduct, protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

USA vs.   Zachary Joseph Horwitz          Docket No.:    2:21-cr-00214-MCS-1

☐   The defendant must also comply with the following special conditions (set forth below).

## STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant must pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment under 18 U.S.C. § 3612(f)(1). Payments may be subject to penalties for default and delinquency under 18 U.S.C. § 3612(g). Interest and penalties pertaining to restitution, however, are not applicable for offenses completed before April 24, 1996. Assessments, restitution, fines, penalties, and costs must be paid by certified check or money order made payable to "Clerk, U.S. District Court." Each certified check or money order must include the case name and number. Payments must be delivered to:

United States District Court, Central District of California
Attn: Fiscal Department
255 East Temple Street, Room 1178
Los Angeles, CA 90012

or such other address as the Court may in future direct.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant must pay the balance as directed by the United States Attorney's Office. 18 U.S.C. § 3613.

The defendant must notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence address until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. § 3612(b)(l)(F).

The defendant must notify the Court (through the Probation Office) and the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. § 3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution under 18 U.S.C. § 3664(k). See also 18 U.S.C. § 3572(d)(3) and for probation 18 U.S.C. § 3563(a)(7).

Payments will be applied in the following order:

    1. Special assessments under 18 U.S.C. § 3013;
    2. Restitution, in this sequence (under 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid):
        Non-federal victims (individual and corporate),
        Providers of compensation to non-federal victims,
        The United States as victim;
    3. Fine;
    4. Community restitution, under 18 U.S.C. § 3663(c); and
    5. Other penalties and costs.

## CONDITIONS OF PROBATION AND SUPERVISED RELEASE PERTAINING TO FINANCIAL SANCTIONS

As directed by the Probation Officer, the defendant must provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant must not apply for any loan or open any line of credit without prior approval of the Probation Officer.

When supervision begins, and at any time thereafter upon request of the Probation Officer, the defendant must produce to the Probation and Pretrial Services Office records of all bank or investments accounts to which the defendant has access, including any business or trust accounts. Thereafter, for the term of supervision, the defendant must notify and receive approval of the Probation Office in advance of opening a new account or modifying or closing an existing one, including adding or deleting signatories; changing the account number or name, address, or other identifying information affiliated with the account; or any other modification. If the Probation Office approves the new account, modification or closing, the defendant must give the Probation Officer all related account records within 10 days of opening, modifying or closing the account. The defendant must not direct or ask anyone else to open or maintain any account on the defendant's behalf.

The defendant must not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

USA vs.  Zachary Joseph Horwitz                                    Docket No.:    2:21-cr-00214-MCS-1

## RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

_____                By  _____
Date                                          Deputy Marshal

## CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

_____                By  _____
Filed Date                                    Deputy Clerk

## FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them.

(Signed) _____                _____
Defendant                                       Date

_____                _____
U. S. Probation Officer/Designated Witness          Date

# Exhibit 6

LOFTUS & EISENBERG, LTD.
ALEXANDER N. LOFTUS, ESQ. (#630384)
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T:  (312) 772-5396
alex@loftusandeisenberg.com
*Pro Hac Vice Applied for*

ARON LAW FIRM
WILLIAM ARON, ESQ. (#234408)
15 W Carrillo St, Suite 217
Santa Barbara, CA 93101
T: (805) 618-1768
bill@aronlawfirm.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT—NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| JOCELYN CARTER, on behalf of a class of similarly situated individuals, <br><br> Plaintiff, <br><br> v. <br><br> JEFFREY SPIEGEL and RYAN SPIEGEL <br><br> Defendants. | Case No.: 21-CV- 3990 <br><br> **CLASS ACTION COMPLAINT FOR:** <br> **1. NEGLIGENT MISREPRESENTATION** <br> **2. SECURITIES FRAUD (VIOLATION OF CALIFORNIA CORPORATIONS CODE § 25501)** <br> **3. SECURITIES FRAUD (VIOLATION OF CALIFORNIA CORPORATIONS CODE § 25501.5)** <br> **4. UNJUST ENRICHMENT** <br> **DEMAND FOR JURY TRIAL** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff, JOCELYN CARTER, on behalf of a class of similarly situated individuals, by and through her undersigned attorneys, complains against Defendants, JEFFREY SPIEGEL and RYAN SPIEGEL, as follows:

## I.    INTRODUCTION

1.    SAC Advisory Group ("SAC") served as the de facto placement agent or broker for a Los Angeles Ponzi Schemer, Zachary Horwitz ("Horwitz") and his 1inMM Capital, LLC ("1inMM") venture. SAC's managers were Jeffrey Spiegel ("Jeff"), Ryan Spiegel ("Ryan")(collectively "The Spiegels" or "Defendants").

2.    Horwitz's scheme was absurd and it wouldn't have been funded but for sophisticated placement agents including Defendants parroting his lies, cloaking the scheme in their own credibility as financial professionals, and selling the offering to their closest friends.

3.    Defendants acted as brokers for investment in 1inMM and owed well defined duties in that role they assumed to do some investigation into the investment before offering it. Instead, Defendants operated in willful ignorance and never sought any third party confirmation of Horwitz's stories nor registered as brokers.

