Loftus & Eisenberg, Ltd.
ALEXANDER N. LOFTUS, ESQ. (*pro hac vice*)
ROSS M. GOOD, ESQ. (*pro hac vice*)
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T: (312) 772-5396
alex@loftusandeisenberg.com
ross@loftusandeisenberg.com

Aron Law Firm
WILLIAM ARON, ESQ. (#234408)
15 W Carrillo St, Suite 217
Santa Barbara, California 93101
T: (805) 618-1768
bill@aronlawfirm.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT—NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> JEFFREY SPIEGEL, RYAN SPIEGEL, SAC ADVISORY GROUP, LLC, and SPIEGEL ACCOUNTANCY CORP. <br><br> Defendants. | CASE NO. 3:23-cv-00287-AMO <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** <br><br> Date:     February 15, 2024 <br> Time:     2:00 P.M. <br> Courtroom: 10 – 19th Floor <br> Judge:   Hon. Araceli Martinez-Olguin |

1

## <u>TABLE OF CONTENTS</u>

I. STATEMENT OF ISSUES ................................................................................................ 1

II. INTRODUCTION ......................................................................................................... 1

III. ARGUMENT .............................................................................................................. 2

A. Legal Standards ........................................................................................................... 2

B. Plaintiffs state a claim pursuant to 10(b)(5) ............................................................... 3

i. Falsity is adequately alleged to sustain Plaintiffs' § 10(B) claim at
this stage ......................................................................................................................... 3

ii. Scienter is adequately alleged to sustain Plaintiffs' § 10(B)
claim ............................................................................................................................... 3

iii. The S.CMPLT. adequately alleges the "who, what, when, where"
of the alleged fraud ......................................................................................................... 8

iv. The S.CMPLT. Pleads Reliance ................................................................................ 11

v. The S.CMPLT. Pleads Loss Causation ...................................................................... 12

vi. The S.CMPLT. Pleads Economic Loss ...................................................................... 12

vi. The S.CMPLT. Pleads Materiality ............................................................................ 12

viii. The claim is timely filed because the violations occurred within
the statute of repose ....................................................................................................... 13

C. Defendants' Waiver Defense is invalid ...................................................................... 16

D. Plaintiffs State Claims for Violation of 12(A)(2) and Violation of
Section 15 ....................................................................................................................... 17

E. Plaintiffs State a Claim for Declaratory Judgment .................................................... 21

F. Plaintiffs adequately allege Defendants Violated California
Corporations Code § 25401 ............................................................................................ 23

G. Plaintiffs adequately allege Negligent Misrepresentation ......................................... 24

H. Plaintiffs adequately allege Accounting Malpractice ................................................. 25

I. Defendants' proximate cause argument is a non-sequitur ........................................... 27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

J. Defendants' claimed victimhood is nauseating considering the well
pled claim for unjust enrichment.................................................................... 28

IV. CONCLUSION ........................................................................................ 29



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972) ........................................................................................ 12

*Alpha Investment, LLC v. Zynga, Inc.*,
2012 U.S. Dist. LEXIS 81311 (N.D. Cal. 2012) ........................................... 17

*In re Asyst Techs., Inc. Derivative Litig.*,
2008 WL 4891220 (N.D. Cal. Nov. 12, 2008) ......................................... 21-22

*S.E.C. v. Alliance Transcription Services, Inc.*
(D. Ariz., Dec. 18, 2009, No.CV08-1464-PHX-NVW) 2009 WL 5128565 ........................ 5

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................... 2

*Bowden v. Robinson*,
67 Cal. App. 3d 705, 136 Cal. Rptr. 871 (1977) ........................................... 24

*In re Brocade Communs. Sys. Derivative Litig.*,
615 F. Supp. 2d 1018 (N.D. 2009) ................................................................. 15

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ............................................................................ 3

*Bridges v. Geringer*,
No. 5:13-cv-01290-EJD, 2015 U.S. Dist. LEXIS 66695 (N.D. Cal. May 21, 2015) ........... 18, 19

*Buffin v. Community*,
2021 U.S. Dist. LEXIS 190329 (C.D. Cal. Aug. 6, 2021) .............................. 16

*Burgess v. Premier Corp.*,
727 F.2d 826 (9th Cir. 1984) .......................................................................... 22

*Cook v. Avien, Inc.*,
573 F.2d 685 (1st Cir. 1978) ........................................................................... 18

*Dura Pharms., Inc. v. Broudo*
544 U.S. 336 (2005) .......................................................................................... 3

*Durning v. Citibank, Intern.*
990 F.2d 1133 (9th Cir. 1993) .................................................................. 13-14

*Ernst & Ernst v. Hochfelder*
425 U.S. 185 (1976) .......................................................................................... 4

*ESG Capital Partners, LP v. Stratos,*
828 F.3d 1023 (9th Cir. 2016) ............................................................................ 4

*Facebook, Inc. v. Pac. Nw. Software, Inc.,*
640 F.3d 1034 (9th Cir. 2011) .......................................................................... 21

*Hatrock v. Edward D. Jones & Co.,*
750 F.2d 767 (9th Cir. 1984) ............................................................................ 12

*Hill York Corp. v. American International Franchises, Inc.,*
448 F.2d 680  (5th Cir. 1971) ........................................................................... 18

*Hollinger v. Titan Capital Corp.,*
914 F.2d 1564 (9th Cir. 1990) ........................................................................ 3-4

*Koepke v. Loo,*
18 Cal.App.4th 1444 (1993) ............................................................................. 28

*Liu Hongwei v. Velocity V Ltd. partnership,*
No. 2:15-cv-05061-ODW-E, 2018 U.S. Dist. LEXIS 115636 (C.D. Cal. July 11, 2018) .... 19-20

*Lindner v. Barlow, Davis & Wood,*
210 Cal. App. 2d 660 (1962) ............................................................................ 26

*McCool v. Strata Oil Co.,*
972 F.2d 1452 (9th Cir. 1992) .......................................................................... 13

*Melcher v. Fried,*
No. 16-cv-2440, 2018 U.S. Dist. LEXIS 205252 (S.D. Cal. Dec. 4, 2018) ........................ 16, 22

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
540 F.3d 1049 (9th Cir. 2008) ............................................................................ 3

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning,*
578 U.S. 374 (2016) .......................................................................................... 23

*Mills v. Electric Auto- Lite Co.,*
396 U.S. 375 (1970) .......................................................................................... 22

*Moore v. Anderson Zeigler Disharoon Gallagher & Gray,*
109 Cal. App. 4th 1287, 135 Cal. Rptr. 2d 888 (2003) ........................................ 26

*S.E.C. v. Murphy,*
626 F.2d 633 (9th Cir. 1980) ........................................................................ 18-20

*Nat'l Union Fire Ins. Co. v. Cambridge Integrated Servs. Group, Inc.,*
171 Cal. App. 4th 35, 89 Cal. Rptr. 3d 473 (2009) ............................................ 24



*In re Nei Contr. v. Neighborhood Nat'l Bank,*
2016 U.S. Dist. LEXIS 204270 (S.D. Cal. 2016) ................................................. 14-15

*Neilson v. Union Bank of California,*
 290 F. Supp. 2d 1101 (C.D. Cal. 2003) ............................................................. 25

*Parvin v. Davis Oil Co.,*
524 F.2d 112 (9th Cir. 1975)............................................................................. 18

*Paskenta Band of Nomlaki Indians v. Crosby,*
122 F.Supp.3d 982 (E.D. Cal. 2015)................................................................. 28

*Petro-Ventures, Inc. v. Takessian,*
967 F.2d 1337 (9th Cir. 1992)........................................................................ 16, 22

*Pino v. Cardone Cap., LLC,*
55 F.4th 1253 (9th Cir. 2002) .......................................................................... 21

*SEC v. Ralston Purina Co.,*
346 U.S. 119 (1953)........................................................................................ 18

*Reese v. Malone,*
747 F.3d 557 (9th Cir. 2014)........................................................................... 3

*South Ferry LP v. Killinger,*
 542 F.3d 776 (9th Cr. 2008)........................................................................... 6-7

*Sparling v. Daou (In re Daou Systems),*
411 F.3d 1006 (9th Cir. 2005).......................................................................... 12

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,*
552 U.S. 148 (2008)........................................................................................ 11

*Strategic Diversity, Inc. v. Alchemix Corp.,*
666 F.3d 1197 (9th Cir. 2012).......................................................................... 12

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.,*
 802 F. Supp. 2d 1125 (C.D. Cal. 2011) ........................................................... 14-15

*Swartz v. KPMG LLP,*
476 F.3d 756 (9th Cir. 2007)........................................................................... 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007)...................................................................................... 4, 6-7

*TSC Ind., Inc. v. Northway, Inc.,*
 426 U.S. 438 (1976)....................................................................................... 13



*Turpin v. Sortini*,
31 Cal. 3d 220, 643 P.2d 954 (1982) .................................................................... 26

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ............................................................................... 3

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
282 F. Supp. 3d 1074 (N.D. Cal. 2017) ........................................................... 21-22

*Western and Southern Life Ins. Co. v. Countrywide Fin. Corp.*
2012 U.S. Dist. LEXIS 60776  (C.D. Cal 2012) .................................................. 15

**Rules and Statutes**

§ 10(b)(5) of the Securities Act of 1934 .................................................. 1, 3, 14,
23, 25

§ 12(a)(2) of the Securities Act of 1933 ................................................... 1, 17-
18, 20-
21

§ 29(b) of the Securities Act of 1934 .................................................... 1,22-23

California Corporations Code § 25501 ................................................... 1,23-24

California Corporations Code § 25403 ........................................................... 1

Fed. R. Civ. P. 8(a) .......................................................................................... 2

Fed. R. Civ. P. 9(b) ......................................................................................... 26

Fed. R. Civ. P. 12(b)(6) ............................................................................. 2,18-19



1    Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN,

2   SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET

3   MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC,

4   respectfully submit this opposition to Defendants' Motion to Dismiss the Second Amended

5   Complaint.

6        **I.      STATEMENT OF ISSUES**

7        Whether the Second Amended Complaint (Doc. 53, the "S.Cmplt."[1]) adequately pleads

8   Defendants' violation of § 10(b)(5) of the Securities Act of 1934, § 12(a)(2) of the Securities Act

9   of 1933, violation of § 15 of the Securities Act of 1933, violation of § 29(b) of the Securities Act

10   of 1934, violation of California Corporations Code § 25501, violation of California Corporations

11   Code § 25401, violation of California Corporations Code § 25403, and states a claim for Negligent

12   Misrepresentation and Accounting Malpractice, and whether Defendants were unjustly enriched by

13   profits earned from helping the criminal fraud.

