| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(a) | (1) Ryan Spiegel on behalf of SAC; (2) April 2017; (3) Via a Google Drive Link sent to Joe, Cindy and Brad. Joe shared the link with his business partner Jim.<br><br>(Plaintiffs adopt the abbreviations used in the Complaint) | (1) That 1inMM was actually engaging in business transactions with movie platforms; (2) That 1inMM acquired rights to pictures; (3) That platform companies executed letters of intent with 1inMM before a loan was made by SAC; (4) SAC wires funds to an account "with 1inMM and are signees on the account to make sure the funds to the FSA [Foreign Sales Agent]"; (5) That SAC was "assigned the rights to the movie" and (6) 1inMM "Acquired and successfully licensees 11 Films in 2014/38 in 2015/ 92 in 2016" | (1) 1inMM never received any money from Netflix or HBO, there were no loans, the whole scheme was imagined by Horwitz (¶ 71(a)); (2) 1inMM never received payments from HBO; (3) Horwitz never engaged with any movie platforms and never had a letter of intent with any platforms to purchase any movies. In the extensive investigation of Horwitz's activities, no "letters of intent" have been uncovered, not even any forged copies (¶ 71(d)); (4) None of 1inMM's bank accounts at City National Bank indicated that Jeff, Ryan, or SAC were cosigners. Jeff and Ryan may have completed a form to become co-signors, but it was never processed by City National Bank, and neither Jeff, Ryan, nor SAC ever had any access to 1inMM's accounts as they falsely told investors; (¶ 71(k)) | Plaintiffs are proceeding on a recklessness theory of scienter. (S.Cmplt. ¶¶ 6, 140); *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1569 (9th Cir.1990). In support of recklessness, in repeating Horwitz's lies the following facts are pled: Defendants never contacted HBO, (2) Netflix, Sony, or (City National Bank, and never investigated whether there were any internal controls in place at 1inMM, never talked to any third parties in the movie funding business who had experienced dealing with Horwitz, never evaluated Horwitz's personal finances or credit rating, never confirmed what if any assets 1inMM had, never checked to see if 1inMM had any UCC filings for its purported interest in films, never reviewed any financial statements or tax returns created by a third party for 1inMM or Horwitz, and limited their due diligence to asking Horwitz and Cole questions and reviewing documents provided by Horwitz and Cole (¶71(b)); While Defendants claimed they engaged counsel to perform due diligence, Defendants do not know whether the attorney working on this communicated with any third parties or sought any records from any third parties. They do not know what if any due diligence attorney Brian Fraser did on their behalf other than reviewing the documents provided by Horwitz and ordering a background check. They do not know what if anything they paid Fraser for this service (¶ 71(c)); The contracts Horwitz gave Defendants were with "HBO Holdings, Inc." (emphasis added). Defendants did not know what if any relationship "HBO Holdings, Inc." had with the streaming platform HBO and did not bother to confirm that HBO Holdings, Inc. was even an |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | | existing corporation. There was no HBO Holdings, Inc. incorporated anywhere in 2017 or 2018. This is readily apparent with a Google Search of "HBO Holdings, Inc" which leads to the Edgar Archive of all of Time Warner's Subsidiaries which does not include "HBO Holdings, Inc." Further, the California Secretary of State website that shows there is no company registered to do business in California called "HBO Holdings, Inc" despite numerous other HBO entities (¶ 71(e)); On or about November 18, 2019, Ryan was told by one of the female investors that "HBO Holdings, Inc." did not exist. Defendants never took any independent steps to confirm that "HBO Holdings, Inc." did not exist. (¶ 71(f)); While "reckless" is sufficient, some specific representations are beyond reckless and demonstrate an intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976). The representation about a shared bank account or co-signors on an account with 1inMM is intentionally misleading. None of 1inMM's bank accounts at City National Bank indicated that Jeff, Ryan, or SAC were cosigners. Jeff and Ryan may have completed a form to become co-signors, but it was never processed by the bank, and neither Jeff, Ryan, nor SAC ever had any access to 1inMM's accounts as they falsely told investors (¶ 71(k)); Defendants never communicated directly with 1inMM's bank, City National Bank, never accessed the accounts they were supposedly co-signors on. The whole extent of the due diligence is what Horwitz and Cole told them. Had investors known that, they never would have invested (¶71(i)) |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(b) | (1) Ryan Spiegel on behalf of SAC; (2) At the time each investment was made: Uyen September 2019 and January 2020 (¶ 126); Ellusionist September 2019 and January 2020 (¶ 127); Southwest Investment Funds in June 2019 and January 2020 (¶ 129); AVR Group in June 2019 and January 2020 (¶ 130); Trident Asset management in June 2019 and January 2020 (¶ 131); Phoenix Affordable Housing in June 2019 and on January 2020; (3) Via the Profit Sharing Agreement itself sent via email by Ryan Spiegel. | (1) 1inMM Capital, LLC, is in the business of acquiring and licensing film distribution rights to third-party media companies for exclusive distribution in Latin American and African countries; (2) Distributor must pay a one-time non-refundable license fee (the "Acquisition Fee") to the holder of the movie's worldwide distribution rights which is generally the producer of the movie; (3) SAC provides the Distributor with the funds necessary to pay the Acquisition Fee (the "SAC Advance") in exchange for a participation interest in the funds received by Distributor in relicensing a portion of the Distribution Rights to a third-party media company. | 1inMM never received any money from Netflix or HBO and there were no loans. The whole scheme was imagined by Horwitz (¶ 71(a)). | *See* first cell above, Defendants were reckless in ignoring concerns that contracts provided by Horwitz were with entities that do not exist, they did not perform an ounce of third-party investigation and due diligence was limited to talking to Horwitz and Cole and their attorney, Brian Fraser, ordering a background check and the background check did not match the representations made. *See* (¶ 71(b)-(e)). |

