UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLUSIONIST CASH BALANCE PLAN AND TRUST, et al., | Case No. 23-cv-00287-AMO |
| Plaintiffs, | **ORDER RE MOTION TO DISMISS SECOND AMENDED COMPLAINT** |
| v. | Re: Dkt. No. 54 |
| SPIEGEL ACCOUNTANCY CORP., et al., | |
| Defendants. | |

This securities fraud action arises from the Ponzi scheme orchestrated by a Los Angeles-based actor named Zachary Horwitz. Defendants Spiegel Accountancy Corporation, Jeffrey Spiegel, Ryan Spiegel, and SAC Advisory Group, LLC move to dismiss the second amended complaint filed by Plaintiffs Ellusionist Cash Balance Plan and Trust, Uyen "Cindy" Huhyn, Southwest Investments Funds, LLC, AVR Group, LLC, Trident Asset Management, Inc., and Phoenix Affordable Housing Authority, LLC. Having carefully considered the parties' papers, the relevant legal authority, and good cause appearing, the Court **GRANTS** the motion to dismiss **WITHOUT LEAVE TO AMEND** as to the federal claims and **DECLINES** to exercise supplemental jurisdiction over the state law claims, for the reasons set forth below.

## I.    BACKGROUND

### A.    Factual Background[1]

Zachary Horwitz is an actor based in Los Angeles. ECF 53 ¶ 19. He raised more than

---

[1] This background is based on the well-pleaded allegations in the second amended complaint, which are taken as true and viewed in the light most favorable to Plaintiffs for the purpose of the instant motion. *See In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181, 1184 (9th Cir. 2024).

$690 million as part of a Ponzi scheme operated through his company, 1inMM Capital, LLC.  *Id.*

¶ 1, 19.  1inMM issued promissory notes with maturities ranging from three to twenty-four

months, with the majority of the notes coming due in six or twelve months.  *Id*. ¶ 21.  The

"relativity short maturities" supposedly aligned with "the standard payment timeline" for Netflix

and HBO.  *Id.* ¶ 34.  Each note provided for a specific amount to be paid at maturity, equating to a

profit between 35 to 45 percent over the life of the note.  *Id.* ¶ 21.

   The funds generated from the promissory notes were to be used "to purchase the rights to a

specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the

note[s]."  *Id.* ¶ 31.  Horwitz claimed 1inMM would generate revenue by:

> (i) receiving a percentage of the gross receipts that HBO generated
> from exploiting film rights; (ii) retaining a portion of the profit
> margin from Netflix-specific transactions; [and] (iii) following the
> repayment of notes used to finance the acquisition of content rights
> and the expiration of initial 3-year sublicensing period with
> platforms such as HBO and Netflix, 1inMM would retain rights to
> the same content for an additional period of years, thereby enabling
> 1inMM to continue licensing the content to other parties for
> 1inMM's sole financial benefit.

*Id.* ¶ 32.  Horwitz and his company actually had no relationship with HBO or Netflix, did not sign

distribution agreements with either company, did not acquire the promised movie rights using the

money raised by the sale of promissory notes, and did not sell those rights to Netflix or HBO.  *Id.*

¶¶ 24, 35.  Horwitz used "fabricated agreements and fake emails with prominent third-party

companies with whom [he] had no actual business relationship."  *Id.* ¶ 19.

   Horwitz raised funds through "five principal aggregators who acted as placement agents or

underwriters selling securities for investment in 1inMM[,] most of whom raised funds from

friends, family, and other downstream investors[.]"  *Id.* ¶ 43.  Defendants' efforts alone led to

"$75,132,950 in investment[s,]" with Plaintiffs' collective investments totaling more than

$17,000,000.  *Id.* ¶¶ 1, 46.  The investments "were structured as 'Profit Sharing Agreements'

whereby SAC provided 1inMM with the funds necessary to pay the purported Acquisition Fee

(the 'SAC Advance') in exchange for a participation interest in the funds received by 1inMM in

relicensing a portion of the Distribution Rights to a third-party media company."  *Id.* ¶ 50.  "SAC

did not invest money via the Profit Sharing Agreements but earned a significant profit on each

investment that paid before the Ponzi Scheme collapsed." *Id.* ¶ 57.

Plaintiffs Southwest Investment Funds, AVR Group, Trident Asset Management, and Phoenix Affordable Housing Authority first invested in SAC in or about June 2019. *Id.* ¶¶ 129-132. Plaintiffs Huhyn and Ellusionist first invested in SAC in or about September 2019. *Id.* ¶¶ 126, 127. Plaintiffs entered into their final investment agreement in or about January 2020. *Id.* ¶¶ 126-132.

All Plaintiffs, except Huhyn, had prior dealings with SAC. *Id.* ¶¶ 111 n.2, 128, 133. "Ellusionist was a longtime customer of Spiegel Accountancy Corp. and was solicited for investment in SAC at Spiegel Accountancy Corp.'s office." *Id.* ¶ 128. "The principal of Southwest Investment Funds, AVR Group, Trident Asset Management, and Phoenix Affordable Housing Authority was [also] a customer of Spiegel Accountancy Corp. and was solicited by Jeff at Spiegel Accountancy Corp.'s office." *Id.* ¶ 133.