4.    Defendants, as de facto brokers, and were the gatekeepers of any information from Horwitz.

5.    Had either one of the Defendants called HBO or Netflix, obtained 1inMM bank records, or ordered an audit, as required by controlling regulations, before recommending this investment all of this would have been prevented and Plaintiff would not have even been presented with this "opportunity".

## II.    PARTIES

6.    Plaintiff, JOCELYN CARTER, is an individual and resident of California and domiciled in California.

7.    Defendant, JEFFREY SPEIGEL, is an individual and citizen of California and domiciled in California.

Class Action Complaint

8.     Defendant, RYAN SPEIGEL, is an individual and citizen of California and domiciled in California.

## III.    JURISDICTION

9.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

10.    This is a class action. Members of the proposed Plaintiff Class are citizens of states different from the Spiegels home state.

11.    Aggregate claims of individual Class Members exceed $5,000,000, exclusive of interest and costs.

## IV.    VENUE

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

13.    The Spiegels reside in this district pursuant to 28 U.S.C. § 1391(c), so personal jurisdiction is appropriate.

14.    In addition, a substantial part of the events or omissions giving rise to these claims occurred in this district.

15.    California law applies to all claims in this action.

16.    All of The Spiegels' relevant business, including the formulation and execution of the unlawful practices alleged herein, occurred in or emanated from California, where The Spiegels have their principal place of business. Thus, California has significant contacts and/or a significant aggregation of contacts to the claims asserted by Plaintiffs and Class Members.

17.    California has a materially greater interest than any other State in enforcing the rights and remedies granted to consumers under the California laws invoked in this Complaint. These rights and remedies further strong fundamental public policies of the State of California.

18.     The unregistered securities at issue in this case are not "covered securities" within the meaning of National Securities Market Improvement Act of 1996 (NMSIA), 15 U.S.C. § 77r(b), and accordingly this action is not subject to the procedural requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(a). The securities were not issued by a nationally registered investment company nor was it designated for trading in a national securities exchange.

## V.     FACTS COMMON TO ALL COUNTS

### A. Horwitz's Obvious Ponzi Scheme

19.     Zachary Horwitz, a Los Angeles based actor and Indiana University alum, and his company 1inMM conducted Ponzi scheme raising over $690 million from investors through several de facto placement agents including SAC and its funds using fabricated agreements and fake emails with prominent third party companies with whom Horwitz had no actual business relationship.

20.     Horwitz told Defendants that the purpose of the 1inMM offering was to finance 1inMM's acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies, mostly Netflix or Home Box Office ("HBO").

21.     Horwitz told Defendants he had experience acquiring and licensing distribution rights in movies to HBO and Netflix. Horwitz sold himself as bringing "a wealth of knowledge, reputation, and experience[.]"

22.     In reality, 1inMM and Horwitz had no relationship with either HBO or Netflix and never licensed any movie rights to either company.

23.     Horwitz obtained funds from SAC's three funds and other firms asking as placement agents via promissory notes which were funded by units in the funds to individual investors.

24.     Horwitz relied on The Spiegels to act as his brokers or investment bankers to raise funds and serve as a gatekeeper of his lies delivered to retail investors.

25.    The Promissory Notes issued by 1inMM to the de facto placement agents including SAC's funds had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months. Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the life of the note.

26.    Horwitz told Defendants that he and 1inMM would profit from these transactions by selling the movie rights to HBO or Netflix at a profit in excess of the profits paid to investors, and that Horwitz and 1inMM would retain this excess.

27.    Horwitz told Defendants he had experience and relationships in the media content distribution industry, that he and 1inMM had existing business relationships with HBO and Netflix, and that he could use his experience and connections to acquire and sell distribution rights in movies to Netflix and HBO for a profit.

28.    Horwitz promised to use the proceeds from each promissory note placed with investors to purchase the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.

29.    The manner Horwitz claimed 1inMM supposedly generated revenue for itself included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, 1inMM would retain rights to the same content for an additional period of years, thereby enabling 1inMM to continue licensing the content to other parties for 1inMM's sole financial benefit.

30.    Any of these supposed revenue streams could have been confirmed by reputable third parties directly but never were.

31. Horwitz justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.

32. To support his false representations, Horwitz sent forged documents to The Spiegels that purported to evidence his business dealings with HBO and Netflix, including distribution agreements that appeared to reflect agreements by Netflix and HBO to license rights from 1inMM in the specific movie titles for which investors had purchased the Promissory Notes.

33. Horwitz's representations were false and the documents he sent to SAC were fabricated.

34. These falsehoods could have easily been confirmed prior to any investment by Plaintiff and the Class with a phone call to Netflix or HBO but that call was not made until long after the scheme imploded and The Spiegels had reaped millions in "commissions".

35. Horwitz and 1inMM did not have business relationships with Netflix or HBO and did not sign distribution agreements with Netflix or HBO. They did not acquire the movie rights funded by the Promissory Notes and did not sell those rights to Netflix or HBO.