14       **II.     INTRODUCTION**

15       The Court is well acquainted with the facts of this case and the same arguments in this Motion

16   to Dismiss were for the most part previously addressed. Last time around the Court found the

17   allegations in paragraph 64 were not plead with sufficient specificity (Doc. 52 at. 8), found that

18   nothing was noted in response or sur-reply regarding some of Defendants 12(a)(2) arguments (*Id.*

19   at 10), and that Section 29 claim fails because there is no underlying violation pled (*Id.* at 13).

20       Plaintiffs amended the Complaint and directly addressed the deficiencies noted. Now paragraph

21   68 in the S.Cmplt. explains in detail precise misrepresentations including which individual (there

22   are more plaintiff entities than there are individual plaintiffs) received the misrepresentation, the

23   form of communication, which individual communicated it, and when.

24       The amendment explains the exact misrepresentations communicated in the Profit Sharing

25   Agreement itself (S.Cmplt. ¶ 68(b)), which individuals received the video solicitation and when,

26   (*Id. at* (a)), specific detail and verbatim quotes of written representations that induced Plaintiffs to

27   _____

28       [1] The standard abbreviation of "SAC" is already taken in this case.



1    invest and which Plaintiffs received the representations and from who (*Id. at* (c), (d), (e)), specific

2    detail of phone calls and emails in 2018 inducing Plaintiffs to invest based on the supposed due

3    diligence done by Defendants (*Id.* at (f) and (g));   specific detail of in person and phone

4    communications including in the spring of 2018 (*Id.* at (i)); and specific detail of interstate phone

5    misrepresentations about Defendants being co-signers on Horwitz's bank accounts (*Id.* at (l)).

6        The one addition to the complaint is a claim for unjust enrichment and facts explaining how

7    Defendants profited from the violations alleged. The theme of the defense is that Defendants were

8    victims of Horwitz. This is false. The Complaint alleges "Jeff, Ryan, and SAC are 'net winners' in

9    the Ponzi Scheme. Jeff and Ryan are the only owners of SAC which earned a profit in excess of

10   $4,000,000 at the expense of dozens of investors" (S. Cmplt. ¶ 71(l)). A "victim" does not profit

11   from a crime.

12       Amazingly, Defendants allege another 1inMM aggregator, JJMT Capital, LLC ("JJMT"),

13   is another "victim." (Mot. at 4). A motion is pending in the Central District of California recently

14   to approve the final portion of $12.85M settlement with JJMT and the some of the same plaintiffs

15   for the same claims. (Declaration of Ross Good, Ex. 1A-1B). On July 5, 2023, the Central District

16   of California Court approved a $3.85M settlement for a former co-owner of JJMT. (*Id* at Ex. 2A-

17   2B). JJMT's owners prudently agreed to stay investor litigation, like this case, in favor of a global

18   resolution with the 111 net losers in the 1inMM Scheme represented by the undersigned (of

19   approximately 150 total) and the SEC appointed Receiver. *Id.* Defendants are the only 1inMM

20   aggregator who kept up a fruitless defense while all others saw the writing on the wall and agreed

21   to stays or settled.  Nonetheless, the Parties are vigorously, and at great expense, rearranging the

22   chairs on the Titanic.

23       **III.    ARGUMENT**

24           **A.  Legal Standards**

25        "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

26   factual allegations, a plaintiff's obligation to provide the 'grounds' of his" entitlement to relief'

27   requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

28   action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Rather, the

1    allegations in the complaint "must be enough to raise a right to relief above the speculative level."

2    *Id.* The pleading standards are fully satisfied with the fact intensive S. Cmplt.

3        **B.   Plaintiffs state a claim pursuant to 10(b)(5) (Mot. at 6, 13)**

4        To prevail under Rule 10b-5, a plaintiff must prove: (1) falsity (meaning a material

5    misrepresentation or omission by the defendant); (2) scienter (i.e., a wrongful state of mind); (3) a

6    connection with the purchase or sale of a security; (4) reliance upon the misrepresentation or

7    omission; (5) economic loss; and (6) loss causation. *See Dura Pharms., Inc. v. Broudo,* 544 U.S.

8    336, 341-42 (2005); *Metzler Inv. GMBH v. Corinthian Colls., Inc.,* 540 F.3d 1049, 1061 (9th Cir.

9    2008). To meet the more exacting standards of the PSLRA, a plaintiff must specify each statement

10   alleged to have been misleading and the reason or reasons why the statement is misleading. *In re*

11   *Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1085 (9th Cir. 2002). Plaintiffs satisfied every element

12   with specific detail and the Motion should be denied.

13       **i.     Falsity is adequately alleged to sustain Plaintiffs' § 10(B) claim at this stage**

14       Falsity is established by showing that a statement or omission "affirmatively create[s] an

15   impression of a state of affairs that differs in a material way from one that actually exists." *Brody*

16   *v. Transitional Hosps. Corp.,* 280 F.3d 997, 1006 (9th Cir. 2002); *see also Reese v. Malone,* 747

17   F.3d 557, 569-70 (9th Cir. 2014). The premise of the claim is that Defendants affirmatively created

18   the impression that Horwitz's scheme was real, money was moving to and from HBO and Netflix,

19   and Defendants had investigated this fully and even were co-signors on the accounts to guarantee

20   the money was moving as promised. (S.Cmplt. ¶ 68). The reality is that the whole thing was

21   imaginary and Defendants did nothing to confirm Horwitz's story and ignored countless bright red

22   flags so long as they thought they could continue profiting from Horwitz's fraud. (S.Cmplt. ¶ 69).

23       **ii.    Scienter is adequately alleged to sustain Plaintiffs' § 10(B) claim**

24       In this case, Plaintiffs are proceeding under a deliberate recklessness theory of scienter. *See*

25   (S.Cmplt. ¶¶ 6, 140) A misrepresentation or omission is deliberately reckless if it is highly

26   unreasonable and involves not merely simple negligence, "but an extreme departure from the

27   standards of ordinary care, and [] presents a danger of misleading buyers or sellers that is either

28   known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v.*

1    *Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (internal quotation omitted). Plaintiffs

2    alleging deliberate recklessness need not prove that a defendant "actually knew" their statements

3    were false or misleading, just that they "recklessly turn[ed] a blind eye" to the falsity. *In re*

4    *VeriFone Holdings, Inc. Secs. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). In this case, not only was

5    the conduct extremely reckless but Defendants had a huge financial incentive to be reckless and

6    secure millions in profits off the sham investment.

7         The Supreme Court explained that "[t]he inquiry . . . is whether all of the facts alleged, taken

8    collectively, give rise to a strong inference of scienter, not whether any individual allegation,

9    scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S.

10   308, 323, (2007) (citations omitted). An inference that is "merely plausible or reasonable" is not

11   enough, "it must be cogent and at least as compelling as any opposing inference of nonfraudulent

12   intent." *Id.* at 324. Applying this standard, the Ninth Circuit has held that a plaintiff can establish

13   scienter "by showing deliberate recklessness or 'some degree of intentional or conscious

14   misconduct.'" *ESG Capital Partners, LP v. Stratos,* 828 F.3d 1023, 1035 (9th Cir. 2016)

15        The Ninth Circuit has established that "recklessness" will satisfy the scienter requirement

16   of Rule 10b5 under the standards of *Ernst & Ernst v. Hochfelder* 425 U.S. 185, 193 n. 12 (1976):

17
18        In *Hochfelder*, the Court reserved the question whether "reckless behavior is
         sufficient for civil liability under §10(b) and Rule 10b-5." 425 U.S. at 193-94 n.
19        12,…. This court answered the question affirmatively in *Nelson v. Serwold*, 576
         F.2d 1332 (9th Cir.), Cert. denied, 439 U.S. 970, 99 S.Ct. 464,….Nelson contains
20        a thorough discussion of the scienter requirement and the effect of Hochfelder. We
         concluded that "recklessness, or some degree of intent not sufficiently aggravated
21        to be characterized as 'deliberate and cold-blooded'" would support liability under
         §10(b) and Rule 10b-5. *Nelson v. Serwold*, 576 F.2d at 1338. Our holding is in
22        accord with those of other circuits. *See, e. g., Edward J. Mawod & Co. v. Securities
         & Exch. Com'n*, 591 F.2d 588, 596 (10th Cir. 1979); *Rolf v. Blyth, Eastman Dillon
23        & Co*., 570 F.2d 38, 46 (2d Cir. 1978); *Sundstrand Corp. v. Sun Chemical Corp*.,
         553 F.2d 1033, 1045 (7th Cir.), Cert. denied, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d
24        155 (1977).