3

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(c) | (1) Ryan Spiegel on behalf of SAC; (2) PDF attached to email (metadata indicates document created by Ryan); (3) Transmitted via email in March 2017 to Cindy, Joe, and Brad. | (1) 1inMM Acquires the Latin American distribution rights for all windows of distribution; (2) 1inMM's acquisitions are all under $750,000.00. Films over $750,000.00 are bought by 1inMM Productions; (3) "1inMM licenses all films to either HBO/Netflix or SONY in Latin America;" (4) "1inMM headed up by Zach Horwitz and Craig Cole." | 1inMM never received any money from Netflix or HBO, there were no loans, and the whole scheme was imagined by Horwitz (¶ 71(a); (4) Cole had no ownership interest or employment with 1inMM. This was confirmed in the background checks ordered by Attorney Fraser in 2017. (¶ 71 (h)). | *See* first cell above, Defendants engaged in an "extreme departure from the standards of ordinary care" by ignoring concerns that contracts provided by Horwitz were with entities that exist, not reviewing any tax returns, not communicating with the bank they told investors they controlled the account with, they did not perform an ounce of third party investigation and due diligence was limited to talking to Horwitz and Cole and their attorney Brian Frazer ordering a background check and the background check did not match the representations made. *See* (¶ 71(b)-(e); The background check ordered by Attorney Frazer confirmed that Cole had no ownership interest or employment (¶ 71 (h)). Nonetheless, Defendants continued to hold Cole out as the owner and sell the investment based on their close relationship with Cole. |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(d) | (1) Ryan Spiegel on behalf of SAC; (2) PDF attached to email; (3) Transmitted via email in March 2017 to Cindy, Joe, and Brad. | (1) SAC will hand pick movie deals brought to it by 1inMM. "1INMM will bring SAC signed non-binding letter of intent (the "LOI") from the licensor (companies such as HBO, Netflix, Sony, or Universal) and offer sheet to foreign sales agent ("FSA"), who represent the sales of movie licensing rights," in order for SAC to view the proposed deal; (2) "In essence, 1INMM buys the licensing rights from the FSA and sells the Latin American distribution rights to the licensor, who has already agreed to purchase such distribution rights at a higher price(the "Participation Fee"); (3) "In certain instances, a licensor may decide not to close a movie purchase even after signing an LOI, in which case 1INMM will shop the movie to another licensor.  In this case, the Participation Agreement provides that 1INMM has 10 days after the movie is rejected by a licensor to execute a new participation with a new licensor." (4) If 1inMM is unable to negotiate a new movie participation that is acceptable to SAC, 1INMM is obligated and will refund the | 1inMM never received any money from Netflix or HBO, there were no loans, and the whole scheme was imagined by Horwitz (¶ 71(a)); Horwitz never engaged with any movie platforms and never had a letter of intent with any platforms to purchase any movies. In the extensive investigation of Horwitz's activities, no "letters of intent" have been uncovered, not even any forged copies; (71(d)). | *See* first cell above. Horwitz never engaged with any movie platforms and never had a letter of intent with any platforms to purchase any movies. In the extensive investigation of Horwitz's activities, no "letters of intent" have been uncovered, not even any forged copies; (71(d)). Defendants never asked Horwitz for the letters of intent that are the key to the sales pitch to investors.<br><br>Defendants knew at all times relevant that there was no joint account and there were no letters of intent provided, even forgeries. |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | Participation Advance to SAC; (5) Based on the due date of the participation schedule with 1inMM, the Participation Fee will be paid. This will be coming directly from the licensor to 1inMM who will then deposit into the Company's joint account with 1inMM. As co-signatory on the joint account, the Manager will then wire the money to the Company's bank account to close that movie participation. Profits will then be allocated and distributed for that movie participation to the Company's members in accordance with the terms of the Company's operating agreement. | | |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(e) | (1) Ryan Spiegel on behalf of SAC; (2) PDF attached to email (meta data indicates document created by Ryan); (3) Transmitted via email in March 2017 to Cindy, Joe, and Brad. | (1) Ryan has known "Craig