Horwitz and 1inMM stopped making payments to investors in late 2019. *Id.* ¶¶ 38, 78. On February 14, 2022, he was convicted of securities fraud, sentenced to 240 months in prison, and ordered to pay restitution in the amount of $230,361,884. ECF 54-3 at 56, 58.

**B.    Procedural Background**

Plaintiffs commenced this action on January 19, 2023. ECF 1. After full briefing and a hearing on Defendants' first motion to dismiss, the Court dismissed the initial complaint with leave to amend.[2] ECF 11, 12, 17, 26. Plaintiffs filed their first amended complaint on April 26, 2023. ECF 32. After full briefing on Defendants' motion to dismiss that pleading, the Court dismissed the first amended complaint with leave to amend. ECF 36, 41, 44, 52.

Plaintiffs filed the operative second amended complaint on August 30, 2023. ECF 53. They assert claims for (1) violation of Section 10(b) of the Securities Act of 1934 and Rule 10b-5, (2) violation of Section 12(a)(2) of the Securities Act of 1933, (3) violation of Section 15 of the Securities Act of 1933, (4) declaratory judgment under Section 29 of the Securities Act of 1934, (5) violation of California Corporations Code § 25401, (6) negligent misrepresentation,

---

[2] The matter was pending before the Honorable Vince Chhabria at the time. ECF 26. On May 10, 2023, the case was reassigned to this Court. ECF 39.

1   (7) accounting malpractice, and (8) unjust enrichment.  *Id.* ¶¶ 136-232.  On September 12, 2023,

2   Defendants filed a motion to dismiss the second amended complaint and a request for judicial

3   notice.  ECF 54, 54-3.  Plaintiffs filed their opposition to the motion on September 26, 2023,

4   without responding to Defendants' request for judicial notice.  ECF 59.  Defendants filed a reply

5   in support of their motion to dismiss on October 3, 2023.[3]  ECF 60.  At the Court's direction, the

6   parties filed a supplemental joint chart on April 12, 2024.  ECF 66.

7   **II.      LEGAL STANDARD**

8            A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal

9   sufficiency of the claims alleged in the complaint.  *Ileto v. Glock*, 349 F.3d 1191, 1199-1200 (9th

10  Cir. 2003).  To overcome a Rule 12(b)(6) motion to dismiss, the factual allegations in the

11  plaintiff's complaint " 'must . . . suggest that the claim has at least a plausible chance of

12  success.' "  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century

13  Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (alterations in original)).  In ruling

14  on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe

15  the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire &

16  Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

17           "[A]llegations in a complaint . . . may not simply recite the elements of a cause of action,

18  but must contain sufficient allegations of underlying facts to give fair notice and to enable the

19  opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652

20  F.3d 1202, 1216 (9th Cir. 2011)).  The court may dismiss a claim "where there is either a lack of a

21  cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal claim."

22  *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011) (citing *Johnson v. Riverside

23  Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008)).  "[T]he non-conclusory 'factual

24

25  ─────────────────────

26  [3] With their briefing, each side also filed materials not subject to a pending request for judicial notice.  Defendants' submissions included a declaration from Jeffrey Spiegel in addition to a declaration from their counsel that attached a copy of the transcript of the hearing on the first motion to dismiss.  ECF 54-1, 54-2.  Plaintiffs filed a declaration from their counsel that attached pleadings relating to pending or approved settlements in other litigation stemming from Horwitz's Ponzi scheme.  ECF 59-1.  Neither side offered authority for why the Court can consider these materials.  Consequently, the Court has not.

27

28

United States District Court
Northern District of California

1  content' and reasonable inferences from that content must be plausibly suggestive of a claim

2  entitling the plaintiff to relief."  *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

3         For claims sounding in fraud or mistake, a plaintiff must "state with particularity the

4  circumstances regarding the fraud or mistake."  Fed. R. Civ. P. 9(b).  A plaintiff must set forth

5  " 'the who, what, when, where, and how' of the misconduct charged."  *Vess v. Ciba-Geigy Corp.*

6  *USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.

7  1997)).

8         A claim for violations of Section 10(b) and Rule 10b-5 "must meet both the heightened

9  pleading requirements for fraud claims under Fed. R. Civ. P. 9(b) . . . and the exacting pleading

10  requirements . . . of the Private Securities Litigation Reform Act ('PSLRA') . . . ."  *In re Quality*

11  *Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues*

12  *& Rights, Ltd.*, 551 U.S. 308, 313 (2007)).  In assessing whether a securities fraud claim meets this

13  heightened pleading standard, "courts must consider the complaint in its entirety, as well as other

14  sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

15  documents incorporated into the complaint by reference, and matters of which a court may take

16  judicial notice."  *Tellabs*, 551 U.S. at 322-23 (citations omitted).