36. Horwitz used money "invested" in his "company" to pay earlier investors for lavish personal spending, including, but not limited to, extravagant trips to Las Vegas, flights on chartered jets, payments for high-end automobiles, a subscription service for luxury watches, and the purchase of a multi-million-dollar home.

37. In late 2019, Horwitz and 1inMM stopped making payments to investors for the outstanding promissory notes.

38. Horwitz provided Defendants false explanations for why he had stopped making payments.

39. Horwitz initially blamed HBO and Netflix for failing to make promised payments to 1inMM.

Class Action Complaint

40.     Horwitz told Defendants that while he had intended to sue HBO for non-payment, that he was instead able to obtain an alleged consolidated distribution agreement, pursuant to which HBO would immediately pay its past due payments to 1inMM

41.     Throughout 2020, Horwitz lulled The Spiegels, with false promises that negotiations with HBO and Netflix would soon lead to large payments to 1inMM and, in turn, the repayment of outstanding notes.

## B. Defendant's Ignorant Participation in the Scheme

42.     Horwitz raised money with five principal firms who acted as placement agents selling securities, including SAC, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in promissory notes used to fund individual projects offered by 1inMM (hereinafter "1inMM Offering").

43.     The Spiegels relied on personal relationships and word-of-mouth referrals to obtain investors.

44.     The Spiegels solicited $75,132,950 in investment via sales of units in three funds in the 1inMM Offering of which $29,733,025 remains outstanding.

45.     Upon information and belief, Ryan was introduced to 1inMM by its co-founder Craig Cole.

46.     Defendants published an information statement to investors which stated, "Ryan has known Craig Cole, Co-Founder of 1INMM, for over 10 years and has built a working relationship with his company.  With strong returns in SAC Movie Fund One, LLC, Ryan jumped at the opportunity to launch a second fund." (Information Statement Attached hereto as Exhibit "A" and incorporated herein).

47.     Horwitz made representations regarding 1inMM to Ryan and Jeff regarding Horwitz's experience and relationships in the media content distribution industry, as well as the investment dynamics, deal structure, potential returns, and associated risks pertaining to the opportunity.

48.     Defendants negligently relied on only representations from Horwitz and Cole when recommending the investment to Plaintiff rather than confirming anything with third parties.

49.     In or about March of 2017, SAC Movie Fund One, LLC was created by Defendants for the purpose of selling investment into 1inMM.

50.     In or about October 2017, Defendants created Fortune Film Fund One, LLC for the sole purpose of selling investment into 1inMM.

51.     In or about February 2018, Defendants created Fortune Film Fund Two, LLC for the sole purpose of selling investment into 1inMM.

52.     Ryan is the managing member of each SAC Advisory Group, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC and all operate from the offices of Jeff Spiegel's accounting firm, Spiegel Accountancy Corp. Upon information and belief, neither Jeff nor Ryan are personally members of Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC or parties to their operating agreements.

53.     According to the Information Statement, SAC Advisory Group, LLC, is operated by Jeff and Ryan.

54.     The capital deployed by SAC in each of the three funds was provided by Plaintiff and the Class.

55.     During this time, Horwitz made representations and provided purported contracts, emails, and other information to the Jeff and Ryan, which Defendants negligently believed to be true and accurate without investigating the obvious holes in the story that was far too good to be true.

56.     Defendants proceeded to sell Plaintiff investment in the 1inMM Offering by regurgitating the lies told by Horwitz.

57.     Rather than relying on any substantive investigation of their own, Defendants relied on the fact that 1inMM kept paying as sufficient evidence that the obvious Ponzi Scheme was legitimate.

58.     Defendants did not bother to do their own independent due diligence when promoting the Ponzi Scheme as a suitable investment to Plaintiff as required professionals selling investment.

59.     Horwitz peppered Defendants with hundreds of bogus documents supporting his scheme and even forged documents from reputable attorneys to perpetuate the fraud.

60.     Defendants relied exclusively on Horwitz's own due diligence of himself and 1inMM rather than doing their own investigation.

61.     Defendants kept their head in the sand long after other funds feeding 1inMM realized the fraud.

62.     The amount repaid by 1inMM to SAC during this period for these promissory notes, inclusive of specified interest, was approximately $56,888,512 of this, upon information and belief, in excess of $20,000,000 was retained by Defendants.

63.     At present, the proposed class is owed approximately $29,733,025 for amounts loaned in or about 2018 and 2019 pursuant to the 1inMM Offerings.

**C.  SAC's Duty to Plaintiff and the Class**

64.     The 1inMM Offerings were structured as follows: funds managed by SAC lent money to 1inMM for defined projects at a rate of 25% to 35% interest, SAC funded the loan to 1INMM via the sale of units in the funds managed by SAC to Class Members,  and SAC received 50% of profits on the money invested by the funds it managed.

65.     For all intents and purposes SAC was acting as a placement agent for 1inMM and paid a 12.5% to 17.5% commission on the sales.

66.     Placement agents such as SAC who sell private placements to retail customers for a commission such as SAC are required to register with the Financial Industry Regulatory Authority ("FINRA").