25   Recklessness sufficient to meet the scienter requirement has been described as follows:

26
27        Reckless conduct is best described as "not merely simple, or even inexcusable
         negligence, but an extreme departure from the standards of ordinary care, and
28        which presents a danger of misleading buyers or sellers that is either known to the
         defendant or is so obvious that the actor must have been aware of it." *Hollinger v.*

---

*Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (*quoting Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977)).

*S.E.C. v. Alliance Transcription Services, Inc.* (D. Ariz., Dec. 18, 2009, No.CV08-1464-PHX-NVW) 2009 WL 5128565, at *5.

It goes without saying that in measuring the quality of the "recklessness" of alleged misconduct, context is critical: one must factor in the factual circumstances and the nature of the duty of the one who is alleged to have acted recklessly. Plainly, imbibing an alcoholic beverage while sitting in one's backyard at the end of the work week with relative certainty that the car is in the garage for the weekend is far less likely to be determined a reckless act, than if one was to imbibe the same beverage immediately before driving carpool to the local elementary school on Monday.

In this case, the recklessness is plead clearly some highlights of the reckless conduct plead include:

First, Defendants never contacted, HBO, Netflix, Sony, City National Bank, never investigated whether there were any internal controls in place at 1inMM, never talked to any third parties in the movie funding business who had experienced dealing with Horwitz, never evaluated Horwitz's personal finances or credit rating, never confirmed what if any assets 1inMM had, never checked to see if 1inMM had an UCC filings for its purported interest in films, never reviewed any financial statements or tax returns created by a third party for 1inMM or Horwitz, and limited their due diligence to asking Horwitz and Cole questions and reviewing documents provided by Horwitz and Cole. (S.Cmplt. ¶ 71b). Limiting due diligence on a seventy million dollar investment to simply what one young man with no relevant experience reports is akin to driving the carpool with a blindfold on.

Second, it is true that Horwitz provided forgeries to ply Defendants, however the forged agreements didn't even name the right counterparty.  The contracts Horwitz gave Defendants were with "**HBO Holdings, Inc**." (emphasis added). Defendants did not know what, if any, relationship "HBO Holdings, Inc." had with the streaming platform HBO and did not bother to confirm that HBO Holdings, Inc. was even an existing corporation. There was no HBO Holdings, Inc.

1    incorporated anywhere in 2017 or 2018. This is readily apparent with a Google Search of "HBO

2    Holdings, Inc" which leads to the Edgar Archive of all of Time Warner's Subsidiaries which does

3    not include "HBO Holdings, Inc." Further, the California Secretary of State website that shows

4    there is no company registered to do business in California called "HBO Holdings, Inc" despite

5    numerous other HBO entities. Investing over $75,000,000 based on contracts without checking to

6    confirm the party on the other side where the profits were being paid from exists is reckless.

7    (S.Cmplt. ¶ 71, e.). Applying the analogy above, with the amount of money at stake this act is

8    comparable to performing brain surgery after imbibing an alcoholic beverage.

9         Third, Defendants proceeded with no due diligence of Horwitz apparently because his

10   supposed business partner, Craig Cole ("Cole"), was friends with Ryan. However, Defendants

11   ordered a background check on Cole that confirmed he had no interest in 1inMM and was not

12   employed by 1inMM. (S.Cmplt. ¶ 71 (h)). Nonetheless, Defendants continued to tout Ryan's long-

13   time relationship with Cole and claimed Cole was a 1inMM co-founder as a reason to trust the

14   investment. (S.Cmplt. ¶¶ 68 (c)(iv), (e)(i)(ii), (f)(ii). Relying on Cole despite confirmation of his

15   lack of any formal relationship with 1inMM and holding him out as a co-owner of 1inMM despite

16   confirming otherwise was reckless at the time.

17        Furthermore, Defendants intent to defraud at the time of offering the investment can be

18   inferred from their intentional false statements of fact made to Plaintiffs later. In determining

19   whether there is a "strong inference" of scienter, the court must weigh competing inferences.

20   *Tellabs*, 551 U.S. at 323-24 ("[A] court must consider plausible, nonculpable explanations for the

21   defendant's conduct, as well as inferences favoring the plaintiff."). The inference of scienter must

22   be more than "merely reasonable . . . it must be cogent and compelling, thus strong in light of other

23   explanations." *Id*. at 324.  The court must view the complaint "holistically." *Id*.; *see also South

24   Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cr. 2008)("Vague or ambiguous allegations are now

25   properly considered as a part of a holistic review when considering whether the complaint raises a

26   strong inference of scienter."). Thus, a complaint for securities fraud survives a motion to dismiss

27   when, after considering the totality of the circumstances, "a reasonable person would deem the

28

inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellab*s, 551 U.S. at 324; *South Ferry*, 542 F.3d at 784.

Ryan still told investors their money was safe even after 1inMM defaulted on its obligations and remarkably was not being paid by ANY of the three platforms, and all for different purported reasons. This lie was told with the intent of keeping the fraud under wraps and delaying the consequences of facilitating a Ponzi Scheme. (S.Cmplt. ¶ 71 (m)). On February 17, 2021, 1inMM's attorney, who had been passing along many of the misrepresentations to Ryan and Jeff, explicitly disavowed any statements he had made on behalf of Horwitz and 1inMM. (*Id.* at n). This noisy withdrawal and disavowal was a significant red flag that Ryan knowingly concealed from investors. *Id.* Again, this whole $75,000,000 investment is based on what one man says and that man's lawyer disavowed everything he said. The wheels completely fell off the scheme at this point and we can draw the logical inference Defendants would have told investors and the authorities at this point if this was a surprise to Defendants that Horwitz was lying or if they didn't also have something to hide.

Remarkably, just four days after Horwitz's own lawyer said that nothing previously said on Horwitz's behalf should be believed, on approximately February 21, 2021, Ryan told investors that Horwitz had a new deal with HBO for repayment and money was coming. (*Id.* at o). Ryan had reason to know this was obviously false and he kept up the lie regardless. *Id.*

On or about March 15, 2021, Ryan knowingly lied to his investors stating: "We wanted to provide a quick update as to where everything currently stands. After discussions with their investment groups, 1inMM has agreed to accept the payment proposal from Warner Media and were told they will be receiving the agreement this week. Once all the details are finalized and the agreement is executed we will be sharing all the information with investors. **We are optimistic that this will get finalized and payments will be remitted**." (Emphasis added). At this point the SEC was engaged in its investigation of Horwitz. Two weeks prior, another 1inMM aggregator presented evidence of the fraud to the SEC and had notified its hundreds of investors of the fraud. (*Id.* at p). On March 31, 2021, the SEC prepared a filing including records provided by Defendants. *Id.* The logical inference of this timing is that Defendants had already been contacted by the SEC

at the time of the false statements conveyed on March 15, 2021. The March 15 email was a flat out lie.

Finally, to round out the misrepresentations, Ryan told investors on April 7 "we received some shocking and disheartening news yesterday regarding 1inMM Capital" that the SEC initiated action against 1inMM. (S.Cmplt. ¶ 93). This was certainly not "shocking" news. Ryan was working with the SEC for nearly a month without telling investors the truth though investors were then and are now paying Ryan's legal fees.  This is yet another direct lie to investors told to conceal the fact that he knew 1inMM was a fraud long ago. The conduct alleged is deplorable and more than satisfies the reckless standard of scienter necessary for this case to proceed.

### iii.    The S.Cmplt. adequately alleges the "who, what, when, where" of the alleged fraud.

Defendants' Motion speciously quotes the S.Cmplt. ¶¶ 139, 141, and 144 while omitting the new subparts with the additional detail the Court requested in its last Order. (Mot. at 15). To be very clear, the following representations are alleged prior to the investment at issue:

In or about April 2017, Ryan on behalf of SAC distributed the video referenced in paragraph 65 via a Google Drive link to Joe, Cindy, and Brad, and Joe shared the video with Jim.

SAC, via an email send by Ryan, communicated the following to all Plaintiffs in the Profit Sharing Agreement itself:...

On or about In or about March 2017, SAC communicated the following to Cindy, Joe, and Brad via email...

In or about March 2017, Ryan, on behalf of SAC, communicated the following to Cindy, Joe, and Brad via email:...

In or about March 2017, Ryan, on behalf of SAC, communicated the following to Cindy, Joe, and Brad via email about Craig Cole...

Brad and Cindy talked to Jeff by phone in May 2018, Jeff told Brad during this phone call that he and his son had done much due diligence, had contracts from HBO, signed by officials at HBO, and had verified those individuals worked at HBO.

Brad and Cindy talked to Ryan by phone in May 2018 and Ryan explained that SAC was able to obtain such a "sweet deal" because Ryan went to college with Craig Cole, a co-founder of 1inMM.

On or about May 25, 2018, Joe and Jim met with Jeff and Ryan together at Spiegel Accountancy's office. During that meeting Jeff and Ryan said they went to Los Angeles and personally reviewed 1inMM's financial records and said the operation was legitimate.

In April 2018 Ryan told Cindy by phone that the investment was zero risk of loss and that the only risk was time. ...

Jeff and Ryan communicated this in person to Jim and Joe on May 25, 2018.

Ryan reiterated this by phone to Joe in June 2018.

Ryan told Cindy about the professional due diligence by phone in May 2018...

Jeff and Ryan communicated [facts regarding LOI] in person on or about May 25, 2018 to Jim and Joe.