Cole, Co-Founder of 1INMM, for over 10 years and has built a working relationship with his company"; (2) 1INMM is a California limited liability company that was formed in September 2013. Company was founded and is managed by Zachary Horwitz and Craig Cole. They are a foreign distributor of movie rights focusing on the Latin America territory. | (1) Cole had no ownership interest or employment with 1inMM. This was confirmed in the background checks ordered by Attorney Fraser in 2017 (¶ 71 (h)); (2) 1inMM never received any money from Netflix or HBO, there were no loans, the whole scheme was imagined by Horwitz (¶ 71(a)). | (1) Cole had no ownership interest or employment with 1inMM. This was confirmed in the background checks ordered by Attorney Fraser in 2017 (¶ 71 (h)); (2) 1inMM never received any money from Netflix or HBO, there were no loans, the whole scheme was imagined by Horwitz (¶ 71(a)). |
| 68(f)(i) | (1) Jeff Spiegel; (2) Conference call with Brad and Cindy; (3) May 2018. | Jeff and Ryan had done much due diligence, had contracts from HBO, signed by officials at HBO, and had verified those individuals worked at HBO. | Defendants never contacted, HBO, Netflix, Sony, City National Bank, never investigated whether there were any internal controls in place at 1inMM, never talked to any third parties in the movie funding business who had experienced dealing with Horwitz, never evaluated Horwitz's personal finances or credit rating, never confirmed what if any assets 1inMM had, never checked to see if 1inMM had any UCC filings for its purported interest in films, never reviewed any financial statements or tax returns created by a third party for 1inMM or Horwitz, and limited their due diligence to asking Horwitz and Cole questions and reviewing documents provided | This is a direct false statement of fact made to induce the Plaintiffs to invest. Ryan and Jeff knew they did no due diligence and instead only had a handful of forged contracts and nothing else. Had they done an ounce of third-party due diligence, the scheme would have been readily apparent from the start and no one would have lost money in this fiasco and Jeff would not have made millions of dollars. |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | by Horwitz and Cole (¶ 71(b)); SAC engaged an attorney named Brian Fraser ("Fraser") to draft documents and review contracts between SAC and 1inMM. Defendants do not know whether Fraser communicated with any third parties or sought any records from any third parties. They do not know what if any due diligence Fraser did on their behalf other than reviewing the documents provided by Horwitz and ordering a background check. They do not know what if anything they paid Fraser for this service. (¶ 71(c)). | |
| 68(f)(ii) | (1) Ryan Spiegel; (2) Conference call with Brad and Cindy; (3) May 2018. | Ryan explained that SAC was able to obtain such a "sweet deal" because Ryan went to college with Craig Cole, a co-founder of 1inMM. | (1) Cole had no ownership interest or employment with 1inMM (¶ 71 (h); (2) 1inMM never received any money from Netflix or HBO, there were no loans, the whole scheme was imagined by Horwitz (¶ 71(a)). | (1) Cole had no ownership interest or employment with 1inMM. This was confirmed in the background checks ordered by Attorney Fraser in 2017 (¶ 71 (h)); (2) 1inMM never received any money from Netflix or HBO, there were no loans, the whole scheme was imagined by Horwitz (¶ 71(a)). |
| 68(f)(iii) | (1) Jeff Spiegel and Ryan Spiegel; (2) In person meeting with Joe and Jim at Spiegel Accountancy's Offices; (3) On or about May 25, 2018. | During that meeting Jeff and Ryan said they went to Los Angeles together and personally reviewed 1inMM's financial records and said the operation was legitimate. | 1inMM never received any money from Netflix or HBO, there were no loans, the whole scheme was imagined by Horwitz (¶ 71(a)). | Defendants never contacted, any third party and did not review 1inMMs tax returns (or forgeries thereof) or bank statements showing transfers from HBO or Netflix prior to investing. (¶ 71(b)). |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(g) | (1) Ryan Spiegel; (2) Phone call with Cindy; (3) April 2018. | The investment was zero risk of loss and that the only risk was time. | 1inMM never received any money from Netflix or HBO, there were no loans, the whole scheme was imagined by Horwitz (¶ 71(a)); Defendants never contacted, HBO, Netflix, Sony, City National Bank, never investigated whether there were any internal controls in place at 1inMM, never talked to any third parties in the movie funding business who had experienced dealing with Horwitz, never evaluated Horwitz's