## III.  DISCUSSION

18         The Court first takes up Defendants' request for judicial notice before turning to the

19  pending motion to dismiss.

### A.  Request for Judicial Notice

21         A district court may take judicial notice of facts that are "not subject to reasonable dispute"

22  because they are (1) "generally known within the trial court's territorial jurisdiction," or (2) "can

23  be accurately and readily determined from sources whose accuracy cannot reasonably be

24  questioned."  Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir.

25  1993).  "Accordingly, '[a] court may take judicial notice of matters of public record.' "  *Khoja v.*

26  *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting *Lee v. City of Los*

27  *Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).

28         Defendants ask the Court to take judicial notice of the following documents: (1) the SEC's

complaint against Horwitz and 1inMM, (2) the criminal complaint against Horwitz, (3) the

judgment and commitment order entered in Horwitz's federal criminal case, and (4) the complaint

filed against the Speigel defendants in another case in this district – *Carter v. Spiegel*, No. 21-cv-

3990-JSC (N.D. Cal. filed May 26, 2021) – in which the named putative class representative was

represented by the same counsel representing Plaintiffs in this action.  ECF 54-3.  Because these

documents are court records whose accuracy cannot reasonable be questioned, *see* Fed. R. Evid.

201(b), and given the lack of any opposition by Plaintiffs, the Court **GRANTS** Defendants'

request for judicial notice.  *See Bridges v. Geringer*, No. 5:13-CV-01290-EJD, 2015 WL 2438227,

at *1 n.2 (N.D. Cal. May 21, 2015) (taking judicial notice of indictment and plea agreement in

related federal criminal proceedings).

  **B.**  **Motion to Dismiss**

  Defendants seek dismissal of all claims alleged in the second amended complaint.  ECF

54.  Because no independent basis for jurisdiction lies as to Plaintiffs' state law claims absent a

viable federal claim, the Court first addresses the causes of action Plaintiffs assert under federal

law.

  **1.**  <u>Section 10(b) and Rule 10b-5</u>

  In order to plead a claim under Section 10(b) and Rule 10b-5,[4] a plaintiff must allege

" '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

the misrepresentation or omission; (5) economic loss; and (6) loss causation.' "  *In re Quality Sys.,*

*Inc. Sec. Litig.*, 865 F.3d at 1140 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S.

258, 267 (2013)).

///

---

[4] "SEC Rule 10b-5 implements [Section] 10(b) by declaring it unlawful: '(a) [t]o employ any
device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to
omit to state a material fact necessary in order to make the statements made. . . not misleading, or
(c) [t]o engage in any act, practice, or course of business which operates or would operate as a
fraud or deceit upon any person, in connection with the purchase or sale of any security.' "
*Tellabs*, 551 U.S. at 318 (quoting 17 C.F.R. § 240.10b-5).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In their opening brief, Defendants challenge each of these elements except for reliance and

2 economic loss.[5]  *See* ECF 54 at 23-26.  The Court first discusses the element of falsity.

3    When the alleged fraud stems from a material misstatement or omission, " 'the complaint

4 shall specify [1] each statement alleged to have been misleading, [2] the reason or reasons why the

5 statement is misleading, and, [3] if an allegation regarding the statement or omission is made on

6 information and belief, the complaint shall state with particularity all facts on which that belief is

7 formed.' "  *Khoja*, 899 F.3d at 1008 (quoting 15 U.S.C. § 78u-4(b)(1)) (brackets in original).

8 "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating

9 why those statements were false, does not meet this standard."  *Metzler Inv. GMBH v. Corinthian*

10 *Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (citation omitted).

11    Plaintiffs allege that the following statements[6] were false or misleading.  Statement 1

12 consists of multiple representations made in an April 2017 video presentation:



<hr />

[5] The Court has disregarded arguments Defendants improperly raise for the first time on reply.
*See, e.g.*, ECF 60 at 17 (arguing for the first time that Plaintiffs fail to plead reliance on the alleged
misrepresentations).

[6] The Court has numbered the statements at issue consistent with the numbering adopted by the
parties in the joint chart they submitted on April 12, 2024.  *See* ECF 66.

ECF ¶¶ 65, 68(a); ECF 66 at 1.

The below representations, contained in the profit sharing agreements themselves and transmitted to Plaintiffs via email, comprise Statement 2:

> WHEREAS [1inMM Capital, LLC,] is in the business of acquiring and licensing film distribution rights to third-party media companies for exclusive distribution in Latin American and African countries (the "Distribution Rights");
>
> WHEREAS in connection with acquiring the Distribution Rights to a particular movie (the "Licensed Movie"), Distributor must pay a one-time non-refundable license fee (the "Acquisition Fee") to the holder of the movie's worldwide distribution rights which is generally the producer of the movie;
>
> WHEREAS in order to assist the [1inMM Capital, LLC,] in acquiring the Distribution Rights, SAC provides the Distributor with the funds necessary to pay the Acquisition Fee (the "SAC Advance") in exchange for a participation interest in the funds received by Distributor in relicensing a portion of the Distribution Rights to a third-party media company ("Media Company").