Class Action Complaint

67. FINRA regulates broker/dealer firms like Defendants and their registered representatives (*i.e.*, stockbrokers), and promulgates rules and regulations that brokerage firms and their registered representatives must adhere to.

68. While SAC was not a licensed broker-dealer it acted as if it was one when selling the 1inMM Offering in exchange for what amounted to a hefty commission.

69. A placement agent, or at least a party acting in that role such as SAC, is required to perform reasonable due diligence on a private placement prior to offering it for sale to its customers pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1).

70. SEC Regulation Best Interest ("Reg BI") provides SAC as a placement agent owed the following duties to Plaintiff and the Class:

(ii) Care obligation. The broker, dealer, or natural person who is an associated person of a broker or dealer, in making the recommendation, exercises reasonable diligence, care, and skill to:

(A) Understand the potential risks, rewards, and costs associated with the recommendation, and have **a reasonable basis to believe that the recommendation could be in the best interest of at least some retail customers**;

(B) **Have a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer based on that retail customer's investment profile and the potential risks**, rewards, and costs associated with the recommendation and does not place the financial or other interest of the broker, dealer, or such natural person ahead of the interest of the retail customer;

(C) Have a reasonable basis to believe that a series of recommended transactions, even if in the retail customer's best interest when viewed in isolation, is not excessive and is in the retail customer's best interest when taken together in light of the retail customer's investment profile and does not place the financial or other interest of the broker, dealer, **or such natural person** making the series of recommendations ahead of the interest of the retail customer.

(17 C.F.R. § 240.15l-1(b)(I).)

71. In order to ensure that it has fulfilled its responsibilities, FINRA requires that a broker-dealer in a Regulation D offering must, at a minimum, conduct a reasonable investigation concerning:

a. the issuer and its management;

b.      the business prospects of the issuer;

c.      the assets held by or to be acquired by the issuer;

d.      the claims being made; and

e.      the intended use of proceeds of the offering.

72.     Defendants had a duty to conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.

73.     FINRA has also provided detailed guidance on how a broker-dealer such as SAC was acting with the 1inMM Offering may ensure an adequate investigation has taken place into the issuer and its management, the issuer's business prospects, and the issuer's assets.

74.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1INMM and its history by Defendants would have included:

a.      Examining historical financial statements of 1inMM, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management;

b.      Looking for any trends indicated by 1inMM's financial statements;

c.      Contacting customers and suppliers regarding their dealings with 1inMM;

d.      Reviewing 1inMM's contracts, leases, and financing arrangements;

e.      Inquiring about 1inMM's past securities offerings and the degree of their success;

f.      Inquiring about the length of time that 1inMM had been in business and whether the focus of its business was expected to change.

75.     This was not done here. The full extent of the investigation was reliance on information supplied by the Ponzi Schemer. There was zero independent investigation done by Defendants.

76.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1INMM's business prospects by SAC should include:

Class Action Complaint

a.     Inquiring about the viability and value of any movies funded by 1INMM;

b.     Inquiring about the industry in which 1INMM operates, and the competitive position of

1INMM; and

c.     Requesting any business plan, business model or other description of the business

intentions of 1INMM and its management and their expectations for the business, and

analyzing management's assumptions upon which any business forecast is based. A

broker/dealer should test models with information from representative assets to validate

projected returns, break-even points, and similar information provided to investors.

77.     This was not done here. The contracts were fictitious. Defendants did not engage HBO or Netflix independent of Horwitz in any way to confirm Horwitz's wild story.

78.     Jeff is a Certified Public Accountant and Plaintiff and the Class relied on his financial expertise when deciding to invest with him.

79.     The American Institute of Certified Public Accountants' ("AICPA") Code of Professional Conduct Section 1.000.020 addresses how CPAs such as Jeff should respond to certain ethical conflicts.

80.     The AICPA Code of Professional Conduct Section 1.400.001 "Acts Discreditable" provides: "A member shall not commit an act discreditable to the profession." .

81.     Section 0.300.060 of the Code provides:

 Due care principle. A member should observe the profession's technical and ethical standards, strive continually to improve competence and the quality of services, and discharge professional responsibility to the best of the member's ability. ... **Due care requires a member to discharge professional responsibilities with competence and diligence**. It imposes the obligation to perform professional services to the best of a member's ability, with concern for the best interest of those for whom the services are performed, and **consistent with the profession's responsibility to the public**. ... **Each member is responsible for assessing his or her own competence of evaluating whether education, experience, and judgment are adequate for the responsibility to be assumed**...**Members**

Class Action Complaint

**should be diligent in discharging responsibilities to clients, employers, and the public.**

82. The International Ethics Standards Board for Accountants ("IESBA") Code of Ethics for Professional Accountants is another standard that defines the duties owed by Jeff.

83. Section 100.1 provides:

**A distinguishing mark of the accountancy profession is its acceptance of the responsibility to act in the public interest**. Therefore, a professional accountant's responsibility is not exclusively to satisfy the needs of an individual client or employer. In acting in the public interest, a professional accountant shall observe and comply with this Code.