Ryan communicated this by phone to Joe in April 2018.

Ryan communicated this fact via email to Cindy, Brad, and Joe in March 2017.

In April 2018 Jeff told Brad by phone that 1inMM had been operating for quite a while as a subsidiary of a bigger operation that owned them. 1inMM was the branch-off to go after these smaller movies in 600K range (smaller cost). 1inMM had connections in South America and around the world and would be acquiring the movies and selling the Netflix, HBO, Hulu and Sony.

Jeff, Ryan, and SAC told investors at conferences and symposiums and Plaintiffs by phone and email that they were co-signors on Horwitz's bank account and signed off on each payment to foreign sales agents that 1inMM bought the movie rights from;

Ryan communicated to Brad via email on or about March 15, 2017 that SAC was a co-signor on 1inMM's accounts holding Brad's investment.

Ryan communicated this by phone to Jim and Joe in April 2018.

(S. Cmplt. ¶ 68 (a)-(l)).

The S. Cmplt. recites in extraordinary detail exactly who said what to whom and when. Regardless of any timing arguments, the core misrepresentations that the investment was at all legitimate are included in the Profit Sharing Agreements themselves.

Defendants wildly claim the representations about SAC's investment in 1inMM and their due diligence of 1inMM "have nothing to do with the investments at issue". (Mot. at 16). Balderdash. SAC packaged up investment in 1inMM in two forms, limited liability company units and Profit Sharing Agreements. It's the same investment, the same lack of due diligence, the same criminal scheme that money was being funneled into. The same sales pitch to induce one investment was applied to the other. The S. Cmplt. specifically alleges in paragraphs 55 and 56:

"On August 10, 2018, Ryan communicated an offer for Brad to invest via a Profit Sharing Agreement instead of via a fund. Ryan stated in an email: "Would you be interested in funding your own film outside of the fund? Typically, they range from $650-750k. I could probably get you a film in September or October. You would get 17% return on your capital and you would receive the capital and earnings back in 6 months from the fund date. Let me know if you are interested in something

1
2
3
4

> like that. ... hey have to fill all the fund orders first and then can supply anything extra to me for individual investors. I would purchase the film through my management company and we would have a profit sharing agreement between us that I have used with other individual investors."
> On May 25, 2018, Ryan and Jeff communicated an offer in person to Jim and Joe to invest in the same thing as Fortune Film Fund One but this time via a Profit Sharing Agreement.

5
6
7
8

Assuming *arguendo* this picayune argument separating different forms of investment in the same scam is viable, Plaintiffs allege numerous misrepresentations specific to this Profit Sharing Investment. (S. Cmplt. ¶ 68 (b), (f)(i), (ii), (iii), (g), (l)(i)(ii)(iv)). What's more the allegations of omissions apply to the Profit Sharing Agreements. (*Id.* at (j), (k))

9
10
11
12
13
14
15
16

Defendants make the silly argument that Plaintiffs cannot allege there was no due diligence because they previously alleged: "limited their due diligence to asking Horwitz and Cole questions and reviewing documents provided by Horwitz and Cole" and retained counsel to "draft documents and review" contracts with 1inMM and order a background check which disproved what they claimed about Craig Cole. Mot at 17. This is absurd. When making $75m in investment Defendants ignored glaring red flags, listened only to the fraudsters themselves, lied about material facts, obtained a background check that contradicted what they were told by Cole and Horwitz, and stuck their head in the sand when it started to fall apart. This is beyond reckless.

17
18

Again, to round this out, The Who, what, and when is spelled out in great detail in the Complaint.

19
20

**Who?** The corporate entity SAC Advisory Group and its two owners Jeff and Ryan to each of the individual Plaintiffs.

21
22
23
24
25

**What?** The materially false and, or, deliberately reckless representations discussed above. This includes the basics of the investment spelled out in the Profit Sharing Agreement, emails to investors (they were sent on a group list), the in person meetings with Plaintiffs, the phone calls with Plaintiffs, and the reckless conduct inducing investments and lulling investors once they invested.

26
27
28

**When?** When Defendants first decided to offer the investment, they failed to investigate anything, then made misrepresentations in the Profit Sharing Agreements themselves at the time of

---

the investments without any investigation.  Defendants, as the issuers of those communications,

know when, how, why, and where they were issued.

**Where?** Plaintiff has particularized the "where" of each misrepresentation by identifying

the documents and or the medium (i.e., advertising and/or Internet) where the representations

were made.

### a.   There is no impermissible "lumping" of Defendants in the S. Cmplt.

Defendants argue that Plaintiffs "routinely make prohibited 'group' allegations, inappropriately

lumping the Defendants and Plaintiffs together." (Mot. at 6.) Defendants make this argument by

speciously quoting parts of the complaint and ignoring the new subparts. (Mot. at 15). Defendants

make the outlandish argument that Plaintiffs alleged the following: ""Jeff, Ryan, and SAC told

investors at conferences and symposiums and Plaintiffs by phone and email that 1inMM had a letter

of intent to sell each movie with a distributor before the movie rights were purchased" while

ignoring the immediately following lines: "i. Jeff and Ryan communicated this in person on or

about May 25, 2018 to Jim and Joe. ii. Ryan communicated this by phone to Joe in April 2018. iii.

Ryan communicated this fact via email to Cindy, Brad, and Joe in March 2017. iv. In April 2018

Jeff told Brad by phone that 1inMM had been operating for quite a while as a subsidiary of a bigger

operation that owned them.  1inMM was the branch-off to go after these smaller movies in 600K

range (smaller cost).  1inMM had connections in South America and around the world and would

be acquiring the movies and selling the Netflix, HBO, Hulu and Sony."

The only way this absurd argument would work is if neither Plaintiff's counsel nor the Court

bothered to read the Complaint. There is no "lumping" each misrepresentation is detailed with who

it was communicated by to whom it was communicated, and by what means.

### iv.    The S. Cmplt. Pleads Reliance

Plaintiffs must show reasonable and actual reliance on misrepresentations—namely, that but

for the fraud, Plaintiffs would not have participated in the 1inMM Offering. *See Stoneridge*

*Investment Partners, LLC v. Scientific-Atlanta, Inc*., 552 U.S. 148, 159 (2008). Plaintiffs had no

other possible sources of information on this investment and were completely dependent on

Defendants' representations. Plaintiffs reasonably relied on Jeff who was their accountant and audit

professional. (S.Cmplt. ¶¶ 77, 76). Moreover, Defendants warned Plaintiffs not to contact Horwitz or HBO supposedly to prevent them from somehow messing up the deal or upsetting Horwitz so they could not possibly rely on anything else when making the investment. (S.Cmplt. ¶ 166).

### v.     The S.Cmplt. Pleads Loss Causation

To prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff. *Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767, 773 (9th Cir. 1984). "A plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation," other contributing forces will not bar recovery under the loss causation requirement. *See Sparling v. Daou (In re Daou Systems)*, 411 F.3d 1006, 1025 (9th Cir. 2005) (citation and internal quotation marks omitted). In this case it's simple, but for Defendants' misrepresentations there would have been no investments from Plaintiffs.

### vi.     The S.Cmplt. Pleads Economic Loss

Plaintiffs can demonstrate economic loss in two general ways. The first is the "out-of-pocket," or "market" measure of damages, which is the difference between the fair value of what was received and the fair value of what one would have received had there been no fraudulent conduct. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155 (1972). Alternatively, "rescissionary damages are to be measured so as to result in the substantial equivalent of rescission," taking into account the value of the property, and any income produced by it, after the date of rescission. *Strategic Diversity, Inc. v. Alchemix Corp*., 666 F.3d 1197, 1208 (9th Cir. 2012) (internal quotation marks and citations omitted). Here, Plaintiff Investors alleged the specific amounts of their investments and then separately states the exact amount of the defaulted January 2020 investments. (S.Cmplt. ¶¶ 126-133). Plaintiff Investors have alleged all that they need to show economic loss and entitlement to rescissionary damages.

### vii.     The S. Cmplt. Pleads Materiality (Mot. 18)

This argument is likely the most absurd. The misrepresentations at issue here are whether the thing being invested in even exist. What could possibly be more material than whether 1inMM actually had contract with HBO and Netflix?

---

1    Defendants argue, "The standard requires a showing of a substantial likelihood that, under all

2    the circumstances, the omitted fact would have assumed actual significance in the deliberations of

3    a reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure

4    of the omitted fact would have been viewed by reasonable investors as having significantly altered

5    the "total mix" of information made available". (Mot. at 18, *citing TSC Ind., Inc. v. Northway, Inc.*,

6    426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Would a shareholder care whether the 1inMM

7    was a Ponzi Scheme with no real business? Would an investor care whether The Spiegels didn't

8    bother to check with anyone else at all besides Cole and Horwitz on whether this remarkably

9    profitable scheme was legit? What total mix of information is there when investors were told they

10   could not inquire on their own?

11      **viii.   The claim is timely filed because the violations occurred within the statute of**

12          **repose. (Mot. at 7, 16).**

13      Defendants argue some of the claims are untimely based on application of 28 U.S.C. §

14   1658(b)(2), which provides as follows: "(b) Notwithstanding subsection (a), a private right of action

15   that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory

16   requirement concerning the securities laws * * * may be brought not later than the earlier of-(1) 2

17   years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."

18   The question which is the subject of several conflicting opinions is whether the "violation"

19   triggering is the sale of the security or any misrepresentation that occurred earlier and resulted in

20   the violation. Defendants argue the "violation" is the earlier misrepresentations alleged (Mot. at 16)

21   Plaintiffs in turn argue the statute of repose is not triggered until there is completed violation, thus

22   when the securities at issue were sold.