personal finances or credit rating, never confirmed what if any assets 1inMM had, never checked to see if 1inMM had an UCC filings for its purported interest in films, never reviewed any financial statements or tax returns created by a third party for 1inMM or Horwitz, and limited their due diligence to asking Horwitz and Cole questions and reviewing documents provided by Horwitz and Cole (¶ 71(b)). | Ryan had factual basis for this statement at all. Defendants never contacted, any third party and did not review 1inMMs tax returns (or forgeries thereof) or bank statement showing transfer from HBO or Netflix prior to investing. (¶ 71(b)). |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(h) | (1) Jeff Spiegel and Ryan Spiegel; (2) By phone; (3) At the time each investment was made: Uyen September 2019 and January 2020 (¶ 126); Ellusionist September 2019 and January 2020 (¶ 127); Southwest Investment Funds in June 2019 and January 2020 (¶ 129); AVR Group in June 2019 and January 2020 (¶ 130); Trident Asset management in June 2019 and January 2020 (¶ 131); Phoenix Affordable Housing in June 2019 and on January 2020. | Defendants engaged professionals to do due diligence on Horwitz's representations. | SAC engaged an attorney named Brian Fraser ("Fraser") to draft documents and review contracts between SAC and 1inMM. Defendants do not know whether Fraser communicated with any third parties or sought any records from any third parties. Ryan and Jeff do not know what if any due diligence Fraser did on their behalf other than reviewing the documents provided by Horwitz and ordering a background check. They do not know what if anything they paid Fraser for this service. (¶ 71(c)). | This is a direct false statement of fact made to induce the Plaintiffs to invest. No professional due diligence was done besides a background check. The facts contained in the background check did not match Horwitz's representations. |
| 68(h)(i) | (1) Jeff and Ryan; (2) In person meeting to Jim and Joe; (3) On May 25, 2018. | Defendants engaged professionals to do due diligence on Horwitz's representations. | Defendants do not know whether their attorney, Fraser, communicated with any third parties or sought any records from any third parties. They do not know what if any due diligence Fraser did on their behalf other than reviewing the documents provided by Horwitz and ordering a background check. They do not know what if anything they paid Fraser for this service. (¶ 71(c)). | This is a direct false statement of fact made to induce the Plaintiffs to invest. No professional due diligence was done besides a background check that did not match Horwitz's representations. |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(h)(ii) | (1) Ryan; (2) By phone to Joe; (3) June 2018. | Defendants engaged professionals to do due diligence on Horwitz's representations. | SAC engaged an attorney named Brian Fraser ("Fraser") to draft documents and review contracts between SAC and 1inMM. Defendants do not know whether Fraser communicated with any third parties or sought any records from any third parties. They do not know what if any due diligence Fraser did on their behalf other than reviewing the documents provided by Horwitz and ordering a background check. They do not know what if anything they paid Fraser for this service. (¶ 71(c)). | This is a direct false statement of fact made to induce the Plaintiffs to invest. No professional due diligence was done besides a background check that did not match Horwitz's representations. |
| 68(h)(iii) | (1) Ryan; (2) By phone to Cindy; (3) May 2018. | "At the time of their investment commitment that they engaged professionals to do due diligence on Horwitz's representations." | See cell above. | This is a direct false statement of fact made to induce the Plaintiffs to invest. No professional due diligence was done besides a background check that did not match Horwitz's representations. |
| 68(i)(i) | (1) Jeff and Ryan; (2) In person meeting to Jim and Joe; (3) On May 25, 2018. | 1inMM had a letter of intent to sell each movie with a distributor before the movie rights were purchased. | Horwitz never engaged with any movie platforms and never had a letter of intent with any platforms to purchase any movies. In the extensive investigation of Horwitz's activities, no "letters of intent" have been uncovered, not even any forged copies. (71(d)). | This is a direct false statement of fact made to induce the Plaintiffs to invest. Defendants received some forged documents from 1inMM but the letters of intent were conspicuously missing from Horwitz's and Cole's documents. The letters of intent made the investment appear to be no risk. |