ECF ¶ 68(b) (modifications in original); ECF 66 at 5.

Statement 3 consists of multiple representations communicated via email in or about March 2017, including:

> 1inMM Acquires the Latin American distribution rights for all windows of distribution;
>
> 1inMM's acquisitions are all under $750,000.00. Films over $750,000.00 are bought by 1inMM Productions;
>
> 1inMM licenses all films to either HBO/Netflix or SONY in Latin America; [and]
>
> 1inMM headed up by Zach Horwitz and Craig Cole[.]

ECF ¶ 68(c); ECF 66 at 7.

///

///

8

1    Statement 4, conveyed to Plaintiffs via email in or about March 2017, encompasses the

2  following representations:

3    SAC will hand pick movie deals brought to the SAC by 1inMM.
     "1INMM will bring SAC signed non-binding letter of intent (the
4    "**LOI**") from the licensor (companies such as HBO, Netflix, Sony,
     or Universal) and offer sheet to foreign sales agent ("**FSA**"), who
5    represent the sales of movie licensing rights," in order for SAC view
     the proposed deal.

6
     In essence, 1INMM buys the licensing rights from the FSA and sells
7    the Latin American distribution rights to the licensor, who has
     already agreed to purchase such distribution rights at a higher price
8    (the "**Participation Fee**").

9    In certain instances, a licensor may decide not to close a movie
     purchase even after signing an LOI, in which case 1INMM will shop
10   the movie to another licensor.  In this case, the Participation
     Agreement provides that 1INMM has 10 days after the movie is
11   rejected by a licensor to execute a new participation with a new
     licensor.
12
     If 1inMM is unable to negotiate a new movie participation that is
13   acceptable to the SAC 1INMM is obligated and will refund the
     Participation Advance to SAC.
14
     Based on the due date of the participation schedule with 1inMM, the
15   Participation Fee will be paid.  This will be coming directly from the
     licensor to 1inMM who will then deposit into the Company's joint
16   account with 1inMM.  As co-signatory on the joint account, the
     Manager will then wire the money to the Company's bank account
17   to close that movie participation.  Profits will then be allocated and
     distributed for that movie participation to the Company's members
18   in accordance with the terms of the Company's operating
     agreement.
19

20  ECF ¶ 68(d) (bold in original); ECF 66 at 9.

21    Statement 5, sent via email in or about March 2017, consists of the following:

22    Ryan has known Craig Cole, Co-Founder of 1INMM, for over 10
      years and has built a working relationship with his company.
23
      1INMM is a California limited liability company that was formed in
24    September, 2013.  Company was founded and is managed by Zachary
      Horwitz and Craig Cole.  They are a foreign distributor of movie
25    rights focusing on the Latin America territory.

26  ECF ¶ 68(e); ECF 66 at 11.

27  ///

28  ///

United States District Court
Northern District of California

1

2        Statement 6 was made during a May 2018 phone call: "Brad[7] and Cindy talked to Jeff by

3   phone in May 2018, Jeff told Brad during this phone call that he and his son had done much due

4   diligence, had contracts from HBO, signed by officials at HBO, and had verified those individuals

     worked at HBO."  ECF ¶ 68(f)(i); ECF 66 at 13.

5        Statement 7 was made during a phone call at the time of Plaintiffs' investments: "Brad and

6   Cindy talked to Ryan by phone in May 2018 and Ryan explained that SAC was able to obtain such

7   a 'sweet deal' because Ryan went to college with Craig Cole, a co-founder of 1inMM."

8   ECF ¶ 68(f)(ii); ECF 66 at 14.

9        On or about May 25, 2018, Statement 8 was made: "Joe[8] and Jim[9] met with Jeff and

10  Ryan together at Spiegel Accountancy's office.  During that meeting[,] Jeff and Ryan said they

11  went to Los Angeles and personally reviewed 1inMM's financial records and said the operation

12  was legitimate."  ECF ¶ 68(f)(iii); ECF 66 at 15.

13       In April 2018, Ryan made Statement 9.  ECF ¶ 68(g); ECF 66 at 16.  He told "told Cindy

14  by phone that the investment was zero risk of loss and that the only risk was time."  *Id.*

15       Statements 10, 11, 12, 13 occurred during a series of phone calls:

16           Jeff and Ryan verbally communicated to Plaintiffs at the time of
             their investment commitment that they engaged professionals to do
17           due diligence on Horwitz's representations[.]

18           Jeff and Ryan communicated this in person to Jim and Joe on May
             25, 2018.
19
             Ryan reiterated this by phone to Joe in June 2018.
20
             Ryan told Cindy about the professional due diligence by phone in
21           May 2018[.]

22  ECF ¶ 68(h); ECF 66 at 17, 19, 21.

23  ///

24

25  ───────────────────────

26  [7] Brad Christianson is the individual with authority to invest for Ellusionist.  ECF 53 ¶ 7.

27  [8] Joseph McNulty is the managing member of AVR Group, and the only officer of Trident Asset
    Management.  *Id.* ¶¶ 10, 11.