84. Section 110 of the Code provides:

A professional accountant shall not **knowingly be associated with** reports, returns, **communications** or other information where the professional accountant believes that the information: (a) Contains a materially false or misleading statement; (b) Contains statements or information furnished recklessly; or (c) Omits or obscures information required to be included where such omission or obscurity would be misleading.

85. When a professional accountant becomes aware that the accountant has been associated with such information, the accountant shall take steps to be disassociated from that information

86. Defendants did not engage directly with 1inMM bankers, accountants, or attorneys in order to vet the wild lies they were told.

87. Jeff violated his most basic duties as a professional by failing to at all investigate this absurd investment.

88. Minimal investigation would have confirmed the purported counsel at Netflix was not even working at Netflix at the time of the supposed emails or that HBO had no record of 1inMM.

89. As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1INMM's assets and facilities should include:

a. Carefully examining any reports by third-party experts that may raise red flags;

Class Action Complaint

b.   Obtaining an expert opinion from auditors and financial experts and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors.

c.   Inquiring about previous or potential regulatory or disciplinary problems of the issuer.

d.   Obtaining a credit check of 1INMM.

e.   Making reasonable inquiries concerning the issuer's management. SAC should have inquired about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change.

f.   Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A party acting as a broker-dealer might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issue; and

g.   Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

90.   Defendants failed to do this third party confirmation of this supposedly $600,000,000 operation.

91.   A broker-dealer that offers securities, including those offered under Regulation D, must meet the suitability requirements of FINRA Rule 2111. This means that the broker-dealer must have a reasonable basis to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.

92.   FINRA Rule 2111.05(a) is the source of a broker-dealer's obligation to perform a reasonable investigation of the issuer and offered securities before offering securities in a Regulation D for sale to its clients.

Class Action Complaint

93.     Reasonable-basis suitability requires that a broker-dealer (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test.

94.     Defendants could not rely blindly upon the issuer for information concerning a company, nor may it rely on the information provided by the issuer in lieu of conducting its own reasonable investigation.

95.     While broker-dealers like SAC are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a high degree of care in investigating and independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate this duty to investigate.

96.     Of course, under these circumstances, Defendants were in a position to know more about 1inMM, understand its business, its finances, and its outlook better than just a mere broker-dealer since it was acting as it's placement agent or investment banker raising capital exclusively for 1inMM.

97.     As the de facto placement agent and investment banker for 1inMM, SAC was in a unique position compared to another broker-dealer that was merely part of the investment banking syndicate.

98.     In the course of a reasonable investigation, a broker-dealer, such as The Spiegels were acting, must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. A broker-dealer's reasonable investigation responsibilities obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer. When presented with red flags, the

Class Action Complaint

broker-dealer must do more than "blindly rely" upon representations by the issuer's management or the disclosure in an offering document.

99.     As described below, unfortunately for the Plaintiff and the Class, SAC failed to conduct proper due diligence, which caused Defendant's conduct to fall below the standard of care thereby breaching the duties that it owed the Plaintiffs and the Class.

## D.  1INMM DEFAULTS

87.     On January 22, 2020 Ryan advised class members that the fund was not able to take on new investment purportedly because "Our partners ended up securing another funding source, so we are going to continue with what we currently have for the time being"

88.     On January 31, 2020 Ryan advised class members that there would be some changes in the fund based on Horwitz's imagined deal with HBO:

> Participation Amendments- You may or may not know that TimeWarner (who owned HBO) was recently acquired by AT&T, so there has been some changes in the process between our distribution partner and HBO. These changes are now taking place and we are amending our agreements with our distribution partner to cater to these process changes. HBO has expanded their diligence period on the front end of the purchase cycle, meaning that there is anywhere from 1-3 weeks of diligence before the LOI is inked and the 6 month process starts for the minimum guarantee payment (where we are liquidated from the deal). In addition, there is a 1-2 week processing time from when the minimum guarantee is due to our distribution partner and they actually receive the funds.
> As a result of these processing changes, we are amending our agreement with our distribution partner [1inMM]. The new agreement will be a maturity date of 7.5 months and a yield of 26%, which is amended from the original agreement of a maturity date of 6 months and a yield of 22%. The effective yield is very similar to our original agreement. While our new maturity date is slated to be at 7.5 months, there is the possibility that we are paid before that on some films, which would only increase the effective yield. We still expect for investor returns to be over 20% and on par with the returns from 2019.

89.     Throughout 2020 Ryan relayed Horwitz's elaborate lies about delays in payment to lull investors into not pursuing action.

90.     On April 17, 2020 Ryan and Jeff advised Class Members that 1inMM had defaulted on its loans and advised investors "With this news, **we have decided to wind down the equity fund as**

**participations are paid over the coming months. We will return capital and earnings to investors as the participations in our portfolio are paid off.**" Despite it appearing to be a sufficiently dire situation to warrant shutting down the fund, Ryan and Jeff promised "We want to reassure you again, that although we are having some delays, we know that no funds have been lost. We expect that we will be receiving all of the funds due and will be returning your capital and earnings." (April Investor Update attached hereto as Exhibit "B" and incorporated herein).