23      The only controlling precedent to guide the court on this issue is *Durning v. Citibank, Intern.*,

24   990 F.2d 1133, 1136 (9th Cir. 1993)(*quoting McCool v. Strata Oil Co*., 972 F.2d 1452, 1460 (9th

25   Cir. 1992)). Where the Ninth Circuit held a plaintiff's securities fraud claim "accrues 'on the date

26   the sale of the instrument is completed.'" In *Durning*, the misrepresentations and the purchase

27   occurred at the same time. Thus, the *Durning* court was not required to decide which of two possible

28   dates began the running of the statute of repose. Nonetheless*, Durning* does throw doubt on whether

1  the Ninth Circuit would adopt the position advocated by Defendants and discussed in several

2  Northern District of California cases. [2]

3  　　　The Central District of California explained in *Stichting Pensioenfonds ABP v. Countrywide*

4  *Fin. Corp.*, 802 F. Supp. 2d 1125, 1134 (C.D. Cal. 2011):

5  　　　　　An action under § 10(b)  of the Exchange Act or Rule 10(b)(5) is subject to a five-
   　　　　　year statute of repose. **The period begins to run on the date that the plaintiff**
6  　　　　　**purchased the securities at issue**. 28 U.S.C. § 1658(b)(2); *Arnold v. KPMG LLP*,
   　　　　　334 Fed.Appx 349, 351 (2d Cir. 2009) (**Statute of repose begins to run"on the**
7  　　　　　**date the parties have committed themselves to complete the purchase or sale**
   　　　　　**transaction."**) The first time that Plaintiff asserted § 10(b) claims was in the FAC
8  　　　　　on February 14, 2011. ECF No. 73. Plaintiff has asserted no tolling argument with
   　　　　　respect to these claims, and any such argument would be unavailing because *Luther*
9  　　　　　did not include § 10(b) claims. Therefore, Plaintiff may not assert a § 10(b) claim
   　　　　　for any certificate which it purchased prior to February 14, 2006. Plaintiff's
10 　　　　　Opposition states that it purchased eight of the fifteen RMBS certificates at issue
   　　　　　prior to February 14, 2006. The Court therefore GRANTS Defendants' motions to
11 　　　　　dismiss Plaintiff's § 10(b) claims with respect to the eight certificates listed in
   　　　　　Footnote 8 with respect to ALL DEFENDANTS.
12

13 (emphasis added).

14 　　　*Stiching* is persuasive and follows the rule established in *Durning* and should apply here.  There

15 is no logic to establishing an accrual date before any possible claim could exist. The Central District

16 wisely set a bright line of when the security was purchased as the accrual date. Very simply, there

17 is no violation without a sale so there can be no accrual until the sale.

18 　　　More recently, the Southern District of California reached the same conclusion in *Nei Contr. v.*

19 *Neighborhood Nat'l Bank*, 2016 U.S. Dist. LEXIS 204270, *9-10 (S.D. Cal. 2016) and held:

20 　　　　　Upon review of the complaint, the Court finds that the facts alleged to "constitute
   　　　　　the violation" all occurred on or before December 29, 2010. Plaintiff experienced
21 　　　　　the alleged "pressure" to invest in NNB during the second half of 2010, was
   　　　　　furnished with the POM that was created ahead of the November 8, 2010, meeting
22 　　　　　where Plaintiff received a copy of it, and Plaintiff allegedly discussed the potential
   　　　　　conflict of interest in December 2010. [Compl. at ¶¶ 27, 28, 31-34, 41, 44.] On
23 　　　　　December 29, 2010, Defendant issued a First Supplement to the POM (dated
   　　　　　December 20, 2010) that lowered the offering amount minimum to $750,000.
24 　　　　　[Compl. at ¶ 46.] Also, on December 29, 2010, Barajas, on behalf of NEI,
25 　　　　　completed the Instructions to Investors and Subscription Agreement and wrote a
26 　　　　　check in the amount of $125,000 for the purchase of 25,000 common shares of

27 ――――――――――――
   [2] *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1051 (N.D. Cal. 2008); *In re Zoran Corp. Derivative*
28 *Litig.*, 511 F. Supp. 2d 986, 1014 (N.D. Cal. 2007)

1  NNB. [Compl. at ¶¶ 42, 45.] In the Subscription Agreement, Plaintiff claimed to
2  have the necessary $5,000,000 assets to be qualified as an accredited investor.
   [Compl. at ¶¶ 42.] Thus, from the facts alleged in the complaint, **December, 29,**
3  **2010, is the date on which the parties committed themselves to the purchase of**
   **NNB shares and is the date on which the five year statute of repose began to**
4  **run**. *See Stichting Pensioenfonds ABP*, 802 F. Supp. 2d at 1334.

5  (emphasis added)

6      In *Nei Contr.* just like here, there was a sale pitch and series of meetings leading up to the

7  eventual purchase. The Central District wisely concluded the accrual date was the date of when the

8  parties committed to purchase the securities and not months earlier when the representations were

9  made. *See also Western and Southern Life Ins. Co. v. Countrywide Fin. Corp. (In re Countrywide*

10  *Fin. Corp. Mortgage-Backed Sec. Litig*.), 2012 U.S. Dist. LEXIS 60776, *26 (C.D. Cal 2012)

11  ("statute of repose that begins to run on the date of purchase").

12     Defendants erroneously rely on *In re Brocade Communs. Sys. Derivative Litig*., 615 F.

13  Supp. 2d 1018, 1030 (N.D. 2009). This 2009 case is very different than the present facts. *Brocade*

14  was a shareholder derivative action involving a scheme to manipulate stock option grant dates to

15  maximize profits to themselves at the expense of the company. There is no clear date of a purchase

16  or sale of a security to rely on to establish the violation like there is here.  The Court held that sort

17  of complex claim the statute of repose "begins to run on the date of the false representation" (*Id.* at

18  1035). The Northern District Court relied on another options backdating case, *In re Maxim*

19  *Integrated Prods*., 574 F. Supp. 2d 1046, 1074 (N.D. Cal. 2008) to conclude the repose date is

20  established with a misrepresentation rather than a sale. Derivative claims for secret options

21  backdating are apples to oranges with this case and the Court should follow the cases that establish

22  the repose date as the date of the sale of the securities. Accordingly, *Stichting*; *Nei Contr.*; and *In*

23  *re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig* should apply here.

24     All that being said, even if the options backdating cases apply, Plaintiffs still allege

25  sufficient facts based on recent representations alone. Of the representations in paragraph 68, sub-

26  paragraphs b, f, g (maybe it alleges "April 2018"), h, i, j (alleging concealment), k (also

27

28

1  concealment), l, m, n, o, p, q, and r are all within the statute of repose regardless of how it is

2  construed.

3  **C. Defendants' waiver defense is invalid. (Mot. at 3).**

4  Defendants are inclined to blame anyone remotely involved for their bad acts that yielded

5  them millions of dollars. On page three of their Motion Defendants employ and illegal agreement

6  to try and shift blame. The terms of the Agreement relied on are not enforceable.

7  Section 29(a) of the Securities Exchange Act, however, provides that "any condition,

8  stipulation, or provision binding any person to waive compliance with any provision of this chapter

9  or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be

10  void." 15 U.S.C. § 78cc(a); *Buffin v. Community*, 2021 U.S. Dist. LEXIS 190329, at *6 (C.D. Cal.

11  Aug. 6, 2021). In addition, "[i]n dealing with federal securities, the general rule is that unknown or

12  subsequently maturing causes of action may not be waived." *Petro-Ventures, Inc. v. Takessian*, 967

13  F.2d 1337, 1340-41 (9th Cir. 1992). That is exactly how Defendants are employing this contract

14  term. This provision "generally invalidates blanket releases of liability that accompany the purchase

15  of a sale of securities." *Melcher v. Fried*, No. 16-cv-2440, 2018 U.S. Dist. LEXIS 205252, 2018

16  WL 6326334 at *6 (S.D. Cal. Dec. 4, 2018).  Accordingly, since the waiver is for an unknown and

17  subsequently maturing cause of action it is void as a matter of law.

18  The waiver is also unenforceable pursuant to California Civil Code § 1668. This statute

19  provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from

20  responsibility for his own fraud, or willful injury to the person or property of another, or violation

21  of law, whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668.

22  Pursuant to this statute, California courts have held, "that the parties to a contract may not contract

23  away liability for future intentional misconduct or **for future violation of statutory law**, **whether**

24  **or not intentional**." *Alpha Investment, LLC v. Zynga, Inc*., 2012 U.S. Dist. LEXIS 81311, at *18-

25  20 (N.D. Cal. June 12, 2012).