11

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(i)(ii) | (1) Ryan; (2) By phone to Joe; (3) April 2019. | 1inMM had a letter of intent to sell each movie with a distributor before the movie rights were purchased. | Horwitz never engaged with any movie platforms and never had a letter of intent with any platforms to purchase any movies. In the extensive investigation of Horwitz's activities, no "letters of intent" have been uncovered, not even any forged copies. (¶ 71(d)). | This is a direct false statement of fact made to induce the Plaintiffs to invest. Defendants received some forged documents from 1inMM but the letters of intent were conspicuously missing. The letters of intent made the investment appear to be no risk. |
| 68(i)(iii) | (1) Ryan; (2) By email with PDF attachment to Cindy, Brad, and Joe (3) April 2017. | 1inMM had a letter of intent to sell each movie with a distributor before the movie rights were purchased. | Horwitz never engaged with any movie platforms and never had a letter of intent with any platforms to purchase any movies. In the extensive investigation of Horwitz's activities, no "letters of intent" have been uncovered, not even any forged copies. (¶ 71(d)). | This is a direct false statement of fact made to induce the Plaintiffs to invest. Defendants received some forged documents from 1inMM but the letters of intent were conspicuously missing. The letters of intent made the investment appear to be no risk. |
| 68(i)(iv) | (1) Jeff; (2) By phone to Brad; (3) April 2018. | 1inMM had been operating for quite a while as a subsidiary of a bigger operation that owned them. 1inMM was the branch-off to go after these smaller movies in 600K range (smaller cost). 1inMM had connections in South America and around the world and would be acquiring the movies and selling to Netflix, HBO, Hulu and Sony. | 1inMM never received any money from Netflix or HBO, there were no loans, the whole scheme was imagined by Horwitz. (¶ 71(a)). | This is a direct false statement of fact made to induce the Plaintiffs to invest. Defendants received some forged documents from 1inMM but the letters of intent were conspicuously missing. The letters of intent made the investment appear to be no risk. Jeff had no reason to claim 1inMM was a "branch off" of anything. |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(j) | (1) Jeff and Ryan; (2) Facts concealed with duty to disclose. | Concealed from investors that they never had direct communication with HBO, Netflix, Horwitz's Bank, or Horwitz's accountant to confirm anything Horwitz told them | Defendants never contacted, HBO, Netflix, Sony, City National Bank, never investigated whether there were any internal controls in place at 1inMM, never talked to any third parties in the movie funding business who had experienced dealing with Horwitz, never evaluated Horwitz's personal finances or credit rating, never confirmed what if any assets 1inMM had, never checked to see if 1inMM had an UCC filings for its purported interest in films, never reviewed any financial statements or tax returns created by a third party for 1inMM or Horwitz, and limited their due diligence to asking Horwitz and Cole questions and reviewing documents provided by Horwitz and Cole. (¶ 71(b)). | Liability may be based on omitting "a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011); *Lifevoxel Va. SPV, LLC v. Lifevoxel.Ai, Inc*., 2023 U.S. Dist. LEXIS 177335, *13. The fact that Jeff, a senior audit accountant, did not do an iota of third-party investigation is appalling and reckless. Omitting this fact made all the representations about Horwitz's scheme misleading. |
| 68(k) | (1) Jeff and Ryan; (2) Facts concealed with duty to disclose. | Concealed from investors that 1inMM did not have an accountant and was never audited. | Defendants never contacted, HBO, Netflix, Sony, City National Bank, never investigated whether there were any internal controls in place at 1inMM, never talked to any third parties in the movie funding business who had experienced dealing with Horwitz, never evaluated Horwitz's personal finances or credit rating, never confirmed what if any assets 1inMM had, | Liability may be based on omitting "a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011); *Lifevoxel Va. SPV, LLC v. Lifevoxel.Ai, Inc*., 2023 U.S. Dist. LEXIS 177335, *13. The fact that Jeff, a senior audit accountant, did not do an iota of third-party investigation is appalling and reckless. Omitting this fact made all of the representations about Horwitz's scheme misleading. Had the investors been told there |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | | never checked to see if 1inMM had an UCC filings for its purported interest in films, never reviewed any financial statements or tax returns created by a third party for 1inMM or Horwitz, and limited their due diligence to asking Horwitz and Cole questions and reviewing documents provided by Horwitz and Cole. (¶ 71(b)). | was no investigation they would not have invested. |
| 68(l)(i) | (1) Ryan; (2) Via email to Brad; (3) On or about March 15, 2017. | SAC was a co-signor on Horwitz's bank account and signed off on each payment to foreign sales agents that 1inMM bought the movie rights from. | None of 1inMM's bank accounts at City National Bank indicated that Jeff, Ryan, or SAC were cosigners. Jeff and Ryan may have completed a form to become co-signors, but it was never processed by the bank, and neither Jeff, Ryan, nor SAC ever had any access to 1inMM's accounts as they falsely told investors (¶ 71(k)); Despite telling investors they were co-signors on 1inMM's bank account, Defendants never communicated directly with 1inMM's bank, City National Bank, they never accessed the accounts they were supposedly co-signors on, and never received statements from City National Bank. The whole extent of the due diligence is what Horwitz and Cole told them. Had investors known that, they never would have invested. (¶ 71(i)). | This is a knowingly false statement employed to induce investment. Defendants were not co-signors. The representation of being co-signors was used to induce investment and obviously false. |