28  [9] Kambiz "Jim" Zomorrodi is a managing member of Southwest Investment Funds and Phoenix
    Affordable Housing.  *Id.* ¶¶ 9, 12.

United States District Court
Northern District of California

United States District Court
Northern District of California

Statements 14, 15, 16, and 17 are based on what "Jeff, Ryan, and SAC told investors at conferences and symposiums and Plaintiffs by phone and email."  ECF ¶ 68(i).  They said "that 1inMM had a letter of intent to sell each movie with a distributor before the movie rights were purchased[.]"  *Id.*  Specifically:

> Jeff and Ryan communicated this in person on or about May 25, 2018 to Jim and Joe.
>
> Ryan communicated this by phone to Joe in April 2018.
>
> Ryan communicated this fact via email to Cindy, Brad, and Joe in March 2017.
>
> In April 2018 Jeff told Brad by phone that 1inMM had been operating for quite a while as a subsidiary of a bigger operation that owned them.  1inMM was the branch-off to go after these smaller movies in 600K range (smaller cost).  1inMM had connections in South America and around the world and would be acquiring the movies and selling the Netflix, HBO, Hulu and Sony.

ECF ¶ 68(i)(i)-(iv); ECF 66 at 22-25.

Statement 18 is grounded in an omission, i.e., "Jeff and Ryan concealed from investors that they never had direct communication with HBO, Netflix, Horwitz's Bank, or Horwitz's accountant to confirm anything Horwitz told them[.]"  ECF ¶ 68(j); ECF 66 at 26.

Statement 19 is likewise based on an omission, i.e., "Jeff and Ryan concealed from investors that 1inMM did not have an accountant and was never audited[.]"  ECF ¶ 68(k); ECF 66 at 28.

Statements 20 and 21 are based on what "Jeff, Ryan, and SAC told investors at conferences and symposiums and Plaintiffs by phone and email."  ECF ¶ 68(l).  They said "that they were co-signors on Horwitz's bank account and signed off on each payment to foreign sales agents that 1inMM bought the movie rights from."  *Id.*  Specifically, "Ryan communicated to Brad via email on or about March 15, 2017 that SAC was a co-signor on 1inMM's accounts holding Brad's investment."  ECF ¶ 68(l)(i); ECF 66 at 30.  "Ryan [also] communicated this by phone to Jim and Joe in April 2018."  ECF ¶ 68(l)(ii); ECF 66 at 33.

///

///

11

1    After 1inMM defaulted on its promissory notes, Ryan and Jeff made Statement 22.  ECF

2 ¶ 68(m); ECF 66 at 33.  They "told Plaintiffs by phone and email that they were 'victims' of

3 Horwitz and lost money[.]" *Id.*

4    In early 2020, Ryan made Statement 23.  ECF ¶ 68(n); ECF 66 at 34.  He "told investors

5 via email their 'investment was safe' even after payments stopped coming and it was clear 1inMM

6 did not actually have contracts with HBO[.]" *Id.*

7    In or around February 2021, "Jeff, Ryan, and SAC concealed from investors that Horwitz's

8 attorney disavowed all statements made on behalf of Horwitz when he withdrew[.]"  Plaintiffs

9 plead this as Statement 24.  ECF ¶ 68(o); ECF 66 at 34.

10    On or about February 18, 2021, Ryan made Statement 25.  ECF ¶ 68(p); ECF 66 at 35.

11 ECF ¶ 68(p); ECF 66 at 35.  He "told all Plaintiffs via email HBO had a plan to pay 1inMM[.]"

12 *Id.*

13    On or about March 15, 2021, Ryan made Statement 26.  ECF ¶ 68(q); ECF 66 at 35.  He

14 "told all Plaintiffs via email Warner Media intended to pay 1inMM in March 2021[.]"  *Id.*

15    On or about April 7, 2021, Ryan made Statement 27.  ECF ¶ 68(r); ECF 66 at 36.  He "told

16 all Plaintiffs via email that Jeff and Ryan were 'shocked' by Horwitz's arrest."  *Id.*

17    Statement 28 was made on April 17, 2020:

18           Ryan and Jeff advised Plaintiffs that 1inMM had defaulted on its
             loans and advised investors[:] "With this news, we have decided to
19           wind down the equity fund as participations are paid over the
             coming months.  We will return capital and earnings to investors as
20           the participations in our portfolio are paid off."  Despite it appearing
             to be a sufficiently dire situation to warrant shutting down the fund,
21           Ryan and Jeff promised[,] "We want to reassure you again, that
             although we are having some delays, we know that no funds have
22           been lost.  We expect that we will be receiving all of the funds due
             and will be returning your capital and earnings."
23

24 ECF ¶ 82; ECF 66 at 36.

25    Defendants challenge the sufficiency of these statements on multiple grounds.  Defendants

26 initially argue that Plaintiffs fail to sufficiently allege materiality.  ECF 54 at 19-20, 26.  The

27 Court agrees.  "For the purposes of a 10b-5 claim, a misrepresentation or omission is material if

28 there is a substantial likelihood that a reasonable investor would have acted differently if the