87.     By the fall of 2020 Ryan and Jeff engaged counsel to assist them in spreading Horwitz's falsehoods and providing another layer of credibility to the absurd story told to lull the victims.

88.     On October 4, 2020, Ryan emailed a Class Member, "We will be getting clarity on payments and documentation this week from 1inMM. Our lawyer is in direct contact with their legal counsel, who also confirmed the execution of the agreement."

89.     On November 4, 2020, SAC's counsel, Richard Bowels, sent a letter to all Class Members that provided in pertinent part:

> As you know, 1inMM Capital ( our distribution partner) and HBO (the licensor of our films), have been in negotiations over the past many months to restructure their agreement. That amended agreement was finally executed on October 13, 2020. I was provided a severely redacted copy of this agreement in order to verify that it had been signed and what the terms were regarding the catch up payment owed on film investments. I received the redacted version
> on October 20, 2020. **While the agreement is highly confidential, I am able to tell you that I was able to verify its execution and was further able to verify the terms of payment of past due amounts to 1inMM**. SAC has also been in communication with 1inMM Capital regarding how 1inMM will satisfy its obligations to SAC and its entities. The following information has been provided:
> • 1inMM has confirmed that it agrees with the total amount due and owing as asserted by
> SAC and its entities.
> • 1inMM has agreed to notify SAC of payments made by HBO over the coming months. What I can tell you is that the redacted agreement provides that **HBO will be making full payment by the end of the year, unless it exercises options to extend, which would require making substantial interim payments**.
> • 1inMM has committed that it will make pro rata or proportionate payments to SAC for its share of the total advances. These payments will be made within 14 days of 1inMM receiving any payment from HBO.

• 1inMM has told SAC that March 1, 2021 is the latest date by which full payment will be made.

• SAC will remit payments to its investors in a timely manner as soon as received from 1inMM. These payments will be remitted on a first in first out basis based on the original maturity date of each film.

(Emphasis added, Bowels Letter, attached hereto as Exhibit "C" and incorporated herein)

88      On February 28, 2021 investors in JJMT Capital, LLC who also invested funds in 1inMM, were advised that 1inMM was a fraud after JJMT's new counsel at King & Spalding discovered Horwitz's fraud and Ponzi Scheme **after just one day of investigating.**

89      On March 15, 2021, while the fraud was obvious to hundreds of other investors, Ryan continued to pass along lies to his investors stating: "We wanted to provide a quick update as to where everything currently stands. After discussions with their investment groups, 1inMM has agreed to accept the payment proposal from Warner Media and were told they will be receiving the agreement this week. Once all the details are finalized and the agreement is executed we will be sharing all the information with investors. We are optimistic that this will get finalized and payments will be remitted."

90      On April 5, 2021, the Securities and Exchange Commission filed a securities fraud Complaint against Horwitz detailing the obvious fraud that was easily unraveled with minimal investigation.

91      Two days later, on April 7, 2021, Ryan communicates to investors "we received some shocking and disheartening news yesterday regarding 1inMM Capital" that the SEC initiated action against 1inMM.

92      This was not shocking to Ryan, he had supplied documents to the SEC at least a month earlier in support of its investigation, and it was readily apparent that Horwitz was running a Ponzi Scheme as was confirmed by counsel at King & Spalding after one day of investigation months earlier.

93  Plaintiff justifiably relied on The Spiegels' representations about the suitability of investment in 1inMM because the SAC principals were professionals and had personal relationships with a 1inMM founder.

94  Plaintiff relied on Defendants to investigate the investment it was offering and confirm facts presented in the offering materials.

95  Plaintiff justifiably relied on Defendants' statements about the investment and that Defendants had a reasonable basis for recommending the investment.

**E.  Plaintiff's Investment in SAC**

98.  On or about January 4, 2018 Carter first agreed to invest in Fortune Film Fund Two, LLC.

99.  Defendants offered and Carter agreed to purchase 200,000 Units in Fortune Film Fund Two, LLC in consideration of $200,000.

100.  On January 18, 2018 Carter elected to reinvest 50% of her earnings and receive distributions of 50%.

101.  On September 1, 2018, Carter agreed to purchase 50,000 Units in Fortune Film Fund Two, LLC in consideration of $50,000.

102.  By the end of 2020 her investment purportedly grew to a value of $400,716.87.

103.  Carter's investment in the Ponzi Scheme was a total loss.

104.  To date, Carter is owed over $400,000 from SAC.

Class Action Complaint

## VI.   CLASS ALLEGATIONS

105.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of herself and all others similarly situated, comprising a class consisting of:

> All persons who invested in SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC from January 1, 2018 to December 31, 2020.

Excluded from the proposed Class and subclasses are Defendants, their respective officers, directors, and employees, affiliates, legal representatives, heirs, successors, or assignees. Plaintiffs reserve the right to amend the Class definition as necessary.

106.    Plaintiff is a member of the Class.

107.    Excluded from the Class are judicial personnel involved in considering the claims herein, all persons and entities with claims for personal injury, the defendants, any entities in which the defendants have a controlling interest, and all of their legal representatives, heirs and successors.