26

27

28

**D.  Plaintiffs State Claims for Violation of 12(A)(2) and Violation of Section 15. (Mot. at 5, 10).**

The language of § 12(a)(2) sets out for four elements for liability: (1) there must be an offer or sale of a security; (2) the offer or sale must be made by the use of any means of interstate commerce or the mails; (3) the offer must be made by means of a prospectus; and (4) the prospectus or oral communication relating to the prospectus must include an untrue statement or omission of a material fact. The basic elements of the claim are not disputed in the Motion to Dismiss, and the only point of contention now is whether the investment is public or private. Plaintiff pled ample facts that the offering was public including: (1) Defendants solicited $75,132,950 in investment via sales of three forms of investment in the 1inMM Offering of which $29,733,025 remains owed to investors (S.Cmplt. ¶ 46); (2) Over 100 individuals from all walks of life and experience invested in Defendants' various offerings of investment in 1inMM thanks to Defendants' aggressive public sales efforts.(S.Cmplt. ¶ 67); (3) Defendants employed a video presentation to sell investment in the 1inMM Offering (S.Cmplt. ¶ 66, https://grabify.link/RCI5S5); (4) Defendants engaged at least one salesman with experience selling insurance and unregistered investments and paid him a finder's fee of 5% of the amount invested in consideration of each investor he successfully solicited on Defendants' behalf. (S.Cmplt. ¶ 59); (5) Defendants had no prior relationship with the investors solicited by salesmen including recent immigrants and elderly individuals. (S.Cmplt. ¶ 60); Ryan and Jeff presented to large groups of potential investors at a conference in Oregon. (S.Cmplt. ¶ 62); On or about April 5, 2017, Ryan presented the investment opportunity to individuals at the Mile Marker Club Symposium in Oregon. (S.Cmplt. ¶ 62); Defendants had no prior relationship with the investors solicited at conferences. (S.Cmplt. ¶ 63). These facts are sufficient to state a claim that the investment was offered to the public who required the protections of securities laws. Courts have developed flexible tests to determine whether a transaction involves a public offering. These tests focus on four factors: "(1) the number of offerees; (2) the sophistication of the offerees; (3) the size and manner of the offering; and (4) the relationship of the offerees to the issuer." *S.E.C. v. Murphy*, 626 F.2d 633, 644-45 (9th Cir. 1980) (citations omitted). For an offering to be private, the test must be met with respect to each purchaser and offeree. *Id*. at 645. There is no language

in *Gustafson*, the case Defendants repeatedly rely upon, indicating that a "public offering" should be strictly defined as an offering made to the public at large. Plaintiffs pled facts of a public offering by detailing the road show sales pitch employed by defendants. *See* (S.Cmplt. ¶¶ 54-63). This fact intensive issue cannot be resolved on a 12(b)(6) Motion. Defendants may later present affirmative facts to contradict what is pled but the issue cannot be resolved now against Plaintiffs.

The Supreme Court held that the offer of stock to employees by an employer may constitute a public offering requiring registration. *SEC v. Ralston Purina Co.,* 346 U.S. 119 (1953)(Even if limited to only employees (or customers of an accounting firm and their associates) an offering may be public). In determining whether a public offering exists, courts are to look to the characteristics of each offeree. *Id.* With regard to the number of offerees, courts have routinely held that this factor is not dispositive; there may be instances where there are few offerees but the offering is nonetheless public. *Murphy,* 626 F.2d at 645. Here Plaintiffs alleged "Over 100 individuals from all walks of life and experience invested in Defendants' various offerings of investment in 1inMM thanks to Defendants' aggressive public sales efforts" (S.Cmplt. ¶ 67).

A court assessing the availability of a private offering exemption focuses upon the issuer and the offerees, paying particular attention to the relationship between the two. *See, e.g., Cook v. Avien, Inc*., 573 F.2d 685, 691 (1st Cir. 1978); *Hill York Corp. v. American International Franchises, Inc*., 448 F.2d 680, 690 (5th Cir. 1971). This assessment often requires a careful inquiry into the facts surrounding the offering, *see, e.g., Parvin v. Davis Oil Co*., 524 F.2d 112, 118 (9th Cir. 1975), and, of course, it requires knowledge of who was the issuer of the securities. Plaintiffs allege Defendants engaged a salesman and solicited investment at conventions thus securing investment from individuals Defendants had no relationship at all.

In a Court within this district a group of twenty-one investors who lost money in a Ponzi scheme sufficiently alleged a "public offering" to support a Section 12(a)(2) claim. *Bridges v. Geringer*, No. 5:13-cv-01290-EJD, 2015 U.S. Dist. LEXIS 66695, at *12-15 (N.D. Cal. May 21, 2015). That Court provided the following rationale:

> {R]eliance on Gustafson is inappropriate in this context. In Gustafson, the Court had no reason to decide the issue the Bank raises - whether a particular securities transaction constitutes a public offering - since the case indisputably involved a

1  private stock purchase. Id. at 581 ("It will be recalled that as to private transactions,
2  such as the Alloyd purchase, there will never have been a registration
3  statement."). Instead, the issue of "whether an offering is public or private turns on
   whether the particular class of persons affected needs the protection" of the
   securities laws, and is subject to a four factor test focused on the number of offerees,
4  the sophistication of the offerees, the size and manner of the offering, and the
   relationship of the offerees to the issuer. *West v. Innotrac Corp.*, 463 F. Supp. 2d
5  1169, 1176 (D. Nev. 2006) (citing *SEC v. Murphy*, 626 F.2d 633, 644-45 (9th Cir.
6  1980)). Here, though the Bank would limit review to one paragraph, the court
   construes the Complaint as a whole and finds that it adequately describes with
7  sufficient particularity what could be deemed a public offering under the applicable
8  test, at least at the pleading stage. The fact that Geringer, Luck and Rode may have
   communicated artificial restrictions on the number of investors and required a
9  minimum investment are relevant considerations as to whether or not the Fund was
   a public or private offering, but are not dispositive

10  *Id.*

11      In this case, Plaintiffs plead a detailed recitation of the sales pitch and the wide variety of

12  investors induced to invest based on the presentations, videos, and paid salesman. Like it did in

13  *Bridges* the Court needs to review the whole story and conclude at a minimum that there are too

14  many factual questions remaining to dispose of this issue now.

15      There is scant precedent resolving the public versus private question via a 12(b)(6) Motion.

16  The best discussion of the elements from a Ninth Circuit Court is found in *Liu Hongwei v. Velocity*

17  *V Ltd. partnership*, No. 2:15-cv-05061-ODW-E, 2018 U.S. Dist. LEXIS 115636, at *10-12 (C.D.

18  Cal. July 11, 2018). In that case the Central District of California evaluated a similar complaint and

19  held the offering was public where 30 investors each invested over $500,000. The Court reasoned:

20      First, the offering documents specified that the "VLP units would be sold to 30
        investors," which indicates that the opportunity to invest must have been marketed
21      to more than 30 foreign investors. [] While the number of investors is relatively
        small, the Court interprets the stated number of offerees to be determinative as the
22      total amount of investors is unknown without Defendant's response. *See People v.
        Humphreys*, 4 Cal. App. 3d 693, 698, 84 Cal. Rptr. 496 (1970) ("The significant
23      factor is not the number of ultimate purchasers but rather the number of
        offerees."). Additionally, the Court does not find the second element of the private
24      offering exception to be strongly demonstrated because the level of sophistication
        of the "Chinese and Taiwanese individuals, who made the investment[s]" is
25      unknown. ([] Even so, a lack of finding of the second factor is not dispositive. Third,
        the offerings were neither small nor offered in a private manner as each investor
26      financed at least $500,000.00 and was contacted about the investment through EB-
        5 migration agents. (Compl. ¶¶ 9, 13.) Lastly, the investment relationship was such
27      that Plaintiffs were dependent on Defendants to produce evidence that all the
28

1   information was truthful and available. *Murphy*, 626 F.2d at 647 ("A court may
2   only conclude that the investors *do not* need the protection of the Act if all the
3   offerees have relationships with the issuer affording them access to or disclosure of
    the sort of information about the issuer.") (emphasis added). Altogether, the four
4   factor test indicates that the investment offer constitutes a public offering, and
    therefore falls under the protection of § 77l.

5   *Liu Hongwei v. Velocity V Ltd. partnership*, No. 2:15-cv-05061-ODW-E, 2018 U.S. Dist. LEXIS

6   115636, at *10-12 (C.D. Cal. July 11, 2018). *Liu* makes clear that there is no bright line and instead

7   this is a fact intensive multifactor test that cannot be resolved against Plaintiffs at this early stage

8   of the litigation. Defendants did not register the offering as a private offering so there is no clear

9   guidance on what this was. The leading cases on this complicated issue are summary judgment

10  cases for a reason. *See Murphy*, 626 F.2d at 644;). Accordingly, the Motion to Dismiss should be

11  denied as to the 12(a) claim and the related control person claim.

12      Defendants make an odd argument by citing to a superseded complaint. The law is clear

13  that the amendment disposes of the amended allegations. *See Maloney v. Scottsdale Ins. Co*., 256

14  Fed. Appx. 29, 32 (9th Cir. 2007) ("When a complaint containing a judicial admission is amended,

15  the information admitted in the original complaint is no longer conclusively established. *See Huey*

16  *v. Honeywell, Inc.,* 82 F.3d 327, 333 (9th Cir. 1996) ("When a pleading is amended or withdrawn,

17  the superseded portion ceases to be a conclusive judicial admission . . . .")."

18      Finally, as to whether the Complaint alleges the elements of a 12(a) claim, Plaintiffs plead

19  all the necessary facts.  The language of § 12(a)(2) sets out for four elements for liability: (1) there

20  must be an offer or sale of a security (S. Cmplt. ¶ 151); (2) the offer or sale must be made by the

21  use of any means of interstate commerce or the mail (S. Cmplt. ¶¶ 68 )s; (3) the offer must be made

22  by means of a prospectus (S. Cmplt. ¶¶ 152, 68); and (4) the prospectus or oral communication

23  relating to the prospectus must include an untrue statement or omission of a material fact. (S. Cmplt.

24  ¶¶ 68, 71) Each element is satisfied in the Complaint.