14

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(l)(ii) | (1) Ryan; (2) By phone to Jim and Joe; (3) April 2018. | SAC was a co-signor on Horwitz's bank account and signed off on each payment to foreign sales agents that 1inMM bought the movie rights from. | None of 1inMM's bank accounts at City National Bank indicated that Jeff, Ryan, or SAC were cosigners. Jeff and Ryan may have completed a form to become co-signors, but it was never processed by the bank, and neither Jeff, Ryan, nor SAC ever had any access to 1inMM's accounts as they falsely told investors (¶ 71(k)); Despite telling investors they were co-signors on 1inMM's bank account, Defendants never communicated directly with 1inMM's bank, City National Bank, they never accessed the accounts they were supposedly co-signors on, and never received statements from City National Bank. The whole extent of the due diligence is what Horwitz and Cole told them. Had investors known that, they never would have invested. (¶ 71(i)). | This is a knowingly false statement employed to induce investment. Defendants were not co-signors. The representation of being co-signors was used to induce investment. |
| 68(m) | (1) Ryan and Jeff; (2) Phone and email; (3) Communicated to all Plaintiffs after the default in early 2020. | Ryan and Jeff told Plaintiffs by phone and email that they were "victims" of Horwitz and lost money. | Jeff, Ryan, and SAC are "net winners" in the Ponzi Scheme. Jeff and Ryan are the only owners of SAC which earned a profit in excess of $4,000,000 at the expense of dozens of investors. (¶ 71(l)). | This is a knowingly false statement employed to lull investors. Jeff and Ryan knew they earned a profit on the investment and were familiar with their own financial status. |