United States District Court
Northern District of California

misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005) (citation omitted). Plaintiffs do not meaningfully respond to this argument, resting instead on the assertion that "[t]his argument is likely the most absurd. The misrepresentations at issue here are whether the thing being invested in even exist[s]. What could possibly be more material than whether 1inMM actually had contract with HBO and Netflix?" ECF 59 at 19-20. Plaintiffs' assertions about materiality are insufficient to establish that the allegations in the operative complaint satisfy the PSLRA's exacting pleading requirements. *See Khoja*, 899 F.3d at 1009 ("At a minimum, '[p]laintiffs' allegations must suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable.' ") (quoting *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017)) (modifications in original). This warrants dismissal.

Defendants also argue that Plaintiffs have failed to plead that certain alleged statements were made in connection with the purchase or sale of a security. ECF 54 at 24-25. With respect to Statements 1, 3-9, 11-17, 20, and 21, Defendants assert that the representations concern projects in which Plaintiffs made no investment. ECF 66 at 1-32. With respect to Statements 22-28, Defendants point out that those representations post-date Plaintiffs' investments. *Id.* at 33-37. As they did when opposing Defendants' prior motion to dismiss, Plaintiffs again do not meaningfully respond to these points in their opposition, minimizing them as a "picayune argument." *See* ECF 59 at 16-17. As the Court stated in its prior order, the failure to respond to the argument about lacking allegations of a connection between the alleged misrepresentations and the purchase or sale of a security is an independently sufficient basis to grant dismissal. *See* ECF 52 at 6 n.5; *see also In re: CCIV / Lucid Motors Sec. Litig.*, 110 F.4th at 1187 (stating that "a plaintiff has standing under Section 10(b) if the plaintiff purchased or sold the securities about which the alleged misrepresentations were made.").

With respect to representations about Defendants' due diligence, *e.g.*, Statement 10, Defendants argue, without citation to any authority, that the alleged lack of due diligence constitutes negligence, which is not actionable under Section 10(b). ECF 54 at 25; *see also* ECF

13

66 at 17-18.  The Court declines to credit Defendants' unsupported argument but nonetheless finds

Statement 10 insufficiently pleaded.  "For a statement to be false or misleading, it must 'directly

contradict what the defendant knew at that time' or 'omit[] material information.' " *Weston Fam.*

*P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (quoting *Khoja*, 899 F.3d at 1008-

09).  Plaintiffs contend that Statement 10 was false and misleading "because the facts contained in

[a] background check did not match Horwitz's representations."  *See* ECF 66 at 17.  But this

assertion does not demonstrate that Statement 10 was false and misleading when made.  Indeed,

Plaintiffs' allegations establish that Defendants did conduct *some* due diligence.  For example,

they allege that SAC engaged an attorney to draft documents and review contracts, though they do

not know what due diligence the attorney conducted other than reviewing documents provided by

Horwitz and ordering the background check.  *See* ECF 53 ¶¶ 70(c).  For Statement 10 to have been

false and misleading when made, however, Plaintiffs would have to allege that no due diligence

was conducted, which has not been alleged in the operative complaint.  *See Wochos v. Tesla, Inc.*,

985 F.3d 1180, 1196 (9th Cir. 2021) ("Tesla's remark . . . that 'great progress' was being made on

battery production would potentially be an actionable false statement only if, as the district court

put it, Tesla had been 'making no progress at all.'  Plaintiffs pleaded no facts that would establish

falsity in that sense.").  Accordingly, Plaintiffs have failed to sufficiently plead falsity with respect

to Statement 10.

This analysis applies equally to the omissions Plaintiffs claim are actionable in Statements

18 and 19.  "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any

and all material information.  Disclosure is required under these provisions only when necessary

'to make . . . statements made, in the light of the circumstances under which they were made, not

misleading.' " *Macquarie Infrastructure Corp. v. Moab Partners*, L.P., 601 U.S. 257, 263 (2024)

(quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).  Plaintiffs point to no

allegations satisfying this standard.  Instead, they assert that "the allegations of omission apply to

the Profit Sharing Agreements."  ECF 59 at 17.  In their joint chart, Plaintiffs add that "[t]he fact

that Jeff, a senior audit accountant, did not do an iota of third-party investigation is appalling and

reckless.  Omitting this fact made all the representations about Horwitz's scheme misleading."

United States District Court
Northern District of California

ECF 66 at 26. As discussed in connection with Statement 10, however, Plaintiffs do allege that Defendants conducted due diligence. To the extent, then, that their omission theory hinges on the failure to conduct any due diligence, that theory is not viable given the allegations in the operative complaint about the due diligence Defendants did conduct.