108.    It is estimated that the Class consists of thousands of persons throughout the continental United States. The members of the Class are so numerous that joinder of all members, whether otherwise required or permitted, is impracticable. The exact number of Class members is presently unknown to Plaintiffs, but can easily be ascertained from the sales and warranty claim records of Defendant.

109.    There are numerous questions of law or fact common to the members of the Class which predominate over any questions affecting only individual members and which make class certification appropriate in this case, including:

a.      Whether Defendants, owed an extra-contractual duty of ordinary care to Class Members;

b.      Whether Defendants, breached their duty of ordinary care to Class Members;

c.      Whether Defendants, negligently misrepresented the facts regarding 1inMM to Class Members;

d.      Whether Defendants violated California Securities Law; and

e.      Whether Defendants were unjustly enriched.

110.    The claims asserted by Plaintiff are typical of the claims of the members of the Class.

111.    This class action satisfies the criteria set forth in Fed. R. Civ. P. 23(a) and 23(b)(3) in that Plaintiffs are members of the Class; Plaintiff will fairly and adequately protect the interests of the members of the Class; Plaintiff's interests are coincident with and not antagonistic to those of the Class; Plaintiffs have retained attorneys experienced in class and complex litigation; and Plaintiff have, through their counsel, access to adequate financial resources to assure that the interests of the Class are adequately protected.

112.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.  It is economically impractical for most members of the Class to prosecute separate, individual actions;

b.  After the liability of Defendants has been adjudicated, the individual and aggregate claims of all members of the class can be determined readily by the Court; and

c.  Litigation of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members that would substantially impair or impede the ability of other Class members to protect their interests.

113.    Class certification is also appropriate because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and/or injunctive relief with respect to the claims of Plaintiff and the Class Members.

**V. CLAIMS**

**FIRST CLAIM FOR RELIEF**
**Negligent Misrepresentation**
**[Against all Defendants]**

114.    Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 113 as though fully set forth herein as paragraph 114.

115.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for Defendants include the rules promulgated by FINRA, which each broker offering securities such as the 1inMM notes should be a member of.

116.    Those who undertake any work or calling for which a special skill is required such as a broker-dealer have a duty not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability.

117.    Defendants owed Plaintiff and the Class a duty to act as a reasonably prudent professional would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA. These duties and obligations flow to Plaintiff and the Class Members as a result of the relationship between Defendants, the Plaintiff, and the Class.

118.    As set forth above, Defendant breached its legal duty to provide accurate information to Plaintiff and the Class as prospective purchasers of investments in SAC funds by omitting material facts, and such material facts were necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

119.    By reason of the aforesaid, Defendants are guilty of negligent misrepresentation and omission in connection with the offer and sale of investments in 1inMM Offerings.

120.    At all times relevant to this action, Defendants had knowledge of, or reasonable grounds to believe the existence of facts by reason of which their liability under this Count is alleged

Class Action Complaint

to exist, and with this knowledge, Defendants made material omissions of fact with respect to the offer and sale of securities.

121. As described above, Defendants negligently breached their duties to Plaintiff and the members of the Class.

122. Had a reasonably prudent broker-dealer under the same or similar circumstances conducted adequate due diligence on 1inMM to understand the risks and rewards of the 1inMM Offerings, it would have concluded that the risks in investing in 1inMM far outweighed any potential reward, and it would not have approved of the 1inMM Offerings for sale to any of its clients.

123. By approving of the sale of the 1inMM Offerings to its clients, notwithstanding the numerous red flags identified herein, 1inMM demonstrated that it failed to understand the risks and rewards of the 1inMM offerings, or consciously ignored the risks presented by these red flags in order to ensure it maximized its fees and commissions.

124. Defendants knew or should have known that Plaintiff and the Class would place their trust and confidence in Defendants that it had a reasonable-basis to conclude that 1inMM was suitable for at least some investors, and that it had conducted adequate due diligence to understand the risks and rewards of the 1inMM offering.

125. Defendants knew or should have known that it was reasonably foreseeable that Plaintiff and the Class would act in reliance on Defendants approval to sell the 1inMM Offerings.

126. Plaintiff and the Class acted in reliance on SAC's approval to offer to sell the 1inMM offerings.

127. But for Defendants' approval to sell the 1inMM Offerings, Plaintiff or the Class members would not have even been presented the opportunity to participate in the 1inMM Offerings.

128. As a direct and proximate result of Defendants negligence, 1inMM is liable to Plaintiff and the Class for all of the investment losses that they suffered in 1inMM.

## SECOND CLAIM FOR RELIEF
### Violation of California Corporations Code Section 25401 -
### Untrue Statements or Omissions in Connection with Sale of Security

129.    Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 113 as though fully set forth herein as paragraph 129.

130.    California Corporations Code Section 25401 reads as follows:

"It is unlawful for any person to offer to sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

131.    By its terms, Corporations Code Section 25401 does not require any fraudulent misrepresentation or and intent to deceive, rather simply the making of untrue statements of material fact or the non-disclosure of a material fact.