25      The Ninth Circuit explained recently in *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1258-1259

26  (9th Cir. 2002) the terms in §12(a)(2) are defined broadly:

27      The Eleventh Circuit correctly recognized that nothing in § 12 expressly requires
        that solicitation must be direct or personal to a particular purchaser to trigger
28      liability under the statute. *See id.* at 1345-46. Put differently, nothing in the Act

1
2
3
4
5
6
7
8
9

indicates that mass communications, directed to multiple potential purchasers at once, fall outside the Act's protections. On the contrary, the Act contains broad language authorizing the purchaser of a security to bring suit against "*[a]ny* person . . . who offers or sells a security . . . by means of a prospectus or oral communication" that misleads or omits material facts. 15 U.S.C. § 77*l*(a)(2) (emphasis added). The statute defines "offer to sell," "offer for sale," and "offer" as including "*every* attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." *Id.* § 77b(a)(3) (emphasis added). "Prospectus" means "*any* prospectus, notice, circular, advertisement, letter, or communication, *written or by radio or television*, which offers any security for sale or confirms the sale of any security." *Id.* § 77b(a)(10) (emphasis added). Although the Securities Act of 1933 predates the Internet, the inclusion of radio and television communications indicates Congress contemplated that broadly disseminated, mass communications with potentially large audiences would fall within the Act's scope. *See Wildes*, 25 F.4th at 1346.

10   In this case, the roadshow multimedia sales pitch of reckless investment in a pure Ponzi scheme is

11   more than sufficient to state a claim for violation of 12(a)(2).

12   **E.   Plaintiffs State a Claim for Declaratory Judgment. (Mot. at 5, 11)**

13   The Declaratory Judgement Claim is the heart of the claim. Defendants rely on voidable

14   agreements with terms that are not enforceable. This claim seeks a declaration to the enforceability

15   of two terms of the Profit Sharing Agreements that are the foundation of the defense to all of the

16   claims.  "Section 29(b) renders voidable '[e]very contract made in violation of any provision of [the

17   securities laws] or of any rule or regulation thereunder, and every contract ... the performance of

18   which involves [such a] violation.' *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1039

19   (9th Cir. 2011). At the motion to dismiss stage, all a plaintiff must allege is that "(1) the contract

20   involved a prohibited transaction; (2) he is in contractual privity with [the entity]; and (3) [the

21   individual] is in the class of persons that the securities acts were designed to protect." *In re Wells*

22   *Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017) (*quoting In*

23   *re Asyst Techs., Inc. Derivative Litig.*, 2008 WL 4891220, at *9 (N.D. Cal. Nov. 12, 2008). In

24   the *Wells Fargo* derivative action, the Court determined that allegations that defendants committed

25   violations of the Exchange Act while performing their duties under various employment contracts

26   was sufficient to state a claim under Section 29(b). *Wells Fargo*, 282 F. Supp 3d 1074 at 1106. The

27   court justified this by reference to *Asyst Technologies*, where the contract in question were stock

28

option contracts granted to director-defendants in that derivative action. *Asyst Technologies*, 2008 WL 4891220, at *9.

Plaintiffs have a private right of action for rescission of the Securities Contracts in this case under Section 29(b) of the Act. *See Mills v. Electric Auto- Lite Co*., 396 U.S. 375 (1970). The S. Cmplt. pled facts that an actual controversy of sufficient immediacy exists between the Parties as to whether the blanket releases contain in the Profit Sharing agreements are enforceable, pursuant to Section 29(b), the violative agreement or performance by Defendants of the same renders the agreements void. Section 29(b) of the Act voids the rights of the violator (i.e., Defendants, who are conducting themselves as unregistered dealers) when the conduct of the violator contravenes the Act.

Section 29(a) of the Securities Exchange Act, however, provides that "any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void." 15 U.S.C. § 78cc(a); *Buffin*, at *6. In addition, "[i]n dealing with federal securities, the general rule is that unknown or subsequently maturing causes of action may not be waived." *Petro-Ventures, Inc. v. Takessian*, 967 F.2d 1337, 1340-41 (9th Cir. 1992). That is exactly how Defendants are employing this contract term. This provision "generally invalidates blanket releases of liability that accompany the purchase of a sale of securities." *Melcher v. Fried* at *6. However, Section 29(a) does not bar waivers of securities fraud claims to settle existing litigation, *Petro-Ventures*, 967 F.3d at 1342-43, or if the waiving party has actual knowledge of claims for securities fraud at the time of signing the release, *Burgess v. Premier Corp.*, 727 F.2d 826, 831-32 (9th Cir. 1984). Neither occurred here: Plaintiffs signed the agreement before making the investment, learning of the present claims, or filing this action.

Accordingly, since the waiver is for an unknown and subsequently maturing cause of action it is void as a matter of law.

The S. Cmplt. makes clear that Defendants were in the business of selling securities and the Profit Sharing Agreements contain anticipatory waivers of compliance with securities law. (S.Cmplt. ¶ 172). There is an actual controversy between the parties as to the enforceability of these terms under Federal Securities Laws. There is no legitimate question that this action is properly broad "to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 378-79 (2016) thus granting this Court jurisdiction.

### F. Plaintiffs adequately allege Defendants Violated California Corporations Code § 25401 (Mot. at 19)

This claim is pled based on negligence. The statute provides:

> It is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication **that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made**, in the light of the circumstances under which the statements were made, not misleading.

The Complaint details how Defendants parroted Horwitz's lies even after other similarly situated middlemen had disclosed the fraud to their investors. Defendants didn't do an iota of due diligence into any one besides Horwitz's own representations about himself. *Id.* Defendants came nowhere close to the due diligence required of professional brokers engaged in the same work of offering securities. Instead, they were content to profit from of passing along the con man's lies. The same issues are discussed above in the more exacting 10(b)(5) context. *See supra* pp. 3-9. As discussed above, Plaintiff pled the falsity of the statements and how Defendants either knew the statements were false (being co-signors or Craig Cole's role) or were reckless in not determining the truth (no third party contact at all and not simply Googling the HBO entity on the contracts).

Cal. Corp. Code § 25401 prohibits the sale of securities by means of any written or oral communication which includes an untrue statement of a material fact. California has a provision imposing joint and several liability on every person who directly or indirectly controls a person liable under Cal. Corp. Code § 25501 unless the other person who is so liable had no knowledge of

1   or reasonable grounds to believe in the existence of the facts by reason of which the liability is

2   alleged to exist. Cal. Corp. Code § 25504. There is no dispute that the representations in the Profit

3   Sharing Agreement itself are untrue and material. The only issue now is whether Respondents can

4   show they exercised reasonable care. *See* Cal. Corp. Code § 25401. They cannot.

5       **All** of the facts upon which the investment was based were false. There can be no dispute as to

6   the falsity, materiality, or whether the statements were made in conjunction with the purchase of

7   securities since they were referenced in the Profit Sharing Agreement itself.  Sections 25401 and

8   25501 differ from common law negligent misrepresentation in that: (1) proof of reliance is not

9   required, (2) although the fact misrepresented or omitted must be "material," no proof of causation

10  is required, and (3) plaintiff need not plead defendant's negligence. *Bowden v. Robinso*n, 67 Cal.

11  App. 3d 705, 714-15, 136 Cal. Rptr. 871 (1977) *citing* (Cal. Attorney's Damages Guide

12  (Cont.Ed.Bar) ch. 5, § 5.14,  pp. 173-174.) To avoid any implication that strict liability is involved,

13  the Legislature provided that as a defense the defendant may: (1) prove that he exercised reasonable

14  care and did not know of the untruth or omission, (2) show that even if he had exercised reasonable

15  care, he would not have known of the untruth or omission, and (3) show that the plaintiff knew the

16  facts concerning the untruth or omission. *Bowden v. Robinso*n, 67 Cal. App. 3d 705, 714-15, 136

17  Cal. Rptr. 871 (1977) (Corp. Code, § 25501; and see 2 Ballantine & Sterling, Cal. Corporation

18  Laws, § 463.03, pp. 932.40-932.41.).  Plaintiffs stated a claim for violation of Sections 25401.

19      **G.  Plaintiffs adequately allege Negligent Misrepresentation (Mot. at 20)**

20      The facts pled in support of this claim are largely the same as the statutory claims discussed

21  above.  *See Supra* pp. 3-9. The elements of a negligent misrepresentation claim are "(1) a

22  misrepresentation of a past or existing material facts, (S.Cmplt. ¶ 68); (2) without reasonable

23  ground for believing it to be true, (S. Cmplt.. ¶ 71) (3) with the intent to induce another's reliance

24  on the fact misrepresented (S. Cmplt... ¶¶ 45, 46, 208, 209), (4) justifiable reliance on the

25  misrepresentation, (S.Cmplt. ¶¶ 69, 70) and (5) resulting damage" *Nat'l Union Fire Ins. Co. v.*

26  *Cambridge Integrated Servs. Group, Inc*., 171 Cal. App. 4th 35, 50, 89 Cal. Rptr. 3d 473 (2009).

27  This should be obvious by now. Defendants were invited by Ryan's buddy Cole to fundraise for

28  Ponzi scheme. Defendants did no investigation at all. Repeated what the Ponzi schemers told them.

Then reaped a huge profit for serving as the middleman for Horwitz and keeping him a step removed from curious investors.