15

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(n) | (1) Ryan; (2) Email; (3) Communicated to all investors on same distribution list in early 2020. | Plaintiffs' "investment was safe" even after payments stopped coming and it was clear 1inMM did not actually have contracts with HBO. | Ryan still told investors their money was safe even after 1inMM defaulted on its obligations and remarkably was not being paid by ANY of the three platforms, and all for different purported reasons. This lie was told with the intent of keeping the fraud under wraps and delaying the consequences of facilitating a Ponzi Scheme. (¶ 71(m)). | This is a knowingly false statement employed to lull investors. By this point 1inMM had defaulted and none of the supposed "platforms" were paying. |
| 68(o) | (1) Jeff, Ryan, and SAC; (2) Facts concealed with duty to disclose | Concealed from investors that Horwitz's attorney disavowed all statements made on behalf of Horwitz when he withdrew. | On February 17, 2021, 1inMM's attorney, who had been passing along many of the misrepresentations to Ryan and Jeff, explicitly disavowed any statements he had made on behalf of Horwitz and 1inMM. This noisy withdrawal and disavowal was a significant red flag that Ryan and Jeff concealed from investors. (¶ 71 (n)). | This is a knowingly false statement employed to lull investors. By this point 1inMM had defaulted and none of the supposed "platforms" were paying. |
| 68(p) | (1) Ryan; (2) Email; (3) Communicated to all investors on same distribution list on February 18, 2021. | HBO had a plan to pay 1inMM. | On February 21, 2021, days after the withdrawal and disavowal, Ryan told investors that Horwitz had a new deal with HBO for repayment and money was coming. Ryan had reason to know this was obviously false considering 1inMM's large law firm had just disavowed the same statement. (¶ 71 (o)). | The disavowal of statements by a large law firm is a damning fact and the failure to tell investors about this makes all other representations following this event misleading. Ryan could not have simultaneously known that a large law firm representing Horwitz indicated it was a lie and that HBO was going to pay based on the same lies. |

16

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| 68(q) | (1) Ryan; (2) Email; (3) Communicated to all investors on same distribution list in March 2021. | Warner Media intended to pay 1inMM in March 2021. | On or about March 15, 2021, Ryan told investors a lie about a purported deal between Warner Media and 1inMM. At this point the SEC was engaged in its investigation of Horwitz. Two weeks prior, another aggregator presented evidence of the fraud to the SEC and had notified its hundreds of investors of the fraud. On March 31, 2021, the SEC prepared a filing including records provided by SAC. (¶ 71 (p)). | This is a knowingly false statement employed to lull investors. By this point 1inMM had defaulted and none of the supposed "platforms" were paying and its law firm disavowed all statements. Ryan could not have simultaneously known that a large law firm representing Horwitz indicated it was a lie and that HBO was going to pay based on the same lies. |
| 68(r). | (1) Ryan; (2) Email; (3) Communicated to all investors on same distribution list in April 2021. | Jeff and Ryan were "shocked" by Horwitz's arrest. | This was not shocking to Ryan at all because he had supplied documents to the SEC the prior month in support of its investigation, and it was readily apparent that Horwitz was running a Ponzi Scheme. (¶ 94). | This is a knowingly false statement employed to lull investors. By this point 1inMM had defaulted and none of the supposed "platforms" were paying, its law firm disavowed all statements, and Ryan and Jeff had spoken with SEC counsel who said Horwitz was being investigated. |
| 82 | (1) Ryan; (2) Email; (3) Communicated to all investors on same distribution list in on April 2021 | On April 17, 2020, Ryan and Jeff advised Plaintiffs that 1inMM had defaulted on its loans and advised investors "With this news, we have decided to wind down the equity fund as participations are paid over the coming months. We will return capital and earnings to investors as the participations in our portfolio are paid off." Despite it appearing to be a sufficiently dire situation to warrant shutting down the fund, Ryan | This statement was false. Ryan had no reason to believe that payment was coming and that nothing was lost. (¶ 82). | Ryan had no factual or legal basis to say "no funds had been lost" the statement was reckless. |

| Statement Paragraph No. | The Speaker(s), Date(s), and Medium | False or Misleading Statements | Reason Statements were False or Misleading when Made | Facts Giving Rise to a Strong Inference of Scienter |
|---|---|---|---|---|
| | | and Jeff promised "We want to reassure you again, that although we are having some delays, **we know that no funds have been lost**. We expect that we will be receiving all of the funds due and will be returning your capital and earnings." (Emphasis added). | | |

Respectfully Submitted,

/s/*Alexander N. Loftus*
Attorneys for Plaintiffs

Alexander N. Loftus, Esq. (admitted *pro hac vice*)
Ross M. Good, Esq. (admitted *pro hac vice*)
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T: (312) 899-6625
alex@loftusandeisenberg.com
ross@loftusandeisenberg.com