Statement 2 is also insufficiently pleaded. Plaintiffs allege that the statements were false and misleading, not that they were false and misleading when made. They point to allegations concerning an investigation of Horwitz's activities, which revealed that there were no letters of intent, that 1inMM never received any money from Netflix or HBO, that there were no loans, and that the whole scheme was imagined by Horwitz. *See* ECF 66 at 1, 5. But they point no allegations that Defendants were aware of these subsequently uncovered facts when relaying Statement 2. Without such allegations, Plaintiffs have not adequately alleged falsity with respect to Statement 2. *See Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) (explaining that "[t]he most direct way to show both that a statement was false when made and that the party the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement.").

For the reasons set forth above, the Court finds that Plaintiffs have failed to sufficiently allege an actionable misstatement or omission. Because this failure warrants dismissal of Plaintiffs' Section 10(b) claim, the Court does not reach the parties' remaining arguments about this cause of action. The Court now turns to Plaintiffs' claim under Section 12(a)(2).

### 2.    Section 12(a)(2)

To plead a claim under Section 12(a)(2), a plaintiff must allege "(1) an offer or sale of a security, (2) by the use of a means or instrumentality of interstate commerce, (3) by means of a prospectus or oral communication, (4) that includes an untrue statement of material fact or omits to state a material fact that is necessary to make the statements not misleading." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 885 (9th Cir. 2008). "Section 12(a)(2) does not prohibit all species of securities fraud; instead, it prohibits fraud in or relating to a prospectus." *Bridges*, 2015 WL 2438227, at *5 (quoting 15 U.S.C. § 77l(a)(2)). For the purposes of Section 12(a), a "prospectus" is "a document that describes a public offering of securities by an issuer or controlling

1  shareholder." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 584 (1995).  Whether an offering is

2  public or private turns on four factors: "(1) the number of offerees, (2) the sophistication of the

3  offerees, (3) the size and the manner of the offering, and (4) the relationship of the offerees to the

4  issuer." *Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir. 1984) (citing *SEC v.*

5  *Murphy*, 626 F.2d 633, 640 (9th Cir. 1980)).  However, "[a]n offering to those who are shown to

6  be able to fend for themselves is a transaction 'not involving any public offering.' " *S.E.C. v.*

7  *Murphy*, 626 F.2d 633, 644 (9th Cir. 1980) (citations omitted); *see also Western Fed. Corp.*, 739

8  F.2d at 1443 (finding private offering exemption applicable "only where the offerees do not need

9  the protection of the Securities Act.") (citations omitted).

10      Here, the profit sharing agreements attached to the operative complaint, which form the

11  basis of Plaintiffs' claims, include a representation that Plaintiffs were accredited investors.  ECF

12  53-1 at 3, 6, 10, 13, 16, 19, 22.  In that capacity, Plaintiffs invested hundreds of thousands to

13  multiple millions of dollars with SAC.  *See* ECF 53 ¶¶ 126-132.  In addition, all but one of the

14  Plaintiffs had a preexisting relationship with SAC.  *See id.* ¶¶ 111 n.2, 128, 133.[10]

15      These allegations distinguish the instant case from those Plaintiffs offer in support of their

16  position.  In *SEC v. Ralston Purina Co.*, the Supreme Court rejected the argument that corporate

17  employees, "with the duties of artist, bakeshop foreman, chow loading foreman, clerical assistant,

18  copywriter, electrician, stock clerk, mill office clerk, order credit trainee, production trainee,

19  stenographer, and veterinarian" were not entitled to the protection of federal securities laws.  346

20  U.S. 119, 120 (1953).  The Court found that those employees "were not shown to have access to

21  the kind of information which registration would disclose."  *Id.* at 127.  In *Bridges v. Geringer*, the

22  plaintiffs were a group of 21 "individual investors."  2015 WL 2438227, at *1.  And they, unlike

23  Plaintiffs here, "allege[d] the existence of a prospectus, albeit in the form of marketing materials."

24  *See id.* at *5.  In *Liu Hongwei v. Velocity V Ltd. P'ship*, a case Plaintiffs describes as one that

25

26  _____

   [10] To the extent Plaintiffs allege that "Defendants had no prior relationship with the investors
   solicited by salesmen including recent immigrants and elderly individuals," that "Ryan and Jeff

27  presented to large groups of potential investors at a conference in Oregon," and that "[o]ver 100
   individuals from all walks of life and experience invested," *see* ECF 53 ¶¶ 60-63, 67, they do not

28  tie those allegations to the specific profit sharing agreements in which Plaintiffs invested, which
   contain the accredited investor language noted above.

1    "makes clear that there is no bright line," the court granted the plaintiffs' motion for default

2    judgment, weighing the factors of the private offering exemption in their favor given the lack of

3    the defendant's response.  No. 2:15-CV-05061-ODW-E, 2018 WL 3414053, at *1 (C.D. Cal. July

4    11, 2018).  In that case, the eight plaintiffs were Chinese nationals seeking to secure visas by

5    making investments through the federal government's EB-5 visa program.  *Id.*

6        Because Plaintiffs have failed to align their allegations with the cases on which they rely,

7    Defendants' motion to dismiss the Section 12(a)(2) claim is **GRANTED**.  *See S.E.C. v. Platforms*

8    *Wireless Int'l Corp.*, 617 F.3d 1072, 1090-91 (9th Cir. 2010) ("A limited distribution to highly

9    sophisticated investors, rather than a general distribution to the public, is not a public offering.").