132.    As more fully set forth in General Allegations and in the First Claim for Relief, plaintiffs are informed and believe and based thereon allege that the above described representations, promises, assurances, expressions of opinion and non-disclosures of material fact by defendants were made negligently, recklessly and carelessly.

133.    California Corporations Code Section 25501 is the remedial statute for Code 23 Section 25401, and reads as follows:

Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells security to him, who may sue either for rescission or damages.

134.    Jeff and Ryan are jointly and severally liable pursuant to California Corporations Code Section 25504 which provides in pertinent part:

Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker–dealer or agent who materially aids in the act or transaction constituting the violation, are

also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

135. Defendants offered to sell Plaintiff securities, consisting of units in SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC, to plaintiff and the Class within the State of California, by means of both oral and written communications by Defendants to Plaintiff and the Class, and said offer included untrue statements concerning the true value of the units being offered, and numerous statements lulling Plaintiff to allow the fraud to continue, whereas the true facts were that 1inMM was a complete scam with no actual value at all and was a pure Ponzi Scheme.

136. Plaintiff is therefore informed and believe and based thereon allege that Defendants made untrue and misleading statements of material facts and also omitted material facts in offering and selling the 1inMM Offering to plaintiff and the Class.

137. Plaintiff is informed and believes and based thereon allege that defendants Ryan and Jeff should reasonably have known these statements were untrue and misleading at the time they made them, and that plaintiffs were in complete reliance upon his claimed superior and exc1usive knowledge, information and expertise, and that the facts stated and omitted were material to plaintiff's decision to participate in the Offering.

138. As a result of Defendants' representations and non-disclosures, plaintiff participated in the 1inMM Offering and caused investment funds to be transferred to funds operated by defendants to purchase the subject securities.

139. For all the reasons set forth above the plaintiff and the class lost the entirety of their investment and hereby seek recovery of the full amount of their monetary detriment, damage and loss in the sum in excess of $30,000,000 or in an amount or amounts to be established according to proof at time of trial.

**THIRD CLAIM FOR RELIEF**
**Violation of California Corporations Code Section 25501.5**
**Untrue Statements or Omissions in Connection with Sale of Security**

140. Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 113 as though fully set forth herein as paragraph 140.

141. The Spiegels were acting on behalf of SAC and SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC when selling their securities with the various entities knowledge and approval.

142. The units in SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC sold to Plaintiff and the Class were securities.

143. When Plaintiff and the class purchased fractional interests in entities controlled by Defendants, SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC and Defendants were required to be licensed as a securities broker-dealer, or to have applied for and secured a certificate under California Corporations Code section 25200.

144. Neither Defendants are licensed as a securities broker-dealers, nor, upon information and belief have they applied for and secured a certificate under California Corporations Code section 25200, Part 3.

145. As a proximate result of Defendants and the controlled entities failure to obtain the proper broker-dealer licensing or certificate, Plaintiff and the Class are entitled to rescission of the investments in SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC and reasonable attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**

146. Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 113 as though fully set forth herein as paragraph 146.

147. Defendants each received and retained a benefit from Plaintiff and the Class totaling in excess of $10,000,000 and inequity has resulted.

Class Action Complaint

148. Defendants benefitted from negligently misrepresenting the nature and value of the Plaintiffs investment and Horwitz's gross fraud.

149. Plaintiff conferred a benefit on Defendants by paying excessive interest on fraudulent investments.

150. It is inequitable for Defendants to retain these benefits.

151. Plaintiff was not aware of the true facts about the investment, and did not benefit from Defendants' conduct.

152. Defendants knowingly accepted the benefits of their unjust conduct.

153. As a result of Defendants' conduct, the amount of their unjust enrichment should be disgorged in an amount according to proof.

WHEREFORE, Plaintiff, individually and on behalf of the Class as defined herein, respectfully request that this Court enter a judgment against Jeffrey Spiegel and Ryan Spiegel and in favor of Plaintiffs and the Class, and grant the following relief:

A. Determine that this action may be maintained and certified as a class action on a nationwide, statewide, and/or multistate basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3); or alternatively, certify all questions, issues and claims that are appropriately certified under 23(c)(4); and that it designate and appoint Plaintiffs as Class Representatives, and appoint Class Counsel under Rule 23(g).

B. Award Plaintiffs and Class members their actual, compensatory and/or statutory damages, according to proof;

C. Award Plaintiffs and Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

D. Award Plaintiffs and Class members such other, further and different relief as the case may require; or as determined to be just, equitable, and proper by this Court.

Dated: May 26, 2021

Respectfully submitted,

**LOFTUS & EISENBERG, LTD.**

By:    /s/*Alexander N. Loftus*   
              Alexander N. Loftus
              Attorneys for Plaintiff

Alexander Loftus, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T: (312) 772-5396
alex@loftusandeisenberg.com
*Pro Hac Vice Applied*

William Aron, Esq.
ARON LAW FIRM
15 W Carrillo St, Suite 217
Santa Barbara, CA 93101
T: (805) 618-1768
bill@aronlawfirm.com

Class Action Complaint