"It is well established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirement." *Neilson v. Union Bank of California*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003); *see also Lorenz v. Sauer*, 807 F.2d 1509, 1511-12 (9th Cir. 1987) ("Under California law, negligent misrepresentation is a species of actual fraud . . . ."). Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). At a minimum, the plaintiffs must "identify the role of each defendant in the alleged fraudulent scheme." *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007). The relationship between Jeff and Ryan and SAC is discussed above. *Supra* pp. 3-9. The relationship with Spiegel Accountancy Corp is plead in two ways. In paragraph 49 the Complaint alleges, "Ryan and Jeff are both employees of Spiegel Accountancy Corp. and relied on its office infrastructure for all of SAC's activities as detailed herein" and more importantly the Complaint alleges the agency between Jeff and his firm. (S.Cmplt. ¶ 15, "At all relevant times, Jeff was acting as an agent or apparent agent of Spiegel Accountancy Corp.").   For the same reasons the Complaint states a 10(b)(5) claim it states a negligent misrepresentation claim.

### H. Plaintiffs adequately allege Accounting Malpractice (Mot. at 20)

Spiegel Accountancy Corp. was the accountant for a feeder fund for a criminal enterprise whose principal, Jeff, profited from the investment in the criminal scheme, whose investors were customers of Spiegel Accountancy Corp. that were solicited for investment at Spiegel Accountancy Corp. Jeff was able to locate and solicit all but one of the Plaintiffs because he was there accountant with intimate knowledge of  their finances and a long trusting relationship. (S.Cmplt. ¶ 211).

The basic elements of a claim for professional malpractice are as follows: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from

the professional's negligence. *Turpin v. Sortini*, 31 Cal. 3d 220, 229-30, 643 P.2d 954 (1982). Regarding the first element, the duty to use skill, prudence, and diligence is triggered only where the professional owes a duty to the claimant in the first place. *See Moore v. Anderson Zeigler Disharoon Gallagher & Gray*, 109 Cal. App. 4th 1287, 1294, 135 Cal. Rptr. 2d 888 (2003) (noting that "[a] key element of any action for professional malpractice is the establishment of a duty by the professional to the claimant" and that, "[a]bsent duty there can be no breach and no negligence") (internal quotation marks omitted). As an accountant, Jeff and Spiegel Accountancy Corp. are subject to professional liability. *Lindner v. Barlow, Davis & Wood*, 210 Cal. App. 2d 660, 665 (1962).

Plaintiffs plead the following facts necessary to state a claim for accounting malpractice: First, Jeff was acting as an actual or apparent agent of Spiegel Accountancy Corp. (S. Cmplt. ¶ 208). Second, Plaintiffs were customers of Spiegel Accountancy Corp. (*Id.* at 208) Jeff sold Plaintiffs on the 1inMM in investments when meeting to discuss the tax services provided by Spiegel Accountancy Corp. at its office and utilized his knowledge of their financial situation and trusting relationship as their accountant to effectuate the sale of the bogus securities (*Id.* ¶¶ 2110, 211). The California Board of Accountancy, ICPA Code of Professional Conduct, and The International Ethics Standards Board for Accountants ("IESBA") Code of Ethics for Professional Accountants define the standard of care which prohibit just this sort of conduct. (*Id.* ¶¶ 217-223). Spiegel Accountancy Corp. and Jeffrey Spiegel violated the controlling standards set forth herein and capitalized on a conflict of interest, woefully failed to discover the fraud despite the countless red flags, and, once the fraud became obvious, it failed to act in the public interest. (*Id.* at 221). Jeff Spiegel violated controlling regulations while concurrently selling his customers investment in a Ponzi scheme for his own personal gain while also providing them with tax services. (*Id*. at 222). Finally, but for the negligent acts and breaches of the standard of care, Jeffrey Spiegel would not have parroted Horwitz's lies, would have uncovered the fraud, and would have saved Plaintiffs millions of dollars. (*Id*. at 223). Plaintiffs allege Jeff was wearing his CPA hat at all times relevant. (*Id.* at. ¶ 16). To the extent he claims that he took off his CPA had and put on his broker or underwriter hat at some point and time is an issue of fact to resolve later. The bottom line is that

Plaintiffs invested because he was their accountant, trusted him because he was their accountant, and Jeff relied on the professional relationship to make the sale. If all this happens within the context of the professional relationship, then his professional duties of competence and diligence apply here as well.

Accordingly, there is no question that Plaintiffs state a claim for accounting malpractice against their accountant who profited by selling them into a Ponzi Scheme fund that his firm did the accounting work for.

Assuming, *arguendo,* the waiver was somehow valid, the waiver is limited to claims "against SAC" there is no limitation on claims against the other Defendants.

The Agreement provides:

> "Investor acknowledges that SAC has not guaranteed that Investor will actually receive the Preferred Return and Investor irrevocably waives any and all claims **against SAC** in the event Investor receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder."

(S.Cmplt. Ex. A, ¶ 3.1)

There is no language in the investment contract extending this waiver to other parties or broadly defining SAC to include all Defendants.

**I.   Defendants' proximate cause argument is a non-sequitur (Mot. at 22)**

Defendants miss the mark on this argument. While they very much want to claim they were victims of Horwitz, it doesn't work that way legally or factually considering they made a multimillion dollar profit.

The criminal act by Horwitz is the first act in the causal chain. First, Horwitz lied to Defendants. Second, Defendants failed to investigate whether Horwitz was misrepresenting facts. Third, Defendants parroted Horwitz's lies to Plaintiffs. Fourth, Defendants profited handsomely on selling securities based on these lies. Fifth, Horwitz's obvious lies were discovered. Sixth, investors lost their investment.  There is no "intervening act". The criminal conduct occurred, then Defendants through their willful ignorance profited on the crime and kept it going. The negligence alleged is the failure of Defendants to be aware of what had already occurred.

Defendants oddly rely on *Paskenta Band of Nomlaki Indians v. Crosby*, 122 F.Supp.3d 982 (E.D. Cal. 2015) which supports Plaintiffs' argument perfectly. The issue in that case was whether a criminal act broke the causal chain.  The law as explained in *Paskenta* is clear, "Criminal conduct which causes injury will ordinarily be deemed the proximate cause of an injury, **superseding any prior negligence** which might otherwise be deemed a contributing cause." *Id.* at 996 (emphasis added). In this instance, the crime of creating an imaginary investment preceded Defendants' negligence in approving it, marketing it, and selling it for a profit. The District Court held the criminal conduct was not a superseding cause and the Motion to Dismiss was denied. The same logic applies here.

Defendants rely on *Koepke v. Loo*, 18 Cal.App.4th 1444, 1449 (1993). Where, unlike here, the alleged negligence preceded the criminal act. In *Koepke* the alleged negligence was the failure to prevent an unforeseeable act. Conversely, in this case the criminal act was complete, and the negligence was in furtherance of the crime. The situations are completely distinct.

Obviously, there is no case that can be cited where a broker or salesman successfully placed the entire blame for his own failure to investigate on the person he failed to investigate and achieved dismissal.

### J. Defendants' claimed victimhood is nauseating considering the well pled claim for unjust enrichment. (Mot. 21)

"Ordinarily, a plaintiff must show that a benefit was conferred on the defendant through mistake, fraud, coercion, or, request; otherwise, though there is enrichment, it is not unjust." *Nibbi Brothers, Inc. v. Home Federal Sav. & Loan Assn.*, 205 Cal. App. 3d 1415, 1422 (1988). In this case Defendants received in excess of $4,000,000 in profits from their operation of a feeder fund for a criminal Ponzi scheme. As a direct and proximate result of their reckless conduct and false promises they made millions. Nothing could be more unjust than allowing The Spiegels to retain the fruits of the fraud. Sadly, it seems they have chosen to spend the profits of the fraud on litigating over procedural and jurisdictional issues rather than working towards peace as similarly situated parties have. *See Supra* pp. 2.

1

**IV. CONCLUSION**

2

     Defendants' motion to dismiss should be denied in its entirety.[3]

3

4

Dated:  September 26, 2023                    Respectfully submitted,

5

                                        **LOFTUS & EISENBERG, LTD.**

6

                                 By:   /s/*Alexander N. Loftus*

7

                                      Alexander N. Loftus
                                      Attorneys for Plaintiffs

8

Alexander N. Loftus, Esq. (*pro hac vice*)

9

Ross M. Good, Esq. (*pro hac vice*)
LOFTUS & EISENBERG, LTD.

10

161 N. Clark, Suite 1600
Chicago, Illinois 60601

11

T: (312) 899-6625
alex@loftusandeisenberg.com

12

ross@loftusandeisenberg.com

13

William Aron, Esq.

14

ARON LAW FIRM
15 W Carrillo St, Suite 217

15

Santa Barbara, CA 93101
T: (805) 618-1768

16

bill@aronlawfirm.com

17

18

19

20

21

22

23

24

25

26

27

---

[3] In the event the Court grants Defendants' motion, or any part of it, Plaintiffs respectfully request leave to amend

28

under Rule 15(a)(2) of the Federal Rules of Civil Procedure. The over one hundred net losers in the 1inMM Ponzi Scheme greatly benefit from this matter remaining in Federal Court.

---

Plaintiffs' Response to Motion to Dismiss Second Amended Complaint
Case No. 3:23-cv-00287



1

**CERTIFICATE OF SERVICE**

2

3       I hereby certify that on September 26, 2023 I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on Electronic Mail Notice List.

4

5       I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

6

Executed on September 26, 2023.

7

8                                                       By:  ___/s/*Ross M. Good*_____
                                                            Ross M. Good
9                                                           Attorneys for Plaintiffs

10   Alexander Loftus, Esq.
     Ross M. Good, Esq.
11   LOFTUS & EISENBERG, LTD.
     161 N. Clark, Suite 1600
12   Chicago, Illinois 60601
     T: (312) 772-5396
13   alex@loftusandeisenberg.com
     ross@loftusandeisenberg.com
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28