10   The Court now turns to Plaintiffs' derivative claim under Section 15.

11              3.    Section 15

12       "Section 15(a) provides liability for persons who control any person or entity liable under

13   other sections of the 1933 Act, including Section 12."  *Fabian v. LeMahieu*, No. 19-CV-00054-

14   YGR, 2019 WL 4918431, at *7 (N.D. Cal. Oct. 4, 2019) (citing 15 U.S.C. § 77o(a)).  It "require[s

15   an] underlying primary violation of the securities laws. . . ."  *In re Rigel Pharms., Inc. Sec. Litig.*,

16   697 F.3d 869, 886 (9th Cir. 2012) (citations omitted).  As discussed above, Plaintiffs have failed to

17   allege an actionable Section 12 claim.  Accordingly, dismissal of their derivative Section 15 claim

18   is warranted.  *See id.* ("Because Plaintiff here has failed to adequately plead a violation of the

19   federal securities laws, it follows that Plaintiff also has failed to adequately plead violation[] of . . .

20   [S]ection 15.").  The Court now turns to Plaintiffs' final federal claim for declaratory relief under

21   Section 29.

22              4.    Section 29

23       Section 29(a) of the Securities Exchange Act of 1934 provides that "[a]ny condition,

24   stipulation, or provision binding any person to waive compliance with any provision of this

25   chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization,

26   shall be void."  15 U.S.C. § 78cc(a); *see Lee v. Fisher*, 70 F.4th 1129, 1138 (9th Cir. 2023).

27   Section 29(a) "applies only to express waivers of non-compliance with the provisions of the

28   Exchange Act."  *Lee*, 70 F.4th at 1138 (internal quotations and citations omitted).  "Section 29(b)

United States District Court
Northern District of California

renders voidable '[e]very contract made in violation of any provision of [the securities laws] or of any rule or regulation thereunder, and every contract . . . the performance of which involves [such a] violation.' " *Facebook Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1039 (9th Cir. 2011) (quoting 15 U.S.C. § 78cc(b)) (modifications in original; further citations omitted); *see also see Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 387-88 (1970).

As the Court previously explained in its order granting Defendants' prior motion to dismiss, if Defendants had violated a provision of the securities laws, Plaintiffs would be entitled to relief under Section 29(b). *See* ECF 52 at 13. However, a claim for such relief cannot lie where, as here, the allegations of the underlying violation fail. *Id.* Accordingly, Defendants' motion to dismiss is **GRANTED** with respect to Plaintiffs' claim for relief under Section 29. *Cf. In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1106 (N.D. Cal. 2017) (concluding that Section 29(b) claim survived dismissal where plaintiffs alleged actionable underlying securities claims).

### 5. Leave to Amend

Having dismissed Plaintiffs' federal claims, the Court must determine whether it will grant further leave to amend. The Court has "particularly broad discretion to deny leave to amend when the plaintiff has already had a chance to amend[.]" *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 623 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 559, 217 L. Ed. 2d 297 (2024) (internal quotations and citation omitted).

Plaintiffs ask that the Court grant further leave to amend, "noting that [t]he over hundred net losers in the 1inMM Ponzi Scheme greatly benefit from this matter remaining in Federal Court." ECF 59 at 36 n.3. They also point to other federal litigation[11] in which the aggregators named as defendants in those cases have agreed to settle claims asserted against them in connection with their alleged role in the Ponzi scheme. *See id.* at 9. That non-parties might benefit from remaining in federal court or that other parties have settled is not grounds for granting

---

[11] As the Court previously noted, the materials Plaintiffs offer about those cases are not subject to a pending request for judicial notice. Even if they were, however, they would not alter the Court's ruling for the reasons set forth above.

further leave to amend here.  Plaintiffs have filed three iterations of their complaint.  In each iteration, they have failed to plead a viable federal claim.  The Court finds that further amendment would be futile, and for this reason, **DENIES** further leave to amend.

### 6. State Law Claims

In addition to the federal claims discussed above, Plaintiffs also assert state law claims for violation of California Corporations Code § 25401, negligent misrepresentation, accounting malpractice, and unjust enrichment.  ECF 53 ¶¶ 177-232.  They assert 28 U.S.C. § 1367(c) as the basis for the Court's jurisdiction over those claims.  *Id.* ¶ 17.  Because Plaintiffs have failed to plead a viable claim for relief under federal law, the Court declines to exercise supplemental jurisdiction over the alleged state law claims.  *See Hussey v. Ruckus Wireless, Inc.*, 263 F. Supp. 3d 781, 788 (N.D. Cal. 2017) (citing 28 U.S.C. § 1367(c)(3)).

## IV.   CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' motion to dismiss as to the federal claims **WITHOUT LEAVE TO AMEND**.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  The Clerk is directed to enter judgment consistent with this order and close the file in this matter.

**IT IS SO ORDERED.**

Dated: September 24, 